# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE,  MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>       *Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, and UNITED STATES OF AMERICA,<br><br>       *Defendants*. | **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE AGENCY ACTION**<br><br><br>Case No. 1:26-cv-11201<br><br><br>ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    I.    The CAR Confirms that Plaintiffs Are Likely to Succeed on the Merits ........................... 2

        A.    The CAR shows that Defendants made a predetermined decision to terminate Somalia's TPS designation before following the statutorily required steps for review and termination of a designation. ................................................................. 2

        B.    The CAR shows that Defendants failed to undertake statutorily mandated consultation with appropriate agencies. ................................................................ 5

        C.    The CAR shows that Defendants did not undertake a good faith and objective review of conditions in Somalia as the TPS statute requires. ................................ 8

        D.    The CAR shows Defendants impermissibly and improperly considered U.S. national interest. ...................................................................................................... 15

        E.    The CAR shows Defendants conducted an unconstitutionally discriminatory periodic review. ...................................................................................................... 18

    II.    The CAR Confirms that Plaintiffs Face Severe and Irreparable Harm Absent Postponement ....................................................................................................................... 19

CONCLUSION ...................................................................................................................... 20

CERTIFICATE OF SERVICE .............................................................................................. 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afr. Cmtys. Together v. Noem*,
No.1:26-cv-10278-BEM, slip op. (D. Mass. Apr. 8, 2026), *appeal docketed*,
No. 26-1376 (1st Cir. Apr. 10, 2026).......................................................................................6, 7

*Afr. Cmtys. Together v. Noem*,
No. 25-CV-13939-PBS, 2026 WL 395732 (D. Mass. Feb. 12, 2026), *appeal
docketed*, No. 26-1254 (1st Cir. Mar. 15, 2026) ...........................................................5, 7, 9, 18

*Aung Doe v. Noem*,
No. 1:25-cv-15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026), *appeal
docketed*, No. 26-1294 (7th Cir. Feb. 13, 2026) ......................................................4, 5, 6, 7, 8, 15

*Buck v. Davis*,
580 U.S. 100 (2017).......................................................................................................................18

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ........................................................................................................5

*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (1st Cir. 2002)...........................................................................................................5

*Centro Presente v. Dep't of Homeland Sec.*,
332 F. Supp. 3d 393 (D. Mass. 2018) .............................................................................................9

*Dahlia Doe v. Noem*,
No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025).............................................................................15

*Dep't of Com v. New York*,
588 U.S. 752 (2019).................................................................................................................4, 14

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................................................5

*FDA v. Wages & White Lions Investors, L.L.C.*,
604 U.S. 542 (2025)........................................................................................................................5

*Hines Immigr. L. v. EOIR*,
No. 1:26-cv-01018-CJN (D.D.C. Mar. 24, 2026)........................................................................20

*Miot v. Trump*,
  2026 WL 266413, at *22 (D.D.C. Feb. 2, 2026), *stay pending appeal denied*,
  2026 WL 659420 (D.C. Cir. Mar. 6, 2026), *cert. granted before judgment*,
  2026 WL 731087 (U.S. Mar. 16, 2026) ............................................................................7, 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29, 43 (1983) ...............................................................................................8

*Nat'l TPS All. v. Noem*,
  No. 3:25-cv-05687-TLT, 2025 WL 4058572 (N.D. Cal. Nov. 4, 2025) ...................................7

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) .............................................................................4, 8, 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...................................................................................................18

**Statutes**

5 U.S.C. § 705...........................................................................................................2, 20

8 U.S.C. § 1254a(b)(3)(A)–(B)..............................................................................2, 3, 4, 5, 6, 16

**Other Authorities**

91 Fed. Reg. 1547 (Jan. 14, 2026) ............................................................1, 4, 9, 10, 12, 13, 16, 17

Press Release, Democracy Forward, Legal Service Providers Challenge
  Discriminatory Fast-Track Policy Targeting Somali Immigrants (Mar. 24,
  2026), https://democracyforward.org/news/press-releases/legal-service-
  providers-challenge-discriminatory-fast-track-policy-targeting-somali-
  immigrants/ ..............................................................................................................20

**INTRODUCTION**

Plaintiffs' 96-page Complaint and Memorandum of Law in Support of Plaintiffs' Emergency Motion for Postponement ("Mem. in Supp.") detail evidence of the Trump Administration's xenophobic rhetoric and policies that intentionally and illegally target Somali people based on their race and national origin. Compl., ECF No. 1 ¶¶ 84–107, 316; ECF No. 3-1. Defendants' predetermined agenda to end Temporary Protected Status ("TPS") for Somalia—and other non-European countries whose nationals are predominantly non-white—infected the periodic review and ultimate termination of Somalia's TPS designation. *See* Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547 (Jan. 14, 2026) ("Notice"). The Certified Administrative Record ("CAR") contains almost 3,700 pages of reports and articles that detail dire country conditions in Somalia.[1] It reveals: (1) Defendants decided to terminate Somalia's TPS designation before taking the statutorily required steps for periodic review and termination of a designation; (2) Defendants did not consult with appropriate agencies during the review of Somalia's designation, as the TPS statute requires; (3) Defendants failed to undertake a good faith and objective review of an overwhelming amount of available and objective evidence in their possession regarding ongoing armed conflict and extraordinary conditions rendering return to Somalia unsafe for its nationals; (4) Defendants exceeded their statutory authority by considering in their review of Somalia's designation the U.S. national interest, bearing no nexus to country conditions in Somalia; and, finally, (5) Defendants were motivated, at least in

---

[1] In the CAR, Defendants produced a USCIS Decision Memo with near-total redactions, *see* ECF No. 42-1 at AR-000001–16, and Somalia TPS-specific charts and data with significant content redacted. *Id*. at AR-000278-90. Plaintiffs requested that Defendants produce the unredacted documents. The parties met and conferred on April 9, 2026. Plaintiffs requested that Defendants provide a basis for the redactions and explained their position that (1) the Decision memo is a final document that is not subject to deliberative process privilege and (2) the document has been produced in similar TPS cases, including for Haiti, Afghanistan, and Cameroon. Defendants asserted that they are not required to provide a privilege log and did not provide any basis for the redactions. Plaintiffs reserve the right to move to compel the disclosure of the redacted documents if this dispute is not resolved by the filing of Defendants' Response on April 17, 2026.

part, by intent to discriminate against Somali people based on their race and national origin, reflected by departures from statutorily required procedures and their reliance on racial stereotypes to target the Somali community in Minnesota.

Accordingly, the CAR shows that Plaintiffs are likely to succeed on the merits of their claims that the procedurally deficient periodic review process underlying the termination of Somalia's TPS designation ("Termination") violated the Administrative Procedure Act ("APA"), including by violating constitutional equal protection guarantees. The CAR's voluminous, objective evidence of ongoing armed conflict and other extraordinary conditions in Somalia demonstrates the severe and irreparable harm that Plaintiffs and other beneficiaries of Somalia's TPS designation would face if the Termination were to take immediate effect during the pendency of this lawsuit. Plaintiffs respectfully submit that postponement of the Termination is appropriate under Section 705 of the APA.

## ARGUMENT

### I.    The CAR Confirms that Plaintiffs Are Likely to Succeed on the Merits

The CAR shows conclusively that the U.S. Secretary of Homeland Security ("Secretary") conducted the periodic review of Somalia's TPS designation without complying with the mandates of the TPS statute, the APA, and the U.S. Constitution.

**A.  The CAR shows that Defendants made a predetermined decision to terminate Somalia's TPS designation before following the statutorily required steps for review and termination of a TPS designation.**

Documents in the CAR show that Defendants decided to terminate Somalia's TPS designation on **November 5, 2025**, prior to undertaking the procedural steps and checks the TPS statute requires. ECF No. 42-1 at AR-000286; *see also* 8 U.S.C. § 1254a(b)(3)(A)–(B). The TPS statute mandates a clear sequence for periodic review and termination of a country's TPS designation. The Secretary's first step is "consultation with appropriate agencies of the

2

Government." 8 U.S.C. § 1254a(b)(3)(A). Next, "after consultation," the Secretary "shall review the conditions in the foreign state and shall determine whether the conditions for" TPS designation continue to be met. *Id.* If the Secretary determines that the conditions for designation are no longer met, the Secretary "shall terminate the designation by publishing the notice in the Federal Register of the determination . . . (including the basis for the determination)." *Id.* § 1254a(b)(3)(B).

The timeline in the CAR is irrefutable. On **November 4, 2025,** at 12:04 PM, the Department of Homeland Security ("DHS") reached out to the Department of State for "memorialization" of the Department's position on a change in Somalia's TPS designation. ECF No. 42-2 at AR-000733. The State Department responded that day at 9:54 PM to "confirm" it "does not have foreign policy objections to a change in TPS for Somalia." *Id.* These communications fail to meet the statutory consultation requirement, *see infra* Section I(B), but, even if they did, a Memorandum from Defendant DHS identifies the very next day, **November 5, 2025**, as the "estimated start date" for "Termination of the Designation of Somalia for Temporary Protected Status." ECF No. 42-1 at AR-000286. There is no evidence in the CAR that Defendants sought further input or undertook any review "of the conditions in the foreign state," as the TPS statute requires, between 9:54 PM on November 4 and the November 5 start-date DHS identified for termination of Somalia's TPS designation. *See id*; 8 U.S.C. § 1254a(b)(3)(A). Indeed, both the "Country of Origin Information Considerations Report, Somalia" and the Policy Considerations Report that served as attachments to the Secretary's Decision Memorandum did not complete reporting on relevant country conditions until **November 17, 2025**, almost two weeks after DHS indicated the termination of Somalia's TPS designation was already operational. ECF No. 42-1 at AR-000016, AR-000019, AR-000041.

3

The CAR reveals that Defendants made the decision to terminate Somalia's TPS designation before completing the necessary procedural steps required by the TPS statute. The record refutes that the Termination turned on review of conditions in Somalia—which the statute requires from the Secretary to assess whether the conditions for TPS designation continue to be met—because Defendants had not undertaken such a review by November 5. *See id.* at AR-000286; 8 U.S.C. § 1254a(b)(3)(A). The CAR also refutes assertions in the Notice that the Secretary "reviewed country conditions in Somalia and considered whether Somalia continue[d] to meet the conditions for the designation under" the TPS statute. 91 Fed. Reg. at 1548. Thus, the pretextual rationales in the Notice are not "the true and factual basis for termination," *Saget v. Trump*, 375 F. Supp. 3d 280, 346–47 (E.D.N.Y. 2019), and the CAR fails to support a "genuine basis for the Secretary's action." *Aung Doe v. Noem* ("*Aung Doe*"), No. 1:25-cv-15483, 2026 WL 184544, at *20 (N.D. Ill. Jan. 23, 2026), *appeal docketed*, No. 26-1294 (7th Cir. Feb. 13, 2026) (finding likelihood of success on the arbitrary and capricious claim for termination of Burma's TPS designation when it was "more likely that the decision to terminate TPS was not actually rooted in the reasons cited in the notice"); *see also* Mem. in Supp., ECF No. 3-1 at 8. Instead, a preordained outcome drove Defendants' procedurally flawed review: eliminating TPS for Somalia as part of the "Secretary's broader goal of curtailing immigration and eliminating TPS generally." *Aung Doe*, 2026 WL 184544, at *20. Defendants' failure to "offer genuine justifications" for their decisions, *see Department of Commerce v. New York*, 588 U.S. 752, 785 (2019), or to publish in the Notice "the true and factual basis for termination," *see Saget*, 375 F. Supp. 3d at 346–67, makes their review and ultimate termination of Somalia's TPS designation unlawful under the TPS statute and the APA.

4

**B. The CAR shows that Defendants failed to undertake statutorily mandated consultation with appropriate agencies.**

The CAR demonstrates that Defendants failed to "consult[] with appropriate agencies of the Government" as the TPS statute requires. 8 U.S.C. § 1254a(b)(3)(A). "[C]onsultation" involves "asking the advice or opinion of someone," *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) (quoting *Black's Law Dictionary* (7th ed. 1999)), and "a meaningful exchange of information." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086 (9th Cir. 2011). The consultation mandate involves "deliberation," which requires "weighing and examining the reasons for and against a contemplated act or course of conduct." *Afr. Cmtys. Together v. Noem*, No. 25-CV-13939-PBS, 2026 WL 395732, at *11 (D. Mass. Feb. 12, 2026) [hereinafter "*ACT I*"], *appeal docketed*, No. 26-1254 (1st Cir. Mar. 15, 2026) (citation modified). Consultation also requires "reciprocal communication of some substance" and is "not satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Aung Doe*, 2026 WL 184544, at *13. While "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *FDA v. Wages & White Lions Investors, L.L.C.*, 604 U.S. 542, 568 (2025) (citation modified), generally, "[a]n agency may not . . . depart from a prior policy *sub silentio*," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

There is *no* evidence in the CAR that DHS consulted the State Department—or any other appropriate agency—regarding country conditions in Somalia as the TPS statute requires. This violates the APA for multiple reasons.

*First*, the sole interagency communication in the CAR fails to meet the statutory consultation requirement. *See* Mem. in Supp. at 11–12. The CAR contains *one* communication between DHS and another agency: a single email from DHS to the State Department on November 4, 2025 and the State Department's response. ECF No. 42-2 at AR-000733. A DHS Under Secretary emailed

a State Department Senior Bureau Official to say the DHS Secretary "is required to make a decision on TPS Somalia" by January 16, 2026. The DHS Under Secretary sought "to put this on [the State Department's] radar for the consultation with State Department and the memorialization of the consultation for inclusion in the decision memo." *Id.* Less than ten hours later, the State Department Senior Bureau Official emailed back to "confirm that State does not have foreign policy objections to a change in TPS for Somalia." *Id.*

"Under any reasonable interpretation of the word 'consultation,' this email exchange plainly is inadequate." *See Afr. Cmtys. Together v. Noem*, No.1:26-cv-10278-BEM, slip op. at 17 (D. Mass. Apr. 8, 2026) [hereinafter "*ACT II*"] (granting motion to postpone termination of Ethiopia's TPS designation), *appeal docketed*, No. 26-1376 (1st Cir. Apr. 10, 2026). Despite the textual references to "consultation," the emails lack any "meaningful exchange of information," or requests for "advice," "opinion," or "deliberation" between DHS and the State Department. The State Department's brief confirmation regarding *foreign policy concerns* does not constitute a consultation because it fails to speak to the only relevant considerations for periodic review under the TPS statute, namely whether the "conditions [in Somalia for its TPS designation] . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The emails fail to offer anything of substance to the review process and instead seek only a rubber stamping of the Secretary's decision, in violation of the statutory requirements. ECF No. 42-2 at AR-000733; *see also Aung Doe*, 2026 WL 184544, at *13.

Courts have rejected similar cursory and perfunctory emails as evidence of statutorily required consultation within TPS periodic reviews. For example, in *Miot v. Trump*, the court underscored the importance of Congress's consultation requirement in the TPS statute, noting the three times it appears and calling it "an integral mechanism to ensure the DHS Secretary

understands country conditions before acting." No. 25-cv-02471 (ACR), 2026 WL 266413, at *22 (D.D.C. Feb. 2, 2026) [hereinafter *Miot I*], *stay pending appeal denied*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026), *cert. granted before judgment*, 2026 WL 731087 (U.S. Mar. 16, 2026) (mem.) [hereinafter *Miot II*]. The *Miot I* court concluded that a one-sentence email from the State Department relating only to foreign policy concerns and lacking any information on country conditions, similar to the brief communication here, did not satisfy the consultation requirement. *Id.*; *see also Aung Doe*, 2026 WL 184544, at *14 (finding emails that lacked any substantive exchange of information relating to individual country conditions failed to meet consultation requirement); *ACT I*, 2026 WL 395732, at *12 (finding single email chain about foreign policy concerns, rather than country conditions, inadequate consultation); *ACT II*, slip op. at 17 (similar).

*Second*, the CAR lacks a country-conditions report from the State Department. This is a sharp break from the agency practice of soliciting and reviewing the State Department's country-conditions reports as part of TPS periodic reviews. Mem. in Supp. at 9; *See* Ex. 9, ECF No. 5-4 at 15–28 (laying out DHS and State Department's normal periodic review process). The sharp break aligns with existing evidence from similar cases related to Nepal, Honduras, and Nicaragua, revealing that DHS stopped receiving country conditions information from the State Department within TPS periodic reviews in or around March 2025. *See, e.g.*, *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT, 2025 WL 4058572, at *5 (N.D. Cal. Nov. 4, 2025);[2] *compare* Ex. 9, ECF No. 5-4 (GAO Report), *with* Exs. 113–116, ECF No. 6-33–6-36. The Notice failed to explain this abrupt departure from agency practice, making it arbitrary and capricious in violation of the APA.

---

[2] *See* Ex. 114, ECF No. 6-34 at 1504_0002–03 (April 8, 2025, email exchanges involving DHS personnel and noting that: "Mirna just confirmed the [Department of State] process" . . . "[Department of State] is no longer providing country conditions"); Ex. 116, ECF No. 6-36 at 2342 (March 21, 2025, email exchange involving DHS personnel and remarking that "State will no longer submit detailed COI [] reports for TPS decision-making"); *see also Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT, 2025 WL 4058572, at *5 (N.D. Cal. Nov. 4, 2025); Exs. in Supp. of Pls.' Mot. for Summ. J., ECF No. 176-27 at 1525 (March 11, 2025, email exchange involving DHS personnel and remarking that for TPS periodic reviews Department of State personnel "are going to provide a letter instead of country conditions").

*Lastly*, the CAR provides further support that Defendants' failure to meet statutory consultation requirements indicates preordained and pretextual action. The lack of back-and-forth between DHS and the State Department and the State Department's confirmatory response suggest it was a "foregone conclusion" that the Secretary would change Somalia's TPS designation, and "a logical assumption based on the Secretary's recent practice of terminating each TPS designation up for review." *Aung Doe*, 2026 WL 184544, at *14; *see also* Mem. in Supp. at 15. Defendants' failure to meet the TPS statute's consultation requirement was contrary to law and reflects a preordained decision that rendered the rationales of the Notice pretextual and arbitrary and capricious, all of which violates the APA.

### C. The CAR shows that Defendants did not undertake a good faith and objective review of conditions in Somalia as the TPS statute requires.

In analyzing the Notice on its face, Plaintiffs noted its contents reflect a pretextual and selective review of conditions in Somalia that "runs counter to the evidence" before the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); Mem. in Supp. at 12. The CAR further bears this out, plainly showing that Defendants' periodic review of Somalia's TPS designation was not undertaken in "good faith," and "regardless of … political motives" as the TPS statute requires. *Saget*, 375 F. Supp. 3d at 346. Instead, the Notice reflects "sham or pretextual justifications" as the basis for the decision. *Id.*

Given the clear evidence in the CAR, the Notice either: (1) failed to explain exclusion of evidence comparable to evidence that past periodic reviews of Somalia's TPS designation had addressed or (2) cherry-picked evidence of supposed "improvements" in country conditions to justify the bases for the termination. *See* Mem. in Supp. at 10–11. Departing from past practice to narrow the scope of reviewable country conditions without rationale or justification likely violates the APA and is "highly suggestive of a pretextual decision." *Saget*, 375 F. Supp. 3d at 349 (finding

defendants' departure from past practice of considering all country conditions suggested a pretextual decision to terminate Haiti's TPS designation); *Centro Presente v. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 413 (D. Mass. 2018) (finding plausible APA violations based on DHS's unexplained change in protocol, by which it had narrowed scope of reviewable country conditions).

Likewise, "cherry-picked positive data" that is "sharply at odds with the country conditions described in the administrative record" creates a "disconnect" between the Notice and the record that is "further evidence of pretext." *ACT I*, 2026 WL 395732, at *10. The breaks from procedure evident in the CAR reflect both an unexplained shift in interpretation of the TPS statute and a failure to undertake the statutorily-required good faith and objective review of conditions in Somalia, both of which violate the APA. *See* Mem. in Supp. at 7–8, 12–14.

> 1. *The CAR shows Defendants did not undertake a good faith objective review of available evidence of ongoing armed conflict.*

The differences between the contents of the CAR, the Notice, and prior Secretaries' periodic reviews of Somalia's TPS designation reflect that, here, the Secretary did not undertake a good faith review of conditions relevant to the armed-conflict basis for Somalia's TPS designation. The CAR includes evidence from DHS itself and other Executive Branch sources of ongoing armed conflict in Somalia, in connection with state security forces and armed non-state actors. *See, e.g.*, ECF No. 42-1 at AR-000024–29, AR-000044, AR-00606–07, AR-000672–74. The Notice does not address these portions of the CAR and does not explain why, despite prior Secretaries addressing comparable evidence of violence by non-state actors in their reviews of the armed-conflict basis for Somalia's TPS designation. *Compare* 91 Fed. Reg. at 1549, *with* ECF No. 42-1 at AR-000097–98 (2024 extension and redesignation of Somalia for TPS), AR-000088 (2023 extension and redesignation of Somalia for TPS), AR-000072–73 (2021 notice).

For example, the CAR contains a DHS report covering country conditions in Somalia from September 2024 to November 2025, acknowledging that "armed conflict continues to affect the population of Somalia [and] Somali authorities continue to face substantial challenges to securing and stabilizing the state." *Id.* at AR-000044. The Notice does not address this content and does not explain why; instead, it cherry picks other content from the DHS report that "[Somalia] has transitioned from a failed state to a fragile state." 91 Fed. Reg. at 1549 (cleaned up). The same report specifies that "security remains fragile" but the Notice does not address how a fragile security situation would not pose a threat to Somali nationals' safe return. ECF No. 42-1 at AR-000019. The DHS report notes "Somalia faces numerous challenges, including security threats from armed non-state actors and/or terrorist organizations such as al-Shabaab, Islamic State-Somalia, and clan militias, as well as violence involving state security forces." *Id.* at AR-000024. Indeed, multiple reports in the CAR describe Somalia's emergence as the new hub of ISIS resulting in U.S. strikes targeting ISIS's Somalia-based leadership. *See, e.g.*, ECF No. 42-2 at AR-000498–601, AR-000602–04, AR-000610–11. However, the Notice selectively includes only "political improvements and advances against Al-Shabaab," 91 Fed. Reg. at 1549 —without addressing their sufficiency to obviate the "significant risk" of Al-Shabaab and the interclan conflicts the agency had previously found relevant to the armed-conflict basis for Somalia's designation. ECF 42-1 at AR-000072 (2021 notice); *see also id.* at AR-000097–98 (2024 notice noting an increase in Al-Shabaab's activities and their clashes with the local Islamic State faction); *id.* at AR-000088 (2023 notice detailing Al-Shabaab's well-organized and well-funded control over parts of Somalia). The CAR also includes the State Department's Level 4 travel advisory that warns: "[d]o not travel to Somalia due to crime, terrorism, civil unrest, health, kidnapping, piracy, and lack of availability of

routine consular services," ECF No. 42-2 at AR-000685. The Notice fails to explain why the advisory is consistent with safe return for Somali nationals. *See* Mem. in Supp. at 13.

Moreover, prior periodic reviews of the armed-conflict basis for Somalia's TPS designation relied on evidence of the harsh impact of violence on civilians, including casualties and human rights abuses. *See, e.g.*, ECF 42-1 at AR-000097 (2024 notice indicating 1,300 civilian casualties over nine months), AR-000088 (2023 notice including information about Al-Shabaab's attacks on civilians and killing of prominent peace activists and community leaders, among others). The CAR is replete with sources that report human rights violations, including thousands of civilian casualties, that all stem from the continued armed conflict. *See, e.g.*, ECF No. 43-2 at AR-000843 ("Clan conflicts in Somalia are escalating as a result of disputes over land, water, and political power, displacing over 250,000 people and killing more than 600 between January 2024 and February 2025."); ECF No. 42-9 at AR-001739 (describing "devastating toll" of armed conflict on civilian population); ECF No. 42-11 at AR-002485 (noting "806 [security] incidents aimed at civilians, in which there were 852 fatalities" over 20 month period, and that "Somali security forces regularly committed human rights violations, both within and outside conflict zones"); *id.* at AR-002493 (documenting 2024 terrorist attacks on civilians in Mogadishu). The Notice fails to explain why it does not address such evidence, although prior Secretaries had considered comparable evidence.

Prior periodic reviews considered many factors related to ongoing instability and insecurity in Somalia that the CAR also supports. *See, e.g.*, ECF 42-1 at AR-000097–98 (2024 review addressed Al-Shabaab's increased attacks, Islamic State-Somalia attacks in Puntland, and continued clan violence), AR-000088 (2023 review noting Al-Shabaab conducts terrorist attacks "across the country"), AR-000072 (2021 review detailing Al-Shabaab's military capacity

11

throughout the country and widespread interclan conflict). For example, a DHS report in the CAR details how security in Somalia remains "fragile" due to conflict throughout the country, while Islamic State-Somalia, operating out of Puntland, "destabili[zes] the country by conducting terrorist attacks, engaging in territorial battles with al-Shabaab, and carrying out assassinations." ECF No. 42-1 at AR-000021, AR-000027. The same report identifies instances of clan conflict and high rates of human smuggling and trafficking in Somaliland "facilitated by organized criminal groups and armed factions like al-Shabaab, as well as corrupt state officials." *Id.* at AR-000023, AR-000029, AR-000044. Other reports in the CAR, including one from 2025, confirm "indiscriminate and widespread forms of targeting across the country, rising levels of clan conflicts, and other layers of conflict . . . that have contributed to ongoing sources of insecurity in the country." ECF No. 42-9 at AR-001499.

The Notice's unexplained failures to address these reports stands in stark contrast with how it cherry-picks information regarding areas of Somalia it alleged permitted safe return. *See* Mem. in Supp. at 12–13; 91 Fed. Reg. at 1549. Failure to explain why the agency did not consider information in the CAR comparable to information it considered during prior periodic reviews reflects a failure to conduct the statutorily mandated, good faith review of relevant conditions and is also arbitrary and capricious in violation of the APA. *See* Mem. in Supp. at 11–12.

### 2. The CAR shows Defendants did not undertake a good faith objective review of available evidence of extraordinary circumstances.

Similarly, the CAR confirms Defendants cherry-picked indicia of minor positive developments related to extraordinary circumstances in Somalia while ignoring objective and available evidence comparable to that considered in prior periodic reviews, including from other Executive Branch sources. Mem. in Supp. at 12–14.

The Notice considers just three sources for review of Somalia's extraordinary circumstances designation: a World Bank overview highlighting Somalia's economic progress and two news articles about a construction boom centered only on the Somali capital, Mogadishu. 91 Fed. Reg. at 1549–50. The Notice employs a selective reading of all three sources while failing to explain why contradictory evidence is irrelevant or insignificant. For example, while acknowledging some progress in Somalia, ECF No. 42-14 at AR-003540, the World Bank overview notes "[t]he overarching goal . . . is to continue to assist Somalia in building a more stable, visible, and legitimate state . . . and building resilience, with a view to restoring the social contract and *enabling Somalia's emergence from fragility, conflict, and violence*," which speaks to current danger that challenges the limited description of progress. ECF No. 42-14 at AR-003529 (emphasis added). Similarly, one of the articles that the Notice cites as proof of Somalia's building "boom" also notes that "[a]lmost 70 percent of Somalia's population is defined as 'multidimensionally poor' . . . tracking  education,  health,  living  standards,  services  and  inclusion," indicating Defendants focused on a single improvement and excluded conflicting evidence from the same source. ECF No. 42-4 at AR-000999. Defendants may not rely solely on references to speculative "future improvement" without justification because the "TPS statute requires periodic review, which focuses the inquiry on present conditions rather than future change." *Miot I*, 2026 WL 266413, at *13 (finding the Secretary's decision to terminate Haiti's TPS designation was likely arbitrary and capricious for failing to "explain why speculative future improvement outweighed overwhelming evidence of present danger").

The  scant  and  selective  considerations  in  the  Notice  stand  in  stark  contrast  with extraordinary conditions that prior reviews addressed, such as barriers to humanitarian assistance and access, environmental dangers, health and food insecurity, and high rates of violence against

women and girls. *See, e.g.*, ECF No. 42-1 at AR-000098–103 (2024 review detailing evidence of particular risks to women and girls, climate change impacts from droughts and floods, and disease outbreaks); *see also id.* at 000072–73 (2021 review describing serious abuses against children, widespread drought conditions, and acute food insecurity hotspots). Defendants fail to explain why this evidence is not germane to the current periodic review, a shift that runs counter to the text and legislative purpose of TPS. *See* Mem. in Supp., ECF No. 3-1 at 10.

As with the armed conflict designation, Defendants also fail to explain the exclusion of crucial Executive-Branch sources of evidence that speak to these circumstances. For example, a DHS report notes that "armed barriers" arising from internal violent conflict "severely curtail civilian travel," impeding humanitarian agencies' ability to deliver lifesaving assistance and leaving many communities isolated and without reliable access to aid or essential services. ECF No. 42-1 at AR-000037. It discusses current prolonged drought and flooding conditions in Somalia, high food prices, and "crisis-levels of hunger as of early 2025." *Id*. at AR-000020. Somalia's healthcare system is described as "among the most fragile globally," *id*. at AR-000030, with a high burden of infectious diseases and poor access to clean water and sanitation, *id*. at AR-000031. Although Defendants have addressed comparable data points concerning extraordinary conditions within prior periodic reviews of Somalia's TPS designation, the Notice failed to explain the exclusion of that evidence here.

The resulting "disconnect" between the decision to terminate Somalia's TPS designation and the explanations given in the Notice means the Secretary has failed to provide "genuine justifications for important decisions" as the APA requires. *Dep't of Com.*, 588 U.S. at 785. Accordingly, the Secretary's review was arbitrary and capricious and contrary to law under the APA. *See* Mem. in Supp. at 12–14. Moreover, considered in the context of Defendants' wider

conduct in terminating TPS designations for every country up for periodic review, the failure to consider the objective evidence in the record, including evidence comparable to evidence considered in prior periodic reviews, suggests that the Secretary "did not review the evidence regarding any of these countries . . . as required by the TPS statute," further supporting a finding that the Secretary made a preordained and pretextual decision that violates the APA. *Aung Doe*, 2026 WL 184544, at *16, 20–21.

### D. The CAR shows Defendants impermissibly and improperly considered U.S. national interest.

The CAR demonstrates that Defendants improperly considered the domestic national interest as central to the periodic review of Somalia's TPS designation. "[N]ational interest divorced from an analysis of country conditions . . . is not appropriately considered in the periodic review or termination inquiries" under the TPS statute. Oral Ruling Tr. at 19, 21, *Dahlia Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025), ECF No. 59 (granting motion to postpone termination of Syria's TPS designation based in part on Secretary's "heavy-handed reliance on the national interest divorced from country conditions"); *see also* Mem. in Supp. at 14–15. Reliance on the national interest is also an unexplained deviation from past policy; no termination of TPS prior to 2025 rested on domestic national interest in this way. Mem. in Supp. at 15; *Aung Doe*, 2026 WL 184544, at *18 (holding Plaintiffs were likely to succeed on their claim that the Secretary's reliance on national interest in her termination notices was arbitrary and capricious because it deviated from past policy without explanation). Here, the CAR's evidence of Defendants' similarly heavy-handed reliance on the domestic national interest further supports that their procedurally flawed review was arbitrary and capricious in violation of the APA.

As Plaintiffs argued in their Memo in Support at 14–15, the Notice reflects the periodic review's finding that the continued presence of Somali TPS beneficiaries in the U.S. is contrary to

15

the U.S. "national interest." This finding is divorced from the country conditions in Somalia, the sole statutory basis for periodic review. 91 Fed. Reg. at 1550; 8 U.S.C. § 1254a(b)(3)(A). The CAR confirms that impermissible U.S. national interest factors, including visa overstay rates and allegations of public safety, fraud, or misrepresentation against individuals in the U.S., played a role. *See, e.g.*, ECF No. 42-1 at AR-000205–68 (analyzing visa overstay rates for student, business, or pleasure visas), AR-000277–78 (analyzing allegations of public safety, fraud, or misrepresentation against individuals associated with TPS), AR-000282–85 (analyzing data on Somali nationals who applied for non-immigrant visas). The State Department's single email noted only U.S. "foreign policy objections" regarding Somalia's TPS designation, evincing an exclusive focus on the U.S. national interest rather than relevant country conditions. ECF No. 42-2 at AR-000733.

Further, the CAR demonstrates that reliance on public safety or fraud as a basis for evaluation of Somalia's TPS designation is not supported by Defendants' own evidence. The Notice specifies that the Secretary "took account of" the cases of TPS beneficiaries or applicants who have been the subject of investigations for fraud, public safety, and national security. 91 Fed. Reg. at 1551. However, the CAR reveals that the Notice mischaracterizes this data, which relates only to a broad category of "Somali TPS filers" and not TPS *beneficiaries* who undergo rigorous vetting and are otherwise subject to strict criteria for maintaining ongoing eligibility for TPS. Compl., ECF No. 1 ¶ 298. The same document also notes that "a TECS[3] hit does not always lead to a derogatory finding or a negative adjudicative outcome," suggesting no negative assumptions should be drawn from such data, a fact the Notice fails to account for. ECF No. 42-1 at AR-000277. Moreover, the

---

[3] The document also describes TECS as "an information-sharing platform which can assist authorized users to access different databases to identify individuals who pose a risk to national security or public safety, and individuals attempting to obtain immigration benefits through fraud or misrepresentation." ECF No. 42-1 at AR-000277.

CAR shows that out of the more than 2000 Somali TPS cases, 4 fraud records and 3 public safety record determinations were found, representing less than one percent of cases. *Id*. at AR-000290. Manipulation of the facts in the record are "highly suggestive" of a pretextual decision. *Saget*, 375 F. Supp. 3d at 349 (noting that "glaring editorial decisions" in the termination notice compared to the administrative record are further evidence that the Secretary "sidestepped the review process required by TPS statute").

The Notice and CAR evidence rely heavily on isolated cases in Minnesota, where the largest population of Somalis in the United States is based, concluding they provide "compelling foreign policy reasons for ending the [TPS] designation for Somalia." 91 Fed. Reg. at 1552; *see, e.g.*, ECF No. 42-1 at AR-000269–70, AR-000616–18, AR-000661. Defendants do not provide an explanation for how or why these incidents have any nexus to the question of whether conditions *in Somalia* allow for the safe return of Somali nationals. Reliance on such flawed factual assertions demonstrates that the Notice does not provide a "true and factual basis" for the Termination as required by the TPS statute and the APA. *Saget*, 375 F. Supp. 3d at 346–347.

Prior to 2025, no TPS termination decision rested on the U.S. national interest. Since then, the Secretary has invoked a "contrary to national interest" rationale to justify the termination of every single TPS designation based on the extraordinary circumstances ground in the statute—impacting, so far, designations for Somalia, South Sudan, Ethiopia, Cameroon, Haiti, Burma, Afghanistan, Syria, and Venezuela. Compl., ECF No. 1 ¶ 172 & n.162. In every instance, the Secretary has failed to explain the shift in agency practice as required by the APA. Moreover, the CAR's evidence of the Secretary's reliance on U.S. domestic interest, which uses "the exact same language alleging fraud, public safety, and national security concerns" the Secretary used in terminating TPS for other countries, suggests a "'practice or procedure' of using stock language

17

in the Federal Register notices regardless of USCIS's actual findings" about country conditions. *ACT I*, 2026 WL 395732, at \*10. The CAR provides uncontroverted proof that Defendants relied on the U.S. national interest in its periodic review of Somalia's TPS designation representing both a violation of the TPS statute and an unexplained departure from past agency practice that is arbitrary and capricious in violation of the APA.

### E.   The CAR shows Defendants conducted an unconstitutionally discriminatory periodic review.

The CAR supports Plaintiffs' arguments that Defendants' flawed periodic review process was also motivated, at least in part, by intent to discriminate against Somali people based on their race and national origin, in violation of the equal protection component of the Fifth Amendment's Due Process Clause. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *see also* Mem. in Supp. at 16–19. Multiple factors support a finding of Defendants' discriminatory motives including Defendants' explicitly racial and nationality-based statements that expressed intent to expel Somali people from the U.S made leading up to and contemporaneous with the periodic review of Somalia's TPS designation, *see* Mem. in Supp. at 16–19; Compl., ECF No. 1 ¶¶ 84–107; the unlawful sequence of events leading to the Termination, *see supra* Section I(A); and substantive procedural departures from the TPS statute, *see supra* Sections I(B)–(D). *See Vill. of Arlington Heights*, 429 U.S. at 266. In addition, Defendants' selective inclusion in the CAR of articles focused on Minnesota to spotlight crimes and bad acts suggest that discrimination based on race and national origin infected the periodic review. Mem. in Supp. at 16–19. The CAR shows that, rather than being based in any truth, Defendants' intentional curation of the record to rely on such materials was based in part on "appeal[s] to a powerful racial stereotype" of Black people as crime and "violence prone." *Buck v. Davis*, 580 U.S. 100, 121 (2017). This forms part of Defendants' broader intentionally discriminatory and

18

politically-driven motive to end TPS for all non-European countries whose nationals are predominantly non-white. The CAR provides further evidence that Plaintiffs are likely to succeed on the merits of their equal protection claims. *See also* Mem. in Supp. at 16–19.

## II.    The CAR Confirms that Plaintiffs Face Severe and Irreparable Harm Absent Postponement

The CAR confirms that Plaintiffs and other Somali TPS holders and applicants would face irreparable harm if the Court does not postpone termination of Somalia's TPS designation. *See* Mem. in Supp. at 19–20. For example, the State Department's May 2025 Level 4 Travel Advisory advises individuals "not travel to Somalia," in part because "violence and explosive attacks can happen anywhere in Somalia, at any time." ECF No. 42-2 at AR-000685–86. DHS's country conditions report also warns that Somalis returning home face "persistent challenges . . . including a lack of resources, limited access to basic services, repeating cycles of violence and food insecurity." ECF No. 42-1 at AR-000035. There are also "heightened health risks." *Id.* The report identifies challenges to return, concluding with "in 2025, over 47% of Somalia's population is affected by a combination of 'conflict, floods, drought, disease outbreaks and displacement, causing humanitarian needs, and almost six million people are projected to need urgent humanitarian assistance and protection in Somalia as of January 2025.'" *Id*. at AR-000035–36. In addition to recognition of the "fragile" security situation, *id.* at AR-000019, the CAR confirms DHS described "Somalia as a terrorist safe haven." *Id*. at AR-000282. Al-Shabaab remains a threat and the "Islamic State-Somalia has grown in strength and international linkages, making it a significant driver of instability and a major concern in the region." *Id*. at AR-000028.

These conditions demonstrate the risk of grave and even deadly harms that Plaintiffs and other Somali TPS holders and applicants face upon return to Somalia. If the Termination takes immediate effect, it provides no comfort that they may be able to raise limited defenses if DHS

undertakes enforcement actions against them. *See* Compl., ECF No. 1 ¶¶ 135, 136, 139, 228–30; Mem. in Supp. at 19–20. These harms are compounded by the fact that Defendants are aggressively targeting Somali community members for immigration enforcement and accelerating immigration proceedings for Somali nationals under a Somali Fast-Track Policy,[4] compromising fair procedures and Somalis' access to attorneys.

Allowing the Termination to take immediate effect would cause irreparable harm to Plaintiffs, other Somali TPS holders and applicants, and their loved ones. *See* Mem. in Supp. at 19–20.

## CONCLUSION

For these reasons, the Court should exercise its authority under 5 U.S.C. § 705 to postpone the effective date of Somalia's termination pending the conclusion of this case on the merits.

---

[4] Press Release, Democracy Forward, Legal Service Providers Challenge Discriminatory Fast-Track Policy Targeting Somali Immigrants (Mar. 24, 2026), https://democracyforward.org/news/press-releases/legal-service-providers-challenge-discriminatory-fast-track-policy-targeting-somali-immigrants/; Compl., *Hines Immigr. L. v. EOIR*, No. 1:26-cv-01018-CJN (D.D.C. Mar. 24, 2026), ECF No. 1.

Dated: April 10, 2026

Respectfully submitted,

*/s/ Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Golnaz Fakhimi*
Sadaf Hasan*
Collin Poirot*
Abbey Rutherford*
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew*
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/ Kacey Mordecai*
Kacey Mordecai*
Mide Odunsi*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W. Suite 600
Washington, D.C. 20005
(202) 682-1300
kmordecai@naacpldf.org
modunsi@naacpldf.org

Ashley Burrell (*pro hac vice* forthcoming)
Lauren Carbajal*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(202) 965-2200
aburrell@naacpldf.org
lcarbajal@naacpldf.org

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2026, this brief will be sent electronically through this Court's CM/ECF system to all registered parties.

/s/ *Kacey Mordecai*
Kacey Mordecai
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.

22