**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **FIRST AMENDED COMPLAINT**<br><br>Civil Action No. 1:26-cv-11201-ADB<br><br>Pursuant to L.R. 5.1(c), Plaintiffs request **emergency relief** against agency action that was scheduled to take effect at **11:59 p.m. on March 17, 2026**. |

**INTRODUCTION**

1.      On November 21, 2025, President Trump posted on the social media website Truth Social that he was terminating Temporary Protected Status ("TPS") for Somalis in Minnesota, "effective immediately," and announced his intention to "[s]end them back to where they came from."[1] Referencing an ongoing Department of Justice investigation into a Minnesota-based fraud scheme predicated on misleading allegations,[2] President Trump claimed that "Somali gangs" were "terrorizing" Minnesotans.[3]

2.      Since then, President Trump has smeared the Somali community publicly, categorically, and repeatedly. He has called Somali people "garbage"[4] and "low IQ people"[5] who "contribute nothing."[6] He has stated that "their country stinks,"[7] is "[f]ilthy, dirty, disgusting, ridden with crime,"[8] "do[es]n't have anything" aside from "murder and robbing ships, bringing in

---

[1] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[2] Chabeli Carrazana, *Here's what's really happening with child care fraud in Minnesota*, MinnPost (Jan. 12, 2026), https://www.minnpost.com/other-nonprofit-media/2026/01/heres-whats-really-happening-with-child-care-fraud-in-minnesota-explained/

[3] Donald J. Trump (@realDonaldTrump), *supra* note 1.

[4] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call (Dec. 2, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/ (at 02:16:33–02:16:55).

[5] TRANSCRIPT: *President Trump Delivers an Address at the World Economic Forum in Davos, 1.21.26* (Jan. 21, 2026), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-delivers-an-address-at-the-world-economic-forum-in-davos-12126 (at 01:06:23-01:06:50).

[6] Associated Press, *Trump Says He Doesn't Want Somalis in the U.S., Urges Them to Go Back to Their Homeland and Fix It*, NPR (Dec. 2, 2025), https://www.npr.org/2025/12/02/nx-s1-5629305/trump-says-he-doesnt-want-somalis-in-the-u-s-urges-them-to-go-back-to-their-homeland-and-fix-it.

[7] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, *supra* note 4 (at 02:16:17–02:16:33).

[8] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC News (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166; *see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call (Dec. 9, (continued…)

ships, pirates,"[9] and is "one of the absolutely worst countries in the World."[10] And he has said point blank: "I don't want [Somali people] in our country."[11]

3.    The purported official termination of Somalia's TPS designation was made by then-DHS Secretary Kristi Noem through a notice in the Federal Register[12] ("Termination") and was issued less than two months after President Trump's November 21, 2025, social media announcement. The Termination contravened the clear procedural requirements of the TPS statute by ignoring statutory requirements and relying on selective and discriminatory facts to justify the termination of Somalia's TPS designation. President Trump's initial post and the Secretary's purported termination notice reflect a desire to target and punish Somali nationals based on their race and national origin in violation of the U.S. Constitution and the Administrative Procedures Act ("APA").

4.    Somalia is currently facing a humanitarian crisis with roots that stretch back decades. In recognition of ongoing armed conflict and other extraordinary conditions threatening the safety of Somali nationals, the United States government designated Somalia for TPS in 1991.

5.    TPS is a Congressionally authorized, humanitarian program that protects eligible individuals from immigration detention and forcible return to countries designated unsafe due to dire conditions such as armed conflict, natural disaster, or other extraordinary circumstances.

---

2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/ (at 01:23:25–01:23:51).

[9] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, Roll Call (Jan. 13, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-detroit-economic-club-january-13-2026/#99 (at 00:57:44–00:58:07).

[10] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, at 10:43 PM), https://truthsocial.com/@realDonaldTrump/posts/115919697262007872.

[11] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, *supra* note 4 (at 02:16:17–02:16:55).

[12] 91 Fed. Reg. at 1,54753.

3

8 U.S.C. § 1254a. It provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is not safe for them to return to their countries of origin.

6.     The United States government has repeatedly designated and/or extended TPS for Somalia over the past three decades. Since 2002, each extension and redesignation has acknowledged Somalia's ongoing armed conflict, which has led to arbitrary detentions, physical violence, torture, the murder of civilians, and other severe human rights violations. These redesignations have also acknowledged other extraordinary circumstances rendering return to Somalia unsafe for its nationals, such as climate extremes, mass internal displacement, food insecurity, and disease outbreaks.

7.     Currently, approximately 1,082 Somali nationals in the United States are TPS beneficiaries. Additionally, approximately 1,383 Somali nationals have pending TPS applications.[13]

8.     Individual Plaintiffs are four Somali TPS beneficiaries and/or applicants who have established deep ties to the United States and their local communities. Each individual plaintiff is a member either of Plaintiff African Communities Together ("ACT") or of Plaintiff Partnership for the Advancement of New Americans ("PANA"). ACT is a non-profit, membership-based organization that represents and empowers African immigrants, their families, and their communities across the United States—helping them integrate socially, advance economically, and engage civically. PANA is a non-profit, membership-based organization of refugees and displaced peoples, primarily of African, Middle Eastern, Muslim, and South Asian origin, that fights for the full economic, social, and civic inclusion of refugees and displaced populations in the United

---

[13] Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1,547, 1,552 (Jan. 14, 2026).

States. Both ACT and PANA represent the interests of U.S.-based Somali TPS holders and applicants.

9.      Plaintiffs bring this action to challenge the unlawful periodic review of Somalia's TPS designation and the resulting termination of it. On January 14, 2026, DHS purported to terminate the designation through a notice in the Federal Register.[14] Due to the Termination, over a thousand Somali TPS holders are set to lose their humanitarian protections at 11:59 pm on March 17, 2026.

10.     If TPS for Somalia imminently and unlawfully terminates, Plaintiffs and other Somali TPS beneficiaries will face immediate harms—including loss of immigration status, loss of access to related federal and state benefits (such as work authorization, driver's licenses, and health insurance), and worsened dignitary injuries resulting from allowing a periodic review process and resultant termination tainted by discrimination to take effect. They will further face a myriad of grave risks: remaining in the United States without lawful immigration status puts them at risk of detention and deportation proceedings; departure or forced removal to Somalia puts them at risk of severe physical violence as well as other unsafe country conditions; and forced separation from community and family in the United States will inflict irreparable harm on them and on their community members, relatives, and dependents, including their minor, U.S. citizen children. Indeed, even a one-day lapse in Somalia's TPS designation will be harmful as it could cause TPS beneficiaries to accrue unlawful status and jeopardize their future ability to obtain more durable immigration status.

11.     The Termination of Somalia's TPS designation violates the Fifth Amendment of the U.S. Constitution in multiple respects. First, the Termination also violates the Due Process Clause.

---

[14] 91 Fed. Reg. at 1,547–53.

TPS holders have substantial liberty and property rights in the benefits that TPS status confers, including protection from removal and immigrant detention, and work authorization. And the TPS statute itself establishes procedural safeguards that are constitutionally necessary to protect those interests, such as consultation with the appropriate agencies and notice that provides the true basis for the termination. 8 U.S.C. § 1254a(b)(3)(A). By issuing the Termination without adhering to those procedures, TPS holders and applicants now face the summary loss of their liberty and property interests without constitutionally adequate process. Second, because Defendants' decisions were motivated, at least in part, by racial and national-origin discrimination towards Somali people, the Termination violates the equal protection component of the Fifth Amendment.

12.    The Termination was also *ultra vires* in violation of the APA because the DHS Secretary lacked statutory authority to terminate Somalia's designation under 8 U.S.C. § 1254a. *See* 5 U.S.C. § 706(2)(C). Congress made clear repeatedly and unambiguously throughout the TPS statute that the "Attorney General"—and only the "Attorney General"—possesses the authority to terminate TPS status. And contrary to the government's assertions, Congress never transferred that authority to the DHS Secretary or any other official.

13.    Because the Termination of Somalia's TPS designation violates both the APA and the U.S. Constitution, this Court should expeditiously postpone and ultimately set aside the Termination or otherwise enjoin Defendants from enforcing it.

## THE PARTIES

**Plaintiffs**

14.    **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. It was founded in 2013.

15.     ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations and their U.S.-based family members. ACT's members have diverse citizenship and immigration statuses and includes TPS holders and/or applicants from Somalia and other African countries, including South Sudan, Ethiopia, and Sudan.

16.     ACT develops and engages in policy and advocacy campaigns calling for the designation, redesignation, and extension of TPS for African countries facing unsafe conditions, in line with the statute's humanitarian principles and intent.

17.     To advance ACT's goals of defending TPS from unlawful terminations and attacks, ACT is part of Communities United for Status and Protection ("CUSP"), which brings together grassroots community groups to advocate for lasting status for TPS-holders from African, Afro-Caribbean, Afro-Latinx, Arab, Middle Eastern, and Asian Pacific Islander communities.

18.     ACT recognizes that, without changes and improvements in U.S. immigration policies, the communities it serves can face many roadblocks and are often threatened unlawfully with being uprooted from their families and communities. That is why ACT supports its members in participating in TPS-related litigation, like this lawsuit.

19.     ACT's members who are Somali TPS recipients and/or applicants live around the United States.

20.     ACT brings this action on behalf of itself and its members.

21.     **Plaintiff Partnership for the Advancement of New Americans ("PANA")** is a non-profit, membership-based organization of refugees and displaced people with a focus on African, Middle Eastern, Muslim, and South Asian communities.

22.     Founded in 2014, PANA's mission is to advocate for the full economic, social, and civic inclusion of its membership. It serves as a research, public policy, and community organizing hub that centers the leadership and voices of refugees and immigrant communities to address systemic barriers such as racial and ethnic profiling, religious discrimination, and limited access to housing, jobs, and education. PANA works to build power, increase civic participation, and promote equitable treatment and meaningful inclusion for its membership.

23.     PANA provides support to communities directly affected by unjust immigration policies. In addition to its public policy advocacy, PANA engages more than 40,000 former refugee, African immigrant, Muslim, and Southeast Asian voters to ensure the fair representation of these historically underrepresented communities. And it provides direct legal services and community support services, with a human rights focus.

24.     PANA is involved in efforts to preserve, defend, and expand TPS designations and related benefits, due to the substantial role TPS plays in protecting PANA's members and their families. PANA signs on to advocacy letters supporting redesignations and extensions of TPS for its member populations; it hosts Know Your Rights sessions on TPS and immigrants' rights, including online so that community members across regions can access the content; and it provides immigration legal services.

25.     PANA has more than four hundred members, who shape the organization's priorities and work, and it brings this action on behalf of itself and its members.

26.     **Plaintiff Alexander Doe** is a Black man and Somali national who lives in the U.S. and applied for TPS over a year ago. He is in his twenties and is a member of PANA.

27.     Alexander has lived in the U.S. for years and is currently pursuing two associate's degrees, while also working full-time as an educational aide in a computer program at an elementary and middle school.

28.     He came to this country fleeing violence and unsafe conditions in Somalia, which directly affected him and his family. Once he arrived in the U.S., Alexander decided to focus on obtaining education. Because his own access to education was disrupted and denied due to the armed conflict and other conditions in Somalia, he places immense value on education, both as a student and as an educator.

29.     As a student, Alexander has enrolled in two-to-three-times the minimum course load each semester, in order to obtain his degrees as quickly as possible. He is scheduled to graduate in a few months' time with two associate's degrees, hoping to pursue teaching credentials, subsequently. He would like to enroll in a four-year degree program this summer and eventually earn his master's degree in counseling.

30.     In addition to being a busy student, Alexander helps to educate almost six hundred children each week at the school where he is an instructional aide, since the curricula for virtually every child there involves an element of computer-based learning. Many of these students depend on Alexander emotionally, and he places special value on his ability to support these students.

31.     Alexander has also developed a strong sense of community by volunteering at and attending mosque. He attends mosque almost daily and participates in community and educational programming, hoping to volunteer for some of the youth programming when he has more time.

32.     **Plaintiff Mohamed Doe** is a Black man who is a Somali national and TPS holder. Mohamed is in his thirties and has lived in the U.S. for years. TPS is his sole form of immigration

status, and he relies on it for his employment authorization and his driver's license. He is a member of ACT and lives in the U.S.

33.    Mohamed is married and lives with his wife, who recently gave birth to their first U.S. citizen child. His wife is lawfully present in the United States under a non-TPS program and relies on him for financial and other forms of support. Mohamed goes with her to many doctors' appointments and has provided essential care and support during her pregnancy. They live in a place without public transportation, so having a driver's license is necessary for managing the day-to-day needs of his and his family's life.

34.    Mohamed has family members who are United States citizens and with whom he is close. At the same time, he supports his parents and multiple siblings, who live abroad and rely on him for financial support: his parents have medical issues, and his younger siblings need Mohamed's support to afford their education.

35.    Mohamed is an educator and a coach of two different scholastic sports teams. He is a source of emotional and mental support for his students and is the official mentor for a small group of seven students who rely on him for career advice, educational guidance, and counseling. Mohamed's students rely on him for many other things, too, including help with getting to class, accessing school-provided meals, and navigating the emotional challenges of growing up. Mohamed was responsible for introducing a halal meal program at his school, from which many Muslim students there now benefit.

36.    Mohamed also volunteers at his mosque and has led prayers and taught lessons on the Quran. He is an integral part of his mosque and is very attached to the community he has built through it.

37.     **Plaintiff Tyson Doe** is a Black man in his twenties who is a Somali national, a TPS holder, and a member of ACT. TPS is his sole source of immigration status; and he relies on it as the basis for his employment authorization and his driver's license.

38.     Tyson is a teacher in an elementary school and has taught there for many years. His young students are very attached to him emotionally. Recently, Tyson took a day off teaching for the first time this school year, and when he came back, his students kept asking where he had been and why had he left them. Tyson's students have many important standardized tests coming up soon, and Tyson worries that their performance and ability to focus and prepare will be impacted if he is unable to stay in the U.S. as their teacher and continue to support their education and their lives. Tyson teaches in an area with a shortage of teachers, and if he were unable to continue teaching, he fears that his young students would be left without an adequate substitute.

39.     Tyson has a United States citizen brother, with whom he previously lived for years. Tyson still visits his brother frequently and talks to him often. Tyson also has many close friends in the U.S. whom he considers to be like family. Additionally, Tyson is very involved in his local mosque community and volunteers at the mosque regularly. He also continues to support family abroad, who rely on him.

40.     Tyson, in turn, relies on TPS for his work authorization—so he can continue teaching elementary school—as well as for his driver's license, which is essential for driving to and from his work and for purchasing groceries and running other errands, since his town does not have public transportation.

41.     Tyson's hope is to eventually pursue a master's degree in education, so that he can have an even bigger impact on the lives of his students.

42.      **Plaintiff Nina Doe** is a Black woman who is a Somali national, a TPS holder, and a member of ACT. Nina is in her twenties and has lived in the U.S. for years. TPS is currently her sole form of immigration status.

43.      Nina first came to this country as a high school exchange student through a philanthropic program. During that time, she lived with a host family of U.S. citizens who did not have children of their own and considered her to be like a daughter. Nina continues to stay in touch with her host family and considers them to be like family, too.

44.      After returning to Somalia briefly following her exchange program, Nina returned to the U.S. to pursue higher education through a competitive scholarship.

45.      Nina earned her bachelor's degree in the U.S. and began teaching at an elementary school, working with a mix of immigrant and U.S.-born students. She loves teaching young children because of the way that educational opportunities changed her own life for the better, and she wants to have a similar impact on this younger generation.

46.      Nina has a cousin who is a United States citizen, and the two support each other in many ways. She also lives with two of her siblings: one is pursuing a graduate degree and works in the public interest sector, and one is working in finance. All three siblings live together and support each other.

47.      Nina relies on her TPS for her ability to continue teaching and pursuing her passion for childhood education, and she hopes to continue teaching through her TPS-based employment authorization.

48.      As TPS holders and/or applicants, Nina, Tyson, Mohamed, Alexander, and other members of ACT and PANA have access to immigration status and to related federal benefits (like work authorization) and state benefits (like driver's licenses and health insurance); have protection

12

against deportation proceedings and related confinement within the U.S.; avoid forced removal to Somalia—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there; avoid forced removal to unsafe third countries; and avoid forced separation from loved ones and communities in the United States.

**Defendants**

49.    **Defendant Markwayne Mullin** is the Secretary of Department of Homeland Security ("DHS"). As an appointee of President Trump and member of his Cabinet, he is subject to his authority. As the highest-ranking officer for DHS, the DHS Secretary has asserted ultimate authority over all TPS designation, extension, and termination decisions. He is sued in his official capacity. Defendant Mullin was preceded in office by Secretary Kristi Noem, who left the position on March 24, 2026, and was an original official-capacity defendant in this action.

50.    **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program. Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

51.    **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

52.    **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

13

**JURISDICTION AND VENUE**

53.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

54.    The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

55.    The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages." 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[15]

56.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

**THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES**

*The TPS Statute and History*

57.    Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific . . . criteria."[16]

---

[15] *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *see also Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[16] *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith (July 19, 1983)).

58.     Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics."[17] Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and to provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay."[18]

59.     Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the U.S., subject to procedural requirements and safeguards. *See* 8 U.S.C. § 1254a. The statute provides that the Attorney General may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) there is a natural disaster or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C). Neither the armed conflict nor environmental disaster grounds for TPS designation include contemplation of domestic "national interest." *Id.* § 1254a(b)(1)(A)–(B). Like those grounds, the "other extraordinary conditions" ground for TPS designation turns on conditions in the foreign country that prevent its nationals from returning safely; this ground does refer to domestic "national interest" but only as an exception to designation: not a condition for it. *Id.* § 1254a(b)(1)(C).

---

[17] 101 Cong. Rec. 25811, 25838 (Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute), https://www.congress.gov/101/crecb/1989/10/25/GPO-CRECB-1989-pt18-7-1.pdf.
[18] *Id.* at 25837 (statement of Rep. Bill Richardson).

*Statutory Authority for TPS Decisionmaking*

60.    In 1991, the Department of Justice ("DOJ") and the former Immigration and Naturalization Service ("INS") adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at Temporary Protected Status for Nationals of Designated States, 8 C.F.R. part 244) ("This interim rule implements a new section, 244A of the Immigration and Nationality Act, established by section 302 . . . ."). Those regulations delegated significant operational aspects of TPS to INS, including the authority to initially find individual noncitizens eligible for TPS and award protected status, *see id*. at 619 (codified as 8 C.F.R. § 244.2), and the authority to receive and process applications for protected status, *see id*. at 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

61.    The regulations, however, did not authorize any subordinate official to exercise the Attorney General's authority to designate or terminate foreign states pursuant to 8 U.S.C. § 1254a. On the contrary, they defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id*. at 619 (codified as 8 C.F.R. § 244.1) (emphasis added).

62.    In practice, the Attorney General made all terminations under the Act. *See, e.g.,* Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

63.    In 2002, Congress created DHS, which absorbed many of the functions of the INS. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The Homeland Security Act charged the DHS Secretary "with the administration and enforcement of this chapter"—the INA— "and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred* upon the President,

*Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers." 8 U.S.C. § 1103(a)(1) (emphases added).

64.    Following the Act's passage, DOJ issued a final rule reorganizing 8 C.F.R. Chapter I—containing, among other things, the existing TPS regulations—in order to "reflect[] the transfer of functions of the Immigration and Naturalization Service through the division of jurisdiction over regulations currently codified in 8 CFR chapter I." Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003).

65.    The rule duplicated existing TPS regulations "because many of the decisions under temporary protected status are made by immigration judges and the Board of Immigration Appeals," which resides within DOJ under EOIR. *Id.* at 9827; *see also id.* at 9841–42. The rule noted regulations would "require further refinement to clarify the authority of Secretary of Homeland Security to designate countries for temporary protected status purposes." *Id.* at 9827.

66.    The president also issued an executive reorganization plan and amendment. *See* 6 U.S.C. § 542 (Department of Homeland Security Reorganization Plan). The reorganization plan purported to "[t]ransfer the . . . functions of the Immigration and Naturalization Service"— including delegated functions "performed by" INS "immediately before" the transfer—to DHS, but it made no mention of TPS, or powers expressly vested in the Attorney General under the INA. *See id.*; 6 U.S.C. § 551(d). By contrast, other portions of the reorganization plan did specifically address the transfer of particular Attorney General functions. *See, e.g.*, 6 U.S.C. § 542 (transferring "the National Domestic Preparedness Office of the FBI, including the functions of the Attorney General relating thereto.").

67.    Beginning in 2003, and through to the present, the DHS Secretary has issued TPS terminations pursuant to the Attorney General's authority under 8 U.S.C. § 1254a. *See, e.g.*,

Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation, 68 Fed. Reg. 52407 (Sep. 3, 2003); Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10402 (Mar. 3, 2026).

68.     In the first TPS designation following the implementation of the Homeland Security Act of 2002, the DHS Secretary addressed "what authority . . . the Secretary of the Department of Homeland Security ha[s] to extend the designation of Honduras under the TPS program." *Id*. (capitalization altered). The DHS Secretary took the position that: "On March 1, 2003, the Immigration and Naturalization Service (INS) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS)." *Id*. The DHS Secretary cited no other source of authority for exercising the Attorney General's power to issue, extend, or terminate TPS designations.

***Periodic Review of a Country's TPS Designation***

69.     In conducting periodic reviews, the TPS statute first requires the Attorney General to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Attorney General "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the Attorney General may specify." *Id.* § 1254a(b)(2). As long as the Attorney General consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

70. By contrast, Congress limited the Attorney Generals's discretion to periodically review TPS designations.[19]

71. The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

72. Congress textually limited periodic reviews to consideration of the "*conditions in the foreign state*" for which "a designation is in effect," in order to determine "whether the conditions for such designation . . . continue to be met." *See id.* § 1254a(b)(3)(A) (emphases added). Because Congress chose not to refer to domestic "national interest" within the armed conflict and environmental disaster grounds for TPS designation, and domestic "national interest" is only an exception and not a condition for the "extraordinary or temporary circumstances" designation—Congress omitted any reference to domestic "national interest" in the provisions of the TPS statute governing periodic reviews of designations, 8 U.S.C. § 1254a(b)(3)(A), and terminations of designations, 8 U.S.C. § 1254a(b)(3)(B). Both periodic reviews and terminations of designations turn on the relevant conditions *in the designated country*.

73. The periodic review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. Once DHS begins it, it coordinates with USCIS (one of its sub-

---

[19] *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* 15–18, 27 (2020) ("GAO Report") (differentiating between the discretion afforded before and after an initial designation), https://www.gao.gov/assets/gao-20-134.pdf.

components) and with the U.S. Department of State ("State Department"), which each prepare country conditions memoranda and recommendations for the Secretary.[20]

74.    Historically, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[21] After considering the materials provided, USCIS typically prepares a detailed recommendation, called a "Director Memo" for the DHS Secretary, which it bases on current and objective country conditions.[22]

75.    After this periodic review of the TPS designation, once the decision is made, the statute requires that the Attorney General "provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

76.    Unless the Attorney General timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." *Id.* § 1254a(b)(3)(C).

---

[20] *See id.* at 15–16; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 299–300, 352 (E.D.N.Y. 2019) (describing standard USCIS and Department of State processes for TPS periodic reviews).
[21] *See* GAO Report, *supra* note 18 at 15-21; *see also, e.g.*, *Saget*, 375 F. Supp. 3d at 299-300.
[22] *See, e.g.*, GAO Report, *supra* note 18 at 18; *Saget*, 375 F. Supp. 3d at 299–300, 333 ("Plaintiffs seek neither a substantive declaration nor individualized relief. Rather, they seek to prevent the Secretary and DHS from making TPS determinations based on a subjective goal engineered toward termination rather than on the *objective assessment required by law*.") (emphases added).

77.     In contrast, if the Attorney General timely determines that "a foreign state . . . no longer continues to meet the conditions for designation," she "shall terminate the designation by publishing notice in the Federal Register." *Id.* § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.*

78.     The text of the statute provides no grounds for the termination of a TPS designation other than a determination that the foreign state no longer meets the conditions for designation. The statute does not provide for terminations of TPS designations based on domestic "national interest."  On information and belief, until 2025, DHS had this understanding of the statute. Indeed, from 1992 to 2025, no termination of a TPS designation based on "other extraordinary conditions" had rested on domestic "national interest."[23]

79.     The Attorney General has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, DHS provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period, time that greatly aided TPS beneficiaries who had to navigate fundamental transitions and changes to their and their families' lives.[24] The practice of furnishing orderly transitions of at least six months has been ongoing for over thirty years, and the Trump

---

[23] *See* Decl. of Golnaz Fakhimi ("Fakhimi Decl."), *Afr. Cmmtys. Together v. Noem*, 1:25-cv-13939-PBS (D. Mass. Dec. 23, 2025) ("*ACT I*"), Dkt. 8-7 at 19-29 (Ex. 15, Decl. of Aaron Reichlin-Melnick) (explaining that, in the 35-year history of TPS and before 2025, the sole rationale cited to justify termination of TPS had been an end to the temporary country conditions which authorized the designation).

[24] *See id*., Dkt. 8-6 at 66–69 (Ex. 7, chart documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months) ("Transition Periods Chart").

Administration applied it during its first term in office. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago.[25]

80.     Congress specified strict and ongoing eligibility criteria for individuals to get and maintain TPS status, including: (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Attorney General; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees. *See id.* § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Additionally, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

81.     After USCIS receives an application, it screens the applicant for potential grounds of ineligibility (including criminal and national security grounds) and does so, in part, by using biometric data (including the applicant's photo, signature, and fingerprints) to vet the applicant through background and security checks (if the applicant is at least 14 years-old).[26] Application processing, inclusive of background and security checks, typically takes many months. USCIS estimates current processing times for initial TPS applications under surviving TPS designations

---

[25] *Id.*

[26] *See* USCIS*, Temporary Protected Status,*  https://www.uscis.gov/humanitarian/temporary-protected-status (last visited Mar. 8, 2026).

range from 9 to 18.5 months, with the processing time for initial applications from Somalis estimated to be 14.5 months.[27]

82.     Notably, Congress did *not* condition an individual's eligibility for TPS on having entered the country lawfully or on having any lawful immigration status within the United States. Additionally, Congress ensured that the Attorney General could withdraw an individual's TPS status on the basis of ineligibility, failure to maintain continuous physical presence in the U.S. subsequent to the grant, and/or failure to register annually subsequent to the grant. *See* 8 U.S.C. § 1254a(c)(3); 8 C.F.R. § 244.14.

83.     Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation and related immigration confinement. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the U.S.; "shall not be detained" by the Attorney General on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the stringent requirements for asylum or other immigration relief. *See id.* § 1254a(b)(1).

84.     TPS applicants with *prima facie* eligibility for TPS must receive work authorization and protection from deportation and related immigration confinement while their application is pending. *See id.* §§ 1254a(a)(4)(B), (d)(4); 8 C.F.R. §§ 244.5, 244.10(e).

---

[27] *See* USCIS, *Case Processing Times*, https://egov.uscis.gov/processing-times/ (last visited Mar. 8, 2026) (specifying estimated processing time of 14.5 months for initial applications for TPS (Form I-821) for applicants from Somalia).

85.     As TPS beneficiaries, TPS holders and applicants with *prima facie* eligibility may also access related state benefits (like identification, driver's licenses, and health insurance, depending on the state).[28]

**SOMALIA'S INITIAL TPS DESIGNATION, EXTENSIONS, REDESIGNATIONS, AND TERMINATION (1991–2026)**

86.     Somalia first received designation for TPS in September 1991, based on extraordinary and temporary conditions that prevented Somalis from returning in safety.[29] *See* 8 U.S.C. § 1254a(b)(1)(C). Since then, its TPS designation on this basis has been consistently extended, *see id*. § 1254a(b)(3)(C), or redesignated, see id. § 1254a(b)(3)(A). Since 2002, Somalia has been designated for TPS based both on the extraordinary and temporary conditions ground for designation, id. § 1254a(b)(1)(C), and on the ongoing armed conflict ground for designation, id. § 1254a(b)(1)(A).[30]

---

[28] *See, e.g.* Real ID Act of 2005, Pub. L. No. 109-13, Sec. 202(c)(2)(B)-(C).

[29] *Designation of Nationals of Somalia for Temporary Protected Status*, 56 Fed. Reg. 46,804 (Sep. 16, 1991).

[30] Extension of Designation of Somalia Under Temporary Protected Status Program, 57 Fed. Reg. 32,232 (July 21, 1992); Extension of Designation of Somalia Under Temporary Protected Status Program, 58 Fed. Reg. 48,898 (Sep. 20, 1993); Extension of Designation of Somalia Under Temporary Protected Status Program, 59 Fed. Reg. 43,359 (Aug. 23, 1994); Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 Fed. Reg. 39,005 (July 31, 1995); Extension of Designation of Somalia Under Temporary Protected Status Program, 61 Fed. Reg. 39,472 (July 29, 1996); Extension of Designation of Somalia Under Temporary Protected Status Program, 62 Fed. Reg. 41,421 (Aug. 1, 1997); Extension of Designation of Somalia Under Temporary Protected Status Program, 63 Fed. Reg. 51,602 (Sep. 28, 1998); Extension of Designation of Somalia Under Temporary Protected Status Program, 64 Fed. Reg. 49,511 (Sep. 13, 1999); Extension of Designation of Somalia Under Temporary Protected Status Program, 65 Fed. Reg. 69,789 (Nov. 20, 2000); Extension and Redesignation of Somalia under Temporary Protected Status Program, 66 Fed. Reg. 46,288 (Sep. 4, 2001); Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 Fed. Reg. 48,950 (July 26, 2002); Extension of the Designation of Somalia Under Temporary Protected Status Program, 68 Fed. Reg. 43,147 (July 21, 2003); Extension of the Designation of Temporary Protected Status for Somalia, 69 Fed. Reg. 47,937 (Aug. 6, 2004); Extension of the Designation of Somalia for Temporary Protected Status, 70 Fed. Reg. 43,895 (July 29, 2005); Extension of (continued…)

24

87.     Since 1991, civil war has embroiled Somalia, after opposition groups led an uprising to overthrow Mohamed Siad Barre's authoritarian regime, which had come into power through a military coup.[31] No central government reemerged to take Barre's place and a civil war broke out as rival clan factions and militia groups competed to fill the power vacuum, control the capital, and gain territory.[32]

88.     Attempts at peacekeeping and instituting transitional governments were unsuccessful from the 1990's throughout the 2000's, as clan-based violence continued and armed militia groups continued to engage in violent fighting, particularly in Somalia's capital,

---

the Designation of Temporary Protected Status for Somalia; Automatic Extension of Employment Authorization Documentation for Somalia TPS Beneficiaries, 71 Fed. Reg. 42,653 (July 27, 2006); Extension of the Designation of Temporary Protected Status for Somalia; Automatic Extension of Employment Authorization Documentation for Somalia Temporary Protected Status Beneficiaries, 73 Fed. Reg. 13,245 (Mar. 12, 2008); Extension of the Designation of Somalia for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Somalian TPS Beneficiaries, 74 Fed. Reg. 37,043 (July 27, 2009); Extension of the Designation of Somalia for Temporary Protected Status, 75 Fed. Reg. 67,383 (Nov. 2, 2010); Extension and Redesignation of Somalia for Temporary Protected Status, 77 Fed. Reg. 25,723 (May 1, 2012); Extension of the Designation of Somalia for Temporary Protected Status, 78 Fed. Reg. 65,690 (Nov. 1, 2013); Extension of the Designation of Somalia for Temporary Protected Status, 80 Fed. Reg. 31,056 (June 1, 2015); Extension of the Designation of Somalia for Temporary Protected Status, 82 Fed. Reg. 4,905 (Jan. 17, 2017); Extension of the Designation of Somalia for Temporary Protected Status, 83 Fed. Reg. 43,695 (Aug. 27, 2018); Extension of the Designation of Somalia for Temporary Protected Status, 85 Fed. Reg. 14,229 (Mar. 11, 2020); Extension and Redesignation of Somalia for Temporary Protected Status, 86 Fed. Reg. 38,744 (July 22, 2021); Extension and Redesignation of Somalia for Temporary Protected Status, 88 Fed. Reg. 15,434 (Mar. 13, 2023); Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59,135 (July 22, 2024).

[31] Ioan M. Lewis, *History of Somalia*, Encyclopedia Britannica (Dec. 4, 2025), https://www.britannica.com/topic/history-of-Somalia; Lauren Ploch Blanchard, Cong. Rsch. Serv., IF10155, *Somalia* at 1 (June 30, 2025), https://www.congress.gov/crs_external_products/IF/PDF/IF10155/IF10155.16.pdf; Off. of the Historian, State Department, *Somalia, 1992-1993*, https://history.state.gov/milestones/1993-2000/somalia (last visited Mar. 8, 2026).

[32] Off. of the Historian, *Somalia, 1992-1993*, *supra* note 29; Lewis, *History of Somalia*, *supra* note 31; U.S. Comm. for Refugees and Immigrants, *The Crisis in Somalia* at 3 (2021), https://refugees.org/wp-content/uploads/2021/04/Somalia-Backgrounder.pdf.

Mogadishu.[33] In 2006, the Islamic Courts Union ("ICU") took control of the capital and southern regions of the country, leading to another installment of civil war as Ethiopian and Somali troops worked to defend the Transitional Federal Government ("TFG"), formed in 2004.[34] The ICU splintered as it lost power, but al-Shabaab, a militant faction with ties to al-Qaeda, survived. Al-Shabaab, armed militia groups, and clan militia continued their insurgency against the TFG and sought control over the capital.[35] The international community, including the United States, established the counterinsurgency force, African Union Mission in Somalia ("AMISOM"), which has been working to assist the Somali government in its fight against al-Shabaab and other armed militia groups since 2007.[36] Although a formal federal government and constitution were established in 2012,[37] al-Shabaab's armed insurgency and clan-based fighting have persisted.[38] The Somali government and al-Shabaab, along with other armed non-state actors, continue to engage in armed conflict, as al-Shabaab has gained increasing control over territory in southern Somalia, encroaching on the capital, while conducting violent attacks throughout the country.[39]

89.    Hundreds of thousands of deaths have been documented since the start of the civil war in 1991,[40] along with human rights abuses, including child recruitment, extrajudicial killings,

---

[33] Lewis, *History of Somalia*, *supra* note 31.

[34] *Id.*; U.S. Comm. for Refugees and Immigrants, *The Crisis in Somalia*, *supra* note 32, at 3.

[35] Lewis, *History of Somalia*, *supra* note 31; U.S. Comm. For Refugees and Immigrants, *The Crisis in Somalia*, *supra* note 32, at 3.

[36] Blanchard, *supra* note 31, at 2; Matt Bryden, *Somalia at Risk of Becoming a Jihadist State*, African Center for Strategic Studies, (Nov. 17, 2025), https://africacenter.org/publication/asb45en-somalia-risk-jihadist-state/.

[37] Blanchard, *supra* note 31, at 1; Lewis, *History of Somalia*, *supra* note 31.

[38] *See generally* 78 Fed. Reg. 65,690; 89 Fed. Reg. 59,135.

[39] *See* Blanchard, *supra* note 31, at 1; Bryden, *Somalia at Risk of Becoming a Jihadist State*, *supra* note 36; 88. Fed. Reg. 15,434; 89 Fed. Reg. 59,135.

[40] *See* John Norris & Bronwyn Bruton, Ctr. for Am. Progress, *Twenty Years of Collapse and Counting: The Cost of Failure in Somalia* at 10–11 (2011), https://cdn.americanprogress.org/wp-content/uploads/issues/2011/09/pdf/somalia.pdf.

sexual and gender-based violence, human trafficking, torture, and arbitrary arrest and detention.[41] The deadly consequences of the war have been exacerbated by climate events, severe malnutrition and food insecurity, a crumbling healthcare system, and widespread outbreaks of disease.[42]

90.     The 2023 and 2024 redesignations of TPS for Somalia on both the "armed conflict" and "extraordinary and temporary conditions" grounds noted ongoing attacks leading to civilian deaths, targeted assaults against government officials, al-Shabaab's violent opposition to the Federal Government of Somalia, climatic shocks, lack of healthcare infrastructure, cholera outbreaks, food insecurity and malnutrition, gender-based violence, humanitarian needs, and human rights violations.[43]

91.     With respect to the ongoing armed conflict, the 2024 redesignation noted that "Somalia continues to experience widespread insecurity due to armed conflict involving state and non-state actors," with al-Shabaab and clan-related violence "continu[ing] to pose a significant threat to Somalia's security," by carrying out deadly attacks with improvised explosive devices and subjecting civilians to human rights abuses including summary executions, indiscriminate and targeted killings, gender-based violence, child recruitment, disappearances, and physical abuse.[44] DHS reported an estimate of 1,300 civilian casualties between January and September 2023.[45]

---

[41] *See* 88. Fed. Reg. 15,434; 86 Fed. Reg. 38,744; UN OHCHR & UN Assistance Mission in Somalia, *Protection of Civilians: Building the Foundation for Peace, Security and Human Rights in Somalia* at 1 (2017), https://www.ohchr.org/sites/default/files/Documents/Countries/SO/ReportProtectionofCivilians.pdf.

[42] *See* Norris & Bruton, *Twenty Years of Collapse and Counting*, *supra* note 40 at 10–11; UNHCR, *Somalia Refugee Crisis Explained* (July 17, 2023), https://www.unrefugees.org/news/somalia-refugee-crisis-explained/; 86 Fed. Reg. at 38,747–49; 88. Fed. Reg. at 15,436–39; 89 Fed. Reg. at 59,138–39.

[43] 88. Fed. Reg. at 15,436–39; 89 Fed. Reg. at 59,137–39.

[44] 89 Fed. Reg. at 59,137–38.

[45] *Id.* at 59,137–38.

92.    The extraordinary and temporary conditions DHS reported in the 2024 redesignation include environmental impacts, healthcare-related needs, food insecurity, and the need for humanitarian assistance. Approximately 6.9 million people, around half of Somalia's population, were estimated to require humanitarian assistance.[46] Severe droughts and floods affected more than 2.5 million people, damaged agriculture and livestock, caused an increase in waterborne diseases, and exacerbated food insecurity.[47] The floods made access to healthcare even more difficult, all while Somalia was facing a continuous cholera outbreak since 2022, with 46 deaths and 18,300 suspected cases reported in 2023.[48] In all, an estimated 4.3 million people in the country experienced acute food insecurity, 1.5 million children under the age of five suffered from acute malnutrition, and 3.8 million people were displaced due to conflict, natural disasters, and other factors.[49]

93.    Still, on January 14, 2026, then DHS Secretary Noem formally announced the purported Termination of Somalia's TPS designation in the Federal Register, terminating both grounds for it (armed conflict and extraordinary and temporary conditions), and announcing a 60-day wind-down period ahead of the March 17, 2026, effective date of the Termination.[50] In a stark departure from the prior reviews of Somalia's TPS designation, Defendants reasoned that ". . . Somalia today shows improved national governance and security structures and now experiences localized pockets of violence rather than nationwide, generalized conflict"[51] and that ". . . requiring

---

[46] *Id.* at 59,138.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] 91 Fed. Reg. at 1,552.
[51] *Id.* at 1,549.

Somali nationals to return to Somalia would not pose a serious threat to their personal safety . . . ."[52]

## DEFENDANTS' DISCRIMINATORY TARGETING OF THE SOMALI COMMUNITY

*Discriminatory Targeting of the Somali Community Coinciding with the Periodic Review of Somalia's TPS Designation*

94.    Instead of construing conditions like "crime" and lack of governance in Somalia through the humanitarian lens that Congress specified in the TPS statute—of whether conditions in Somalia render return there unsafe for its nationals—President Trump, the Secretary, and other senior officials in his administration have weaponized his recognition of such conditions for discriminatory aims: as racist smears against Somali people and justification to expel them from this country.

95.    Since November 2025, President Trump has repeatedly expressed his desire to expel Somali people from the U.S. based on their race and national origin. As described above, he purported to terminate TPS for Somali people in Minnesota via a Truth Social post on November 21, 2025: "I am, as President of the United States, hereby terminating, effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER!"[53] Upon information and belief, the President directed Defendants to terminate Somalia's TPS designation.

96.    The Trump Administration's and Defendants' targeting of Somali people with the racially coded reference to "gangs" reflects their discriminatory views of Somali people based on their race and national origin.

---

[52] *Id.*
[53] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

97.     On November 27, 2025, President Trump posted on Truth Social, stating that "hundreds of thousands of refugees from Somalia are completely taking over the once great State of Minnesota.  Somalian gangs are roving the streets looking for 'prey.'"[54] Using animal imagery to describe Black people is a slur historically rooted in racism.[55] He also referred to Somali-American Congresswoman Ilhan Omar as "always [being] wrapped in her swaddling hijab,"[56] which mocks her Muslim faith. Somali people are over 99% Muslim[57] and this statement demonstrates religious discrimination towards Somali people in addition to discrimination based on race and national origin.

98.     Just a few days later, the President continued targeting Somalis, stating he considers them unwelcome and unwanted in the U.S., remarking during a December 2, 2025, Cabinet meeting:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country. . . . We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country. Ilhan Omar is garbage, she's garbage. Her friends are garbage. These aren't people that work. These aren't people that say let's go, come on, let's make this place great. These are people that do nothing but complain. They complain, and from where they came from, they've got nothing. You know, if they came from Paradise and they said this isn't Paradise.

---

[54] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[55] Ryan P. Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis*, 11 Mich. J. Race & L. 325, 345 (2006).

[56] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, at 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[57] The Association of Religion Data Archives, *National/Regional Profiles: Somalia*, https://www.thearda.com/world-religion/national-profiles?u=205c (last visited July 29, 2026).

> But when they come from hell and they complain and do nothing but bitch we don't want them in our country. Let them go back to where they came from and fix it.[58]

99.     The next day, on December 3, 2025, President Trump expressed more vitriol against Somali-American Congresswoman Ilhan Omar, whose district covers the areas where the bulk of the Somali community in the United States lives:

> [Somalis] have a Representative, Ilhan Omar, who they say married her brother. It's a fraud. She tries to deny it now, but you can't really deny it because, you know, just happened. She shouldn't be allowed to be a Congresswoman. And I'm sure people are looking at that and she should be thrown the hell out of our country. . . . She's always talking about the Constitution provides me with – uh, go back to your own country and figure out your constitution. All she does is complain about this country, and without this country she would not be in very good shape. She probably wouldn't be alive right now. . . . And she's a disaster. She should not be – and her friend shouldn't be allowed – frankly, they shouldn't even be allowed to be Congress people, OK? They shouldn't even be allowed to be Congress people because they don't represent the interests of our country.[59]

100.     On that day, President Trump expressed further race and national-origin based animus against Somalis, in response to comments from Minneapolis Mayor James Frey, who had claimed pride in his city's having the largest Somali population in the country. Again, President Trump weaponized his awareness of unsafe conditions in Somalia to express xenophobia and hate for Somalis, saying:

> I wouldn't be proud to have the largest Somalian – look at their nation. Look how bad their nation is. It's not even a nation, it's just a people walking around killing each other. . . . . And the Somalians should be out of here. They've destroyed our

---

[58] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call, *supra* note 4 (at 02:16:17–02:17:45). On the same day as this Cabinet meeting, USCIS instituted a spate of new policies involving a blanket pause on asylum adjudications; a blanket pause on the adjudication of other benefits applications, including applications for TPS, if the applicant comes from a country whose nationals are subject to entry bans, which includes Somalis; and the revetting of approved beneficiaries of immigration benefits, including TPS, if the applicant comes from a country whose nationals are subject to entry bans, which includes Somalis. *See infra* ¶ 136.

[59] *Remarks: Donald Trump Announces a Reduction in Automobile Mileage Standards - December 3, 2025*, Roll Call (Dec. 3, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-fuel-standards-environment-december-3-2025/ (at 00:52:58–00:55:21).

country. And all they do is complain, complain, complain. . . . So Somalia is considered by many to be the worst country on earth. I don't know. I haven't been there. I won't be there any time soon, I hope. But what Somalia and what the Somalian people have done to Minnesota is not even believable. . . . And you have to have people come in that are going to love our country, cherish our country. They want to kiss our country good night. They talk about our country. We want them to pray for our country. This is not the people living in Minnesota.[60]

101. Nearly a week later, on December 10, 2025, President Trump "boasted about pausing immigration applications from Somalia, which he referred to as a "third-world countr[y]" and "hellhole.""[61] He also juxtaposed Somali immigrants with immigrants from Scandinavia, conveying the Administration's preference for immigrants from white, European countries:

> "[W]hy is it we only take people from shithole countries, right? Why can't we have some people from Norway, Sweden – just a few – let us have a few from Denmark. Do you mind sending us a few people? Send us some nice people, do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime – the only thing they're good at is going after ships."[62]

102. On December 19, 2025, Stephen Miller, the U.S. Homeland Security Advisor, smeared Somalis in Minnesota, calling Somalis "pirates": "We should not be shocked when you import a population whose primary occupation is pirate, that they are going to come here and steal everything we have. . . . So, yes, the pirates have stolen all of our money and they have to go home."[63]

103. On December 31, 2025, the President posted misleading allegations that Somali people caused 90% of the fraud in Minnesota and called them "lowlifes":

> Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who

---

[60] *Id.* (at 00:52:49–00:55:21).

[61] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, *supra* note 8.

[62] *Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, *supra* note 8 (at 01:22:49–01:23:51).

[63] Jesse Watters Primetime, *'GO HOME': Stephen Miller decries 'pirate' Somalis amid alleged fraud scandal*, Fox News (Dec. 20, 2025), https://www.youtube.com/watch?v=Eqs42DviZ3Q.

only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!![64]

### *Discriminatory Targeting of Somalis in Minnesota, Coinciding with the Termination of Somalia's TPS Designation*

104.    The Trump Administration perpetuated these rumors of fraud in Minnesota into the New Year. On January 1, 2026, an "[o]fficial White House Rapid Response"[65] X account shared an artificially generated Pixar-inspired trailer denigrating Somali immigrants and furthering the Trump Administration's narrative that Somalis in Minnesota were committing fraud. The video featured a group of Somali men traveling to Minnesota to defraud the state's daycare program and live the high life.[66] Like the Trump Administration, the characters refer to themselves as "pirates" and "thugs."[67]

105.    On January 9, 2026, Treasury Secretary Scott Bessent announced that "President Trump has instructed the administration to bring accountability for the hardworking people of Minnesota."[68] That same day, the Treasury Department posted, on X, a video of a "Somali fraud press conference" hosted by Bessent in Minnesota.[69]

106.    Defendants' Termination notice and associated public messaging also evidence their disdain for Somali people.[70] On January 13, 2026—the day that USCIS announced the

---

[64] Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 31, 2025, at 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464.

[65] Rapid Response 47 (@RapidResponse47), X, https://x.com/RapidResponse47 (last visited July 21, 2026).

[66] Rapid Response 47 (@RapidResponse47), X (Jan. 1, 2026, at 10:41 PM), https://x.com/RapidResponse47/status/2006933728292122826.

[67] *Id.*

[68] *Secretary Bessent Announces Initiatives to Combat Rampant Fraud in Minnesota*, U.S. Dep't of the Treasury, (Jan. 9, 2026), https://home.treasury.gov/news/press-releases/sb0354.

[69] U.S. Dep't of the Treasury (@USTreasury), X, (Jan. 9, 2026, 4:03 PM), https://x.com/USTreasury/status/2009657285593780644?s=20.

[70] *See* 91 Fed. Reg. at 1,551–52.

purported Termination decision—Defendants and other government officials issued a flurry of negative messages about Somalis, Somalia, and Minnesota.

107.    DHS reposted USCIS's announcement, adding a picture of President Trump and a line from a Somali pirate in the movie "Captain Phillips": "I am the captain now."[71]

108.    The White House posted a screenshot of a Fox News headline about the announcement, with the caption: "BREAKING: President Trump ENDS TPS for thousands of Somalis amid massive fraud scandals in Minnesota. 'We are putting Americans first.' -@Sec_Noem."[72]

109.    DHS also posted online a screenshot of the same Fox News headline, noting: "DHS is ENDING Temporary Protected Status for Somalians in the United States. Our message is clear. Go back to your own country, or we'll send you back ourselves."[73]

110.    President Trump wrote an online post about "convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, dangerous people from foreign mental institutions and insane asylums, and other deadly criminals," whom "ICE want[s] to . . . remove" from Minnesota—where the largest Somali community in the United States lives—declaring ominously: "FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!"[74] President Trump's reference to "retribution" against "drug dealers" and other "deadly criminals"—racialized terms meant to invoke discriminatory

---

[71] Homeland Security (@DHSgov), X (Jan. 13, 2026, at 10:49 AM), https://x.com/DHSgov/status/2011103313299980307.

[72] The White House (@WhiteHouse), X (Jan. 13, 2026, at 9:57 AM), https://x.com/WhiteHouse/status/2011090186629750919.

[73] Homeland Security (@DHSgov), X (Jan. 13, 2026, at 9:40 AM), https://x.com/dhsgov/status/2011085958381256830.

[74] Donald J. Trump (@realDonaldTrump), X (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

stereotypes about Black people as crime and violence-prone—demonstrates that the Termination was motivated by racial animus.

111.    Later that day, during an event at the Detroit Economic Club, President Trump went on a lengthy rant about Somali people in Minnesota, and alleged fraud based on misleading[75] evidence:

> In Minnesota we're cracking down on the Somali scams . . . They're scammers, they're scammers. They always will be. And we're getting them out and we're not going to pay them. . . . They have nothing, they get welfare payments and they have Mercedes Benzes. It angers me so much . . . . But this is one of the great scams ever. . . . We're getting them out. We got a lot of them out already, but we're getting them out. We're also going to revoke the citizenship of any naturalized immigrant from Somalia or anywhere else who is convicted of defrauding our citizens. . . . And they know it too. . . . But in conclusion, as we liberate our country from this cultural scourge and the plague of corruption and fraud, we'll rediscover the natural energy and native spirit that truly makes America great again.[76]

112.    The following day, when DHS Secretary Noem published the purported Termination notice in the Federal Register, President Trump reposted an article entitled "Somali Suitcase Stash: Feds say $130 million moved from Ohio airport to Minnesota on way overseas," and wrote: "They should be thrown out of the USA. Get it done, NOW! That includes their loser Rep. Omar, who married her brother (gross!). President DJT."[77]

113.    President Trump's descriptions of conditions in Somalia weaponize these racially discriminatory characterizations of Somali people to malign them but show that the Administration believes conditions in Somalia to be unsafe. On November 27, 2025, President Trump referred to Somalia as "a decadent, backward, and crime ridden nation, which is essentially not even a country

---

[75] Carrazana, *supra* note 2.

[76] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, *supra* note 9 (at 00:50:48–01:00:48).

[77] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 14, 2026, at 8:13 AM), https://truthsocial.com/@realDonaldTrump/posts/115893625622462941.

for lack of Government, Military, Police, schools, etc. . . ."[78] And, later that day in a press conference, he said:

> [Somalia is] practically no country. It's devastated, it's crime-ridden, it's a mess, it's a disgrace, and we took their people at tremendous—we're not taking their people anymore. We're not taking their people. And we're getting a lot of their people out because they're nothing but trouble. [79]

114.    Defendants included in the Certified Administrative Record cherry-picked articles that mention unsubstantiated allegations of crime, and fraud by Somali people in Minnesota to validate the Termination. Supp. Br. At 8-15, Dkt. 43. This suggests that discrimination based on race and national origin infected the periodic review and ultimate Termination due to discriminatory stereotypes about Black people and criminality.[80]

***Immigration Enforcement Actions Singling Out Somali People***

115.    President Trump's blatant disdain for Somali people was evidenced by the Administration's brutal immigration crackdown in Minnesota, which is where much of the Somali community, of all immigration statuses, in the U.S. lives.[81] To effectuate the Administration's goal of removing Somalis from the country, Defendant DHS launched Operation Metro Surge, the "largest immigration enforcement operation ever carried out by the agency" on December 1,

---

[78] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, at 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[79] *Remarks: Donald Trump Speaks with Servicemembers Via Video on Thanksgiving - November 27, 2025*, Roll Call (Nov. 27, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-thanksgiving-videoconference-servicemembers-november-27-2025/#284 (at 00:49:08–00:49:56). On the same day, USCIS issued a policy announcing that pending and prospective immigration benefits applications would give negative weight to "country-specific factors," flagging the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025. The nationals of these countries are majority non-white, including those of 8 countries who are majority Black, including Somalis. *See infra* ¶ 135.

[80] *See, e.g., Buck v. Davis*, 580 U.S. 100, 121 (2017) (discussing "powerful racial stereotype" of Black people as crime and "violence prone" that is indicative of unconstitutional discrimination).

[81]  Joe Hernandez, *How Minnesota Became a Hub for Somali Immigrants in the U.S.,* NPR (Dec. 4, 2025, at 11:23 ET), https://www.npr.org/2025/12/03/nx-s1-5631809/somali-immigrants-minnesota-twin-cities-trump-ilhan-omar.

2025.[82] The operation ramped up in the weeks following December 26, 2025, after unsubstantiated claims surfaced about Somali "fraud" in Minnesota, through a video posted online that went viral and that Vice President Vance reposted.[83]

116.    Operation Metro Surge was wide-ranging and ultimately devastating in its consequences for a broad array of noncitizens and citizens alike.[84] Stark examples of the violent consequences for U.S. citizens include: ChongLy "Scott" Thao, a 56-year-old man whose front door immigration agents broke down without a judicial warrant and whom the agents dragged out

---

[82] Rebecca Santana & Mike Balsamo, *Homeland security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* Associated Press (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[83] *See* PBS News Hour, *Federal Agents Probe Fraud Allegations Targeting Somali Child Care Providers in Minnesota*, PBS (Dec. 30, 2025), https://www.pbs.org/newshour/show/federal-agents-probe-fraud-allegations-targeting-somali-child-care-providers-in-minnesota; JD Vance (@JDVance), X (Dec. 27, 2025, at 6:55 PM), https://x.com/JDVance/status/2005064947437650251.

[84] The harms of the Administration's dragnet immigration enforcement campaign in Minnesota have extended to a wide array of Black and Brown noncitizens of various nationalities, including over 1,000 people challenging unlawful confinement through immigration habeas petitions in the past two months alone, some of whom are children as young as 2 years old and 5 years old. Max Nesterak, *Lawyers filed over 1,000 lawsuits challenging immigrant detentions during operation metro surge*, Minnesota Reformer (Feb. 19, 2026), https://minnesotareformer.com/2026/02/19/lawyers-filed-over-1000-lawsuits-challenging-immigrant-detentions-during-operation-metro-surge/; Emma Tucker, *Minnesota Toddler Taken into ICE Custody with Father and Flown to Texas Is Returned to Mother Next Day, Lawyer Says*, CNN (Jan. 24, 2026), https://www.cnn.com/2026/01/24/us/elvis-tipan-echeverria-toddler-ice-arrest-minnesota; Camilo Montoya-Galvez, *ICE releases 5-year-old Liam Conejo Ramos and his father from custody*, CBS News (Feb. 2, 2026), https://www.cbsnews.com/news/liam-conejo-ramos-released-ice-custody/. The Administration has failed to comply with nearly 100 court orders in those cases so far, some of which have involved the immigration confinement of children as young as 2 years old and 5 years old. *See Juan T.R. v. Noem*, No. 0:26-cv-00107, 2026 WL 555601 (D. Minn. Feb. 26, 2026). When a federal judge confronted a government attorney about these pervasive violations of court orders, the attorney stated in open court that "the system sucks" and expressed fearfully that "I am not white, as you can see. And my family's at risk as any other people that might get picked up too." Kyle Cheney & Josh Gerstein, *'This Job Sucks': Government lawyers, drowning in immigration cases, have had it*, Politico (Feb. 4, 2026), https://www.politico.com/news/2026/02/04/trump-ice-minnesota-prosecutors-immigration-00765031?utm_content=politico/magazine/Politics&utm_source=flipboard.

of his home, in his underwear, at gunpoint, in front of his 4-year-old grandson;[85] Renee Good, a 37-year-old poet, writer, and mother of three, whom immigration agents shot and killed in her car;[86] and Alex Pretti, a 37-year-old intensive-care nurse, whom immigration agents shot and killed on the street.[87]

117.    On January 9, 2026, a week before the purported Termination, Defendant DHS announced the launch of Operation PARRIS in Minnesota which was described as "a sweeping initiative reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims,"[88] targeting Somali people. Not even a week later, federal immigration agents reportedly arrested dozens of refugees in Minnesota, a majority of whom were from Somalia, including children, who had already passed security screenings before arrival to the United States.[89]

118.    Simultaneous with its pursuit of its goal of mass deporting and detaining Somali people, in tandem with ending TPS, the Administration began targeting Somali people based on

---

[85] *See* Jack Brook, *A U.S. citizen says ICE forced open the door to his Minnesota home and removed him in his underwear after a warrantless search*, PBS News (Jan. 20, 2026), https://www.pbs.org/newshour/nation/a-u-s-citizen-says-ice-forced-open-the-door-to-his-minnesota-home-and-removed-him-in-his-underwear-after-a-warrantless-search.

[86] *See* Michael Biesecker, et al., *Family and neighbors mourn woman who was shot by ICE agent and made Minneapolis home*, Associated Press (Jan. 8, 2026), https://apnews.com/article/ice-shooting-minneapolis-minnesota-9aa822670b705c89906f2c699f1d16c5.

[87] *See* Jacob Phillips, *Who as Alex Pretti, the intensive care nurse shot dead in Minneapolis?*, BBC (Jan. 28, 2026), https://www.bbc.com/news/articles/c62r4g590wqo.

[88] *DHS Launches Landmark USCIS Fraud Investigation in Minnesota*, U.S. Citizenship & Immigr. Servs. (Jan. 9, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota.

[89] Miriam Jordan, *ICE Arrested Dozens of Refugees in Minnesota and Sent Them to Texas, Lawyers Say*, N.Y. Times (Jan. 13, 2026), https://www.nytimes.com/2026/01/13/us/ice-arrests-refugees-minnesota.html.

their nationality by forcing their immigration cases on an accelerated track.[90] Less than a month after announcing the Termination, immigration lawyers reported that dozens of asylum cases filed by Somali migrants in immigration courts were suddenly rescheduled and recategorized.[91] Lawyers working in Minnesota as well as Illinois and Nebraska, reported receiving notices that their clients' asylum hearings were abruptly moved up, including hearings that had not yet been scheduled and others set for dates in 2028, to February and March 2026.[92]

119.    According to the immigration attorneys, the pattern of suddenly rescheduling Somali asylum hearings "appear[ed] to be a coordinated effort between the Executive Office for Immigration Review and [Defendant] Department of Homeland Security to reject Somali asylum applications without court hearings,"[93] which would rob immigrants of their day in court and speed up the process of their removal from the country. Chillingly, the affected cases seemed purposefully referred to immigration judges who grant asylum at lower rates than the national average, increasing the likelihood that Somali people would be expelled.[94]

120.    Defendants' immigration enforcement operations in Minneapolis, Minnesota were an extreme manifestation of their discriminatory intent toward the Somali community.

### *Ongoing Discriminatory Targeting of Somalis Since the Termination Announcement for Somalia's TPS Designation*

121.    Since Defendants issued the purported Termination, the Administration has persisted in its discriminatory targeting of Somali people.

---

[90] Ximena Bustillo, *Immigration Courts Fast-Track Hearings for Somali Asylum Claims*, NPR, (Feb. 9, 2026, 12:41 PM), https://www.npr.org/2026/02/09/nx-s1-5707217/somali-asylum-cases-rescheduled.
[91] *Id*.
[92] *Id.*
[93] *Id.*
[94] *Id.*

122.   Just four days after the publication of the  Termination, the President posted on January 18, 2026: "There is 19 Billion Dollars in Minnesota Somalia Fraud. Fake 'Congresswoman' Illhan [sic] Omar, a constant complainer who hates the USA, knows everything there is to know. She should be in jail, or even a worse punishment, sent back to Somalia, considered one of the absolutely worst countries in the World."[95]

123.   On January 21, 2026, during his speech at the World Economic Forum in Davos, Switzerland, President Trump again called Somali people by the racialized term pirate, indicating that he wanted to "shoot them out of the water:" "do[es]n't have anything" beyond "murder and robbing ships, bringing in ships, pirates."[96] He further stated: "Can you believe that, Somalia? They turned out to be higher IQ than we thought. I always say, these are low IQ people, how do they go into Minnesota and steal all that money? And we have – you know they're pirates, they're good pirates but we shoot them out of the water just like we shoot drug boats out."[97]

124.   The President again openly criminalized and condemned the entire Somali population during a January 29, 2026, White House cabinet meeting: "[Somali] people are – what they've done to rip off our country is terrible . . . They will go to wherever they want to go, but it's probably not going to be heaven."[98] And on February 24, 2026, during his State of the Union address, President Trump said, "[t]he Somali pirates who ransacked Minnesota, remind us that there are large parts of the world where bribery, corruption and lawlessness are the norm, not the

---

[95] *Id.*

[96] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, *supra* note 9 (at 00:57:44–00:58:07).

[97] *Transcript: President Trump Delivers an Address at the World Economic Forum in Davos,* 1.21.26, *supra* note 5 (at 01:06:23–01:06:50).

[98] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - January 29, 2026*, Roll Call (Jan. 29, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-january-29-2026/#268.

exception" and stated that "[w]e' re going to take care of this problem."[99] Upon information and belief, the "we" President Trump refers to are Defendants and others in his Administration who are to address the "problem" of Somali people in Minnesota by limiting immigration pathways, including TPS, for Somali people.

125.    Months after the publication of the Termination, President Trump continued to express his unique disdain for Somalia. At an Easter lunch at the White House on April 1, 2026, President Trump raised the topic: "how about in Minnesota? They come from Somalia . . . They're all crooked . . . All stupid, crooked people and they came in from in this case, Somalia . . . Probably the worst, most dangerous country . . . They're bad people."[100]

126.    The next month, during a Rose Garden dinner for law enforcement officials, President Trump once again demonstrated his racialized contempt towards Somalia while thanking law enforcement stating that: "[w]ithout you, we have bedlam . . . without you, we have Somalia."[101] He went on to claim, ". . . they have nothing but crime, bedlam, filth, a horrible place. They say [Somalia] may be the worst place."[102] Further, he instructed Representative Ilhan Omar to "Go back to your own country, talk about a constitution. They don't have, [Laughs] they don't have a constitution. They never will."[103]

---

[99] *Speech: Donald Trump Delivers the State of the Union Address - February 24, 2026*, Roll Call (Feb. 24, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-state-of-the-union-february-24-2026/ (at 00:46:18–00:47:30).

[100] *Remarks: Donald Trump Addresses an Easter Lunch at the White House - April 1, 2026*, Roll Call (Apr. 1, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-easter-lunch-white-house-april-1-2026/#41.

[101] *Speech: Donald Trump Holds a Rose Garden Dinner for Law Enforcement Officials - May 11, 2026*, Roll Call (May 11, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-rose-garden-dinner-may-11-2026/#59.

[102] *Id.*

[103] *Id.*

41

127.    On June 11, 2026, while signing a commercial fishing proclamation in the Oval Office, President Trump again singled out Somalia, and referred to his perception of the Somali people as corrupt and the country as crime-ridden and lacking in law enforcement and overall governance. He stated:

> "[t]hey don't have constitutions in Somalia, they don't have police . . . all they have is people that run around shooting each other. And then [Ilhan Omar] comes and tells us how to run our country. I don't like it . . . [Somalia is] [p]robably among the worst countries in the world. And [Ilhan Omar] says the Constitution of the United States protects me. She shouldn't be protected. Honestly, she should be thrown out of the country. She's corrupt and most of the people that came in are corrupt."[104]

128.    Comments like these indicate both that the Administration views Somali people in a racially discriminatory manner and acknowledges that Somalia is not a safe place for Somali people to return to. Either shows that the real motivations behind the Termination are not the reasons provided in the formal termination notice but they are rooted in discriminatory purpose.

129.    As recently as July 6, 2026, President Trump targeted Somali American kindergarteners in a Truth Social post, attacking their Muslim religion and identity. He posted a video of the kindergarteners at their graduation ceremony at a school in St. Paul, Minnesota and then reposted the same video with an added quote from a right-wing account called "End Wokeness": "Public school in St. Paul, Minnesota . . . Every girl is in a hijab . . . in kindergarten."[105] The Somali schoolchildren were wearing hijabs because they are Muslim, like over 99% of Somali people across the world, another reference to the intersectional discrimination based on religion, race and national origin that Somali people face from President Trump and his Administration.[106]

---

[104] *Remarks: Donald Trump Signs a Commercial Fishing Proclamation in the Oval Office - June 11, 2026*, Roll Call (Jun. 11, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-proclamation-commercial-fishing-june-11-2026/#245.

[105] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jul. 6, 2026, at 10:53 AM), https://truthsocial.com/@realDonaldTrump/posts/116873600928684662.

[106] Ass'n of Religion Data Archives, National/Regional Profiles: Somalia, https://www.thearda.com/world-religion/national-profiles?u=205c (last visited July 29, 2026).

*The Administration's Reliance on White Nationalist Ideology in Its Immigration Decisions*

130.    During both terms in office, the Trump Administration has openly and repeatedly invoked racist language and stereotypes and promulgated policies designed to remove Somali people and other non-white immigrants from the United States without any regard for their circumstances.

131.    Stephen Miller, a member of the President's current and prior cabinets, has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[107] Review of 900 emails sent by Miller to media outlets going back to 2015 revealed repeated themes of white genocide and a focus on interracial crime.[108] A 2019 article noted that Miller has lauded historical immigration laws that imposed quotas based on racist assumptions.[109]

132.    During his first Administration, President Trump invoked the hallmarks of rhetoric used by avowed white nationalists, who shroud their racial animus in the so-called "Replacement Theory," which posits that non-white immigrants will "replace" the white race, and in doing so, undermine their perception of the United States' white foundation, history, and culture.[110]

133.    President Trump also adopted the rhetoric of eugenicists, by embracing the so-called "racehorse theory." [111] He referred to the theory in remarks to a predominantly white crowd

---

[107] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, S. Poverty L. Ctr. (Nov. 12, 2019), https://www.splcenter.org/resources/hatewatch/stephen-millers-affinity-white-nationalism-revealed-leaked-emails/.
[108] *Id.*
[109] Adam Serwer, *Trump's White-Nationalist Vanguard*, The Atlantic (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").
[110] *See* Nat'l Immigr. F., *The 'Great Replacement' Theory, Explained*, (2021), https://forumtogether.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.
[111] Seema Mehta, *Blowing the 'racehorse theory' whistle*, L.A. Times (Oct. 5, 2020), https://enewspaper.latimes.com/infinity/article_share.aspx?guid=f7927a63-d5b7-4097-a9cb-
(continued…)

in Minnesota during his first term: "You have good genes, you know that, right? . . . You have good genes. A lot of it is about the genes, isn't it? Don't you believe? The race horse theory. You think we're so different? You have good genes in Minnesota.[112]" The choice of Minnesota, which has one of the largest populations of Somali people in the world outside of Somalia, as the venue for his remarks invoking eugenics suggests Trump intended a glaring juxtaposition of white Minnesota residents and Somali people.

134.    In the campaign leading to his second presidential term, President Trump said that "we got a lot of bad genes in our country right now"[113] and immigrants from Africa, the Middle East, Asia, and South America are "poisoning the blood of our country," repeating this trope over a two-year span.[114] And he boasted of his success in excluding Somali immigrants despite the dangerous and threatening conditions for nationals in the country stating, for example: "I banned

---

0c2d910def46 (offering related commentary from Paul Lombardo, a Georgia State University law professor who specializes in bioethics and has written multiple books on the history of eugenics in the U.S.: "'When Trump says at a rally in Minnesota, "You have good genes, I believe in the racehorse theory of heredity," he has all of the earmarks of a classic eugenicist,' Lombardo said. 'It has been astounding to me as somebody who has studied this stuff for 40 years that any public figure would be willing to use that kind of language that so clearly echoes the kinds of things we heard from the people who were running the eugenics movement back in the '20s and '30s.'").

[112] *Id.*

[113] Jake Traylor et al., *Trump suggests immigrants have 'bad genes' in latest disparagement of migrants*, NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[114] *See, e.g.*, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam, *Raheem Kassam interviews Donald Trump*, YouTube (Oct. 1, 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45); *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call (June 15, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108 ("So they come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country. They're destroying our country, and we're not going to let it happen.") (at 00:46:02–00:47:05).

refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world . . . [s]ome very rough people, some very, very rough people come out of these areas."[115]

135. In contrast, Trump has repeatedly stated he welcomes immigrants from "[n]ice countries, you know like Denmark, Switzerland . . . . [and] Norway"—all of which are European countries whose nationals are predominantly white.[116]

136. Since resuming office, President Trump and his Administration have repeatedly used the term "remigration."[117] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[118]

137. In June 2025, President Trump "directed" the "entire Administration to put every resource possible" into the "single largest Mass Deportation Program in History."[119] He said he would not "let America become a Third World Country filled with Crime, failing Schools, collapsing Hospitals, and total Social Dysfunction. It's called 'REMIGRATION' and, it will, MAKE AMERICA GREAT AGAIN!"[120]

---

[115] *See Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, Roll Call (Oct. 16, 2023), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#11 (at 00:36:59–00:37:40).

[116] *See* Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

[117] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Truth Soc. (July 5, 2025, at 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[118] Connor Greene, *Trump's Department of Homeland Security Embraces a Word With Ties to White Nationalism*, Time (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS issued a all to 'remigrate.' Here's the history of the term often associated with far-right groups*, CNN (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[119] Donald J. Trump (@realDonaldTrump), Truth Soc. (June 15, 2025, at 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[120] Donald J. Trump (@realDonaldTrump), Truth Soc. (July 5, 2025, at 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

138.    DHS has echoed these sentiments, including by posting a one-word tweet in October 2025 that simply stated "Remigrate."[121] And on December 15, 2025, DHS claimed over social media that "[a]ll America wants for Christmas is remigration."[122]

139.    Due to the Administration's policies, President Trump was able to announce in January 2026 at the World Economic Forum that "[i]n 2025, for the first time in fifty years, the United States had reverse migration," stating "[b]oy, that was nice."[123]  He went on to say that "[t]he explosion of prosperity . . . and progress that built the West" came from the "very special culture" "share[d]" by "America and Europe," which "we have to keep [] strong" and "defend" in order to "rediscover the spirit that lifted the West from the depths of the dark ages to the pinnacle of human achievement."[124]

### *Policies that Impede Somali People's Entry into the U.S.*

140.    The Administration has undertaken a number of immigration policy changes to effectuate its goal of severely reducing if not eliminating Somali people from the United States.

141.    On November 27, 2025, USCIS announced policy changes under which its adjudication of pending and prospective immigration benefits applications from Somalia, including applications for TPS, accord negative weight to "country-specific factors,"—flagging illustratively screening and vetting capabilities, information sharing policies, whether there is a significant "terrorist presence" within the territory, visa overstay rates, and cooperation with

---

[121] Homeland Security (@DHSgov), X (Oct. 14, 2025, at 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[122] Homeland Security (@DHSgov), X (Dec. 15, 2025, at 2:59 PM), https://x.com/DHSgov/status/2000656958748328114.

[123] *Transcript: President Trump Delivers an Address at the World Economic Forum in Davos*, 1.21.26, *supra* note 5 (at 01:02:47–01:03:09).

[124] *Id*. (at 01:08:54-01:09:39); *see also* David Smith, *Trump paints himself as great white hope in racism-drenched Davos speech*, The Guardian (Jan. 21, 2026), https://www.theguardian.com/business/2026/jan/21/trumps-davos-speech-stephen-miller-white-identity-politics.

accepting back their deported nationals from the U.S.—the sorts of factors at issue in the entry bans  the President instituted effective June 9, 2025, against  Somalia.[125]

142.    On December 2, 2025, USCIS instituted a new policy (1) pausing all asylum processing in the U.S., (2) pausing the processing of immigration benefits applications, including applications for TPS, from people in the U.S. from Somalia; (3) announcing the revetting of approved beneficiaries of immigration benefits, including beneficiaries of Somali TPS; and (4) directing immigration officers to treat a person's nationality as a negative factor when deciding applications.[126] On December 16, 2025, President Trump extended this ban.[127]

143.    On January 21, 2026, the U.S. Department of State instituted a policy indefinitely pausing the issuance of immigrant visas (entry permits) to Somali nationals.[128]

***Preferential Treatment of Immigrants Who are White and European***

144.    These policies do not simply reflect a desire to crack down generally on all immigration into the United States. To the contrary, Defendants have shown a strong bias in favor of immigrant populations they perceive to be European and white.

---

[125] *See* U.S. Citizenship & Immigr. Serv., Policy Alert on Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251127-Discretion.pdf (citing Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, Fed. Reg. 22,491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf).

[126] *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

[127] Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025).

[128] *See* U.S. Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance* (last updated Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

145.    For example, the TPS designation of Ukraine, the sole majority-white nation among the fifteen with active TPS designations at the time the Administration took office in January 2025, has been left undisturbed. Ukraine, like Haiti and Venezuela, received an extension of it TPS designation until 2026 from the previous administration.[129] And like Venezuela and Haiti, thousands of recent immigrants from Ukraine received status through the previous administration's TPS designations. However, in January and February of 2025, Defendants Noem and DHS targeted only the TPS designations of Haiti and Venezuela—both non-European countries whose nationals are predominantly non-white—for unprecedented "vacatur" attempts of the previous administration's extensions of TPS. *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 751, 752–53 (9th Cir. 2026). After the announcement of the purported administrative vacaturs of the TPS designations for Venezuela and Haiti, and when asked if he planned to revoke TPS for Ukrainians, President Trump responded, "[w]e're not looking to hurt them. Especially Ukrainians, they've gone through a lot."[130] The distinction the President has offered to predominantly white Ukrainian immigrants, also appears in his campaign to cancel humanitarian parole statuses for non-white, non-European immigrants, while leaving those protections in place for Ukrainians. In March 2025 DHS revoked the parolee status of all beneficiaries under the Cuban, Haitian, Nicaraguan and Venezuela parole program, while leaving the "United 4 Ukraine" parole program in place for the majority white nationals of Ukraine. *See Doe v. Noem*, 784 F. Supp. 3d 437, 451 (D. Mass. 2025).

---

[129] Extension of the Designation of Ukraine for Temporary Protected Status, 90 Fed. Reg. 90,5938 (Jan. 17, 2025); Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5,961 (Jan. 17, 2025); Extension and Redesignation of Haiti for Temporary Protected Status 89 Fed. Reg. 54,484 (July 7, 2024).

[130] Sergio Martinez-Beltran & Joel Rose, *As protections expire, Ukrainians who escaped war face an uncertain future*, NPR (Mar. 28, 2025), https://www.npr.org/2025/03/28/nx-s1-5318049/as-protections-expire-ukrainians-war-uncertain-future-uniting-for-ukraine.

146.     The Administration has relied on visa-overstay rates to justify immigration policy decisions adverse to Somalia, such as terminating its TPS designation.[131] However, objective data about visa-overstay rates reveals that nationals of countries with high numbers of overstays—such as the United Kingdom or Canada—have not been targeted by the Administration's immigration-related policy changes.[132]

147.     Alongside not prioritizing white and European immigrants for adverse immigration consequences, the Administration has also instituted immigration policies that favor these populations.

148.     On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs the DHS Secretary (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[133] Afrikaners are a white minority ethnic group in South Africa who are "aligned with an extremist ideology that has historically resisted integration and democratic reform."[134] The Trump Administration has called them "victims of unjust racial discrimination."[135]

---

[131] *See* 91 Fed. Reg. at 1,551.

[132] Margy O'Herron & Doug Rand, *New Entry Bans, Same Faulty Reasoning*, The Brennan Ctr. for Justice (Dec. 19, 2025), https://www.brennancenter.org/our-work/research-reports/new-entry-bans-same-faulty-reasoning.

[133] Exec. Order No. 14204, 90 Fed. Reg. 9,497 (Feb. 12, 2025).

[134] Kimahli Powell & Jean Freedberg, Harvard Carr-Ryan Ctr. for Hum. Rts, *The Afrikaner Exception: Race and Strategic Dismantling of U.S. Refugee Protection under the Trump Administration* (May 19, 2025), https://www.hks.harvard.edu/centers/carr-ryan/our-work/carr-ryan-commentary/afrikaner-exception-race-and-strategic-dismantling.

[135] Bustillo, *First Afrikaners arrive in U.S. under radically redrawn refugee program*, NPR (May 12, 2025), https://www.npr.org/2025/05/12/g-s1-65984/south-african-afrikaner-refugee-us.

149.    On March 7, 2025, President Trump posted on Truth Social about the new policy favoring refugee admission and settlement for Afrikaners, stating: "any Farmer (with family!) from South Africa, seeking to flee that country for reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[136]

150.    On May 12, 2025, the first group of white South African refugees arrived in the United States under this program.[137] The review and approval of their applications was expedited; they were brought to the U.S. on a government-chartered flight; and they were greeted at Washington Dulles International Airport by government officials.[138] In explaining why these refugees were being allowed into this country while others were not, Deputy Secretary of State Christopher Landau said that Afrikaners "could be assimilated easily into our country,"[139] presumably because of their race.

151.    A few months later, President Trump announced that the refugee cap for 2026 would be reduced from 125,000 last year, to just 7,500 people—the majority of whom will be white South Africans.[140]

152.    And on February 26, 2026, Reuters reported that the "U.S. aims to process 4,500 refugee applications from white South Africans per month, far above President Donald Trump's stated refugee program cap, and is installing trailers on embassy property in Pretoria to support the

---

[136] Donald J. Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114121529754059509.

[137] Bustillo, *First Afrikaners arrive in U.S. under radically redrawn refugee program*, *supra* note 134.

[138] *Id.*

[139] *Id.*

[140] Rebecca Santana, *Trump limits annual U.S. refugees to 7,500. It'll be mostly white South Africans*, PBS News (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

effort."[141] The article explains that the "new target, contained in a previously unreported document from the U.S. State Department dated January 27, signals a push to ramp up admissions from South Africa, while refugee applications from other areas have been severely curtailed."[142]

153.    In the early months of his second Administration, President Trump announced the creation of an additional policy favoring white and/or European immigrants: a new visa program that he calls the "gold card."[143] Under this program, noncitizens who, in President Trump's words, are "very high-level people" would be able to purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship.[144] This program will disproportionately reduce immigration barriers for white individuals: after the United States, Western Europe has the largest percentage (28 percent) of the world's millionaires.[145] Aside from the United States, the places with the highest proportion of millionaires per capita include Luxembourg, Switzerland, Australia, New Zealand, the Netherlands, and Denmark—all majority white countries.[146]

---

[141] Ted Hesson & Nellie Peyton, *Exclusive: US aims to bring in 4,500 white South Africans per month as refugees, document says*, Reuters (Feb. 26, 2026), https://www.reuters.com/world/us-aims-bring-4500-white-south-africans-per-month-refugees-document-says-2026-02-26/.
[142] *Id.*
[143] Shawn McCreesh, *Trump Plans 'Gold Card' Alternative to Green Cards for 'High Level People'*, N.Y. Times (Feb. 25, 2025), https://tinyurl.com/2a7c9szj.
[144] Ryan Mac & Hamed Aleaziz, *Musk's Team Is Building a System to Sell 'Gold Card' Immigrant Visas*, N.Y. Times (Apr. 16, 2025), https://tinyurl.com/bdycjm6c.
[145] UBS, *Global Wealth Report 2024* (2024), https://perma.cc/NST7-WZDR.
[146] *Id.*

154.    In addition to policies favoring white and European immigrants, the Administration

has posted vivid iconography online that reflects those preferences:



Fig. A[147]                    Fig. B[148]                    Fig. C[149]                    Fig. D[150]

## DEFENDANTS' DEFECTIVE PERIODIC REVIEW OF SOMALIA'S TPS DESIGNATION AND THE RESULTING PURPORTED TERMINATION DECISION

155.    On January 14, 2026, Defendants issued a notice in the Federal Register,

purportedly terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026.[151]

The Termination notice reveals that the periodic review and resulting termination of Somalia's

TPS designation: (1) resulted from the discriminatory and pretextual decision to terminate TPS for

Somalia; (2) involved unexplained and unreasonable changes in statutory interpretation and related

---

[147] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, at 10:06 PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[148] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, at 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[149] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.

[150] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 16, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22.

[151] 91 Fed. Reg. 1,547.

changes in policies and practices for conducting periodic reviews of TPS designations; (3) violated the requirements of the TPS statute by (i) not undertaking required consultation with appropriate agencies, (ii) not undertaking a good faith and objective review of evidence of relevant country conditions, and (iii) impermissibly considering the Administration's understanding of domestic "national interest"; and (4) departed without explanation from past agency practice by (i) relying on domestic "national interest" as a basis for the Termination and (ii) only providing Somali TPS beneficiaries and their U.S.-based love ones a 60-day transition period before the effective date of the Termination.

### *Preordained, Pretextual, and Discriminatory Periodic Review*

156.    Congress deliberately crafted the TPS statutory scheme to solve the problem of political whims that had previously driven decision-making about humanitarian relief for immigrants in the U.S. for whom dire conditions in their countries of origin would render their return unsafe. *See supra* ¶¶ 57-58.

157.    Under the TPS statute, Congress tasked the Attorney General—not the President—with periodic reviews of TPS designations according to mandatory procedural requirements and related decisions to terminate designations. *See* 8 U.S.C. §§ 1254a(b)(3)(A)–(B).

158.    Nevertheless, on November 21, 2025—nearly two months before DHS Secretary Noem's formal announcement of the purported Termination on January 14, 2026, through the Federal Register—President Trump posted on social media that he was terminating TPS for Somalis in Minnesota "effective immediately." *See supra* ¶¶ 1, 95.

159.    The President's post reflects his goal of eliminating TPS for Somalia, his disregard for the procedural requirements of the TPS statute, and his disregard for Congress's goal in enacting the TPS statute: curbing the impact of presidential whims on access to country-based humanitarian immigration relief.

160.    Repeated anti-Somali statements from the President—predating and spanning the periodic review period for Somalia's designation and beyond—further reflect his and Defendants' discriminatory agenda to terminate Somalia's TPS designation. *See supra* ¶¶ 94–127.

161.    As an appointee of President Trump who serves under his authority and direction, then DHS Secretary Noem hewed to the President's agenda to purportedly terminate Somalia's TPS designation—as reflected in Defendant DHS's statements echoing Trump's comments about the Termination and effectuating this goal via a discriminatory periodic review process. *See supra* ¶¶ 104, 105, 107.

162.    On information and belief, DHS Secretary Noem's periodic review of Somalia's TPS designation and purported decision to terminate it were unduly influenced by President Trump's discriminatory motives and involved pretextual justifications with no acknowledgment of the true reasons for the Termination as required by statute.[152]

### *Unexplained Changes in Interpretation of the TPS Statute and in Related Policies and Practices for Periodic Reviews*

163.    The Administration departed from past agency practices for periodic reviews of TPS designations and instituted new policies and practices for them—without any corresponding acknowledgment or explanation to the public. On information and belief, these departures in policy and practice reflect an unexplained change in interpretation by DHS of the meaning and

---

[152] *See* 91 Fed. Reg. at 1,553; *cf. Saget*, 375 F. Supp. 3d at 346–53, 361–62 (postponing termination of TPS for Haiti based on likelihood of success of APA claims that periodic review and resulting termination were preordained, pretextual, and politically influenced); *cf. also Afr. Cmmtys. Together v. Noem*, No. 1:25-cv-13939-PBS, 2026 WL 395732 at *9–11 (D. Mass. Feb. 12, 2026) *("ACT I")* (postponing termination of TPS for South Sudan based on likelihood of success of APA claim that periodic review and resulting termination were preordained and pretextual)*; Aung Doe v. Noem*, No. 1:25-cv-15483, 2026 WL 184544 at *13–21 (N.D. Ill. Jan. 23, 2026) (same with respect to TPS for Burma); Oral Order at 25, *Dahlia Doe v. Noem*, 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025), Dkt. 57 (same with respect to TPS for Syria).

requirements of the periodic review and termination provisions of the TPS statute. These new interpretations are also unreasonable in light of the goals and text of the TPS statute.

164.    *Consultation*: The TPS statute requires consultation with appropriate agencies during periodic reviews of TPS designations. 8 U.S.C. § 1254a(b)(3)(A). Under past agency practices, the State Department was among the appropriate agencies whom the DHS Secretary would consult, by receiving and reviewing country conditions reporting and related recommendations from the State Department.[153]

165.    By contrast, in email exchanges dated April 8, 2025, officials of USCIS noted that the Department of State would not be "provid[ing] country conditions [information] anymore."[154] On information and belief, this shift in practice reflects an unexplained change by DHS in its interpretation of its obligations under the TPS statute to consult appropriate agencies. *See* 8 U.S.C. § 1254a(b)(3)(A).

166.    DHS's unexplained change in interpretation is unreasonable. The State Department has unique insights into and expertise about humanitarian and human rights conditions in foreign states that map directly onto Congress's purpose in enacting the TPS statute.[155]

167.    It also reflects a preordained goal of skewing periodic reviews toward termination decisions, rendering the periodic review and purported Termination of Somalia's designation pretextual.

---

[153] *See, e.g.*, GAO Report, *supra* note 19 at 2, 8, 16, 18, 23, 43; *see also, e.g.*, *Saget*, 375 F. Supp. 3d at 298–300 (describing customary practices for consultation during periodic reviews, including with State Department).

[154] *See* MacLean Decl., Ex. 21 at 3, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-22; *see also id.*, Ex. 27 at 3, Dkt. 176-28 (March 21, 2025, email exchange involving USCIS officials and noting that "going forward State [Department] will no longer submit detailed COI [country conditions] reports").

[155] *See* GAO Report, *supra* note 19 at 2, 8, 16, 18, 23, 43.

168.    *Scope and Nature of Country Conditions Review*: Under the TPS statute, the Attorney General is supposed to undertake a good faith and objective review of available evidence of country conditions relevant to a given ground for the TPS designation.[156] Under past agency practice, USCIS would review available and objective evidence of country conditions that is relevant to legal grounds for TPS designation, including conditions different from or in addition to those considered during the initial designation on a given ground.[157]

169.    By contrast, email exchanges dated February 28, 2025, reflect an unexplained shift in protocol for the scope of reviewable country conditions information: a USCIS official noted that as a matter of course for periodic reviews, DHS "is very focused on [country conditions] research that pertains directly to the original reason for a country's TPS designation and the ability for the U.S. to successfully return [people] to that country."[158]

170.    Further email exchanges dated February 19, 2025, involving USCIS officials reflect a practice of cherry-picking country conditions evidence reflecting purported "improvements" in the country: the email correspondence states that country conditions memoranda for consideration by DHS Secretary Noem "should include additional information that would support different decision outcomes. For example, are there improvements that have been made in the country?"[159]

171.    On information and belief, both of these shifts in practice reflect an unexplained change in interpretation by DHS of the requirement in the TPS statute to undertake an objective

---

[156] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 346.

[157] *See, e.g., Saget*, 375 F. Supp. 3d at 350 (the "DHS Secretary, DHS, and USCIS had a longstanding practice of considering all country conditions when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition.").

[158] *See* MacLean Decl., Ex. 14 at 5, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-15.

[159] *See id*. Ex. 15 at 3, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.) Dkt. 176-16.

and good faith review of relevant country conditions. *See* 8 U.S.C. § 1254a(b)(3)(A). That shift is not reasonable because it runs counter to the text and purpose of the TPS statute.

172.    Both unexplained shifts also reflect a preordained goal of skewing periodic reviews toward termination decisions, rendering the periodic review and purported Termination of Somalia's designation pretextual.

173.    *Consideration of Domestic "National Interest" as a Basis for Termination*: Under past agency practices over a thirty-year span, the government customarily did not assert domestic "national interest" as a basis for terminating a TPS designation. This baseline is reflected in notices in the Federal Register announcing terminations of TPS designations, spanning 1992–2018, under agency leaders appointed by previous presidents and spanning party lines.[160]

174.    By contrast, DHS Secretary Noem asserted the national interest rationale in purporting to terminate Somalia's TPS designation.[161]

175.    This unexplained departure from past agency practice is corroborated by email exchanges between USCIS officials dated February 28, 2025, which note that, as a matter of course, periodic reviews should look for data concerning overstays of non-immigrant visas by the nationals of the TPS-designated country and "fraud or vetting problem statistic[s]" concerning

---

[160] *See* Decl. of Golnaz Fakhimi, *African Communities Together v. Noem*, No. 1:25-cv-13939-PBS (D. Mass. Dec. 23, 2025) ("*ACT I*"), Dkt. 8-7 at 19–29 (Ex. 15, Decl. of Aaron Reichlin-Melnick) (elucidating that review of the 35-year history of TPS demonstrates that, before 2025, the sole rationale cited to justify termination of TPS had been an end to the temporary country conditions which authorized the initial designation).

[161] *See* 91 Fed. Reg. at 1,550–53. DHS Secretary Noem's nine other announcements citing to purported domestic "national interest" as a basis for purportedly terminating TPS designations based on extraordinary circumstances concern the TPS designations of these countries: Ethiopia, South Sudan, Cameroon, Haiti, Burma, Afghanistan, Syria, Yemen. The nationals of four of these nine countries are majority Black and either African or descended from Africans.

nationals of the TPS-designated country[162]—which are among the supposed "national interest" rationales that show up in the Termination notice for Somalia.[163]

176.    On information and belief, this departure from past agency practice reflects a change in interpretation by DHS of the provisions of the TPS statute. This selective fact-finding to support a preordained goal of terminating a TPS designation is unreasonable in three ways: it runs counter to the statute's procedural requirements, to its overarching purpose to protect foreign nationals from ongoing conditions of insecurity in their home countries, and to accomplish Congress's goal of curbing the influence of presidential whims on access to country-based humanitarian immigration protection. *See* 8 U.S.C. § 1254a(b)(1)(C) (designations based on extraordinary circumstances); *id*. § 1254a(b)(3)(A) (periodic reviews); *id*. § 1254a(b)(3)(B) (terminations of designations); *see also supra* ¶¶ 57-58, 69–85.

***Failure to Consult with Appropriate Agencies***

177.    The TPS statute requires consultation with appropriate government agencies as part of the periodic review process and before termination. During the periodic review of Somalia's TPS designation, the only communication between DHS and another agency consists of one single email from a DHS Under Secretary to a State Department Senior Bureau Official saying that a decision on Somalia's TPS was required by January 16, 2026, and seeking "to put this on [the State Department's] radar for the consultation with State Department and the memorialization of the consultation for inclusion in the decision memo. Dkt. No. 42-2 at AR-000733. The State official responded less than ten hours later, "confirm[ing] that State does not have foreign policy objections to a change in TPS for Somalia." *Id.*

---

[162] *See* MacLean Decl., Ex. 14 at 5, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-15.
[163] *See* 91 Fed. Reg. at 1,550–53.

178.    Customarily within periodic reviews of a TPS designation, the Attorney General relies on both USCIS and the State Department's prepared country conditions memoranda and recommendations.[164]

179.    Somalia's purported Termination notice does not mention any agency by name that the Secretary consulted during the periodic review process, describe the content of any consultations, nor mention who or what was considered during those consultations. Rather, the notice merely includes boilerplate language that the Secretary "consult[ed] with appropriate U.S. Government agencies."[165]

180.    That boilerplate language is belied by what the Termination notice does not otherwise say or reference.

181.    Significantly, on May 14, 2025, the State Department issued a Level 4 Travel Advisory concerning Somalia, indicating extremely unsafe conditions there.[166] However, neither this advisory nor the conditions it references are mentioned anywhere in the Termination notice.[167]

182.    Prior notices, by contrast, did refer explicitly to country conditions information from the State Department that formed a critical part of the periodic review process.[168] The

---

[164] *See, e.g.*, GAO Report, 19 at 2, 8, 16, 18, 23, 43; *Saget*, 375 F. Supp. 3d at 346.
[165] *See generally* 91 Fed. Reg. 1,547.
[166] U.S. Dep't of State, *Somalia Travel Advisory* (May 14, 2025), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/somalia-travel-advisory.html.
[167] *See* 91 Fed. Reg. at 1,543.
[168] *See, e.g.*, 89 Fed. Reg. at 59,138 (through four footnotes, referencing: U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Somalia* (2024), https://www.state.gov/wp-content/uploads/2024/02/528267_SOMALIA-2023-HUMAN-RIGHTS-REPORT.pdf); 88 Fed. Reg. 15,434 at 15,437–38 (referencing State Department sources in six footnotes).

Termination notice does not explain its departure from the past agency practice of consulting with that agency and relying on its country conditions reports.[169]

183.    Even assuming DHS Secretary Noem had not instituted categorical changes in policies and practices for how periodic reviews are conducted, on information and belief, she nevertheless did not undertake required consultation with the State Department or other appropriate agencies during her periodic review of Somalia's TPS designation.

***Failure to Undertake Statutorily Required, Good Faith, Objective Review of Relevant Country Conditions***

184.    DHS Secretary Noem failed to undertake a good faith review of available and objective evidence of current country conditions in Somalia relevant to its two based for TPS designation: ongoing armed conflict and other extraordinary and temporary conditions.[170]

185.    *Omission of and Disregard for Evidence of Unsafe Conditions Reported by the Executive Branch:* With respect to the armed conflict basis for Somalia's TPS designation, the Termination notice fails to review available and objective evidence of unsafe conditions in Somalia, including evidence reported *from within the Executive Branch*.

186.    Notably, the Termination does not mention that on April 8, 2025, President Trump himself renewed recognition of Somalia's "national emergency" status under the International Emergency Economic Powers Act, citing to the "deterioration of the security situation and persistence of violence of Somalia" that is "committed against civilians" there and attributable to

---

[169] *Compare generally* 91 Fed. Reg. 1,547, *with, e.g.*, 89 Fed. Reg. at 59,138; GAO Report at 15–21.

[170] *Cf.* 8 U.S.C. § 1254a(b)(3)(A); *see also, e.g.*, *Saget*, 375 F. Supp. 3d at 346, 350.

Al-Shabaab.[171] And the notice does not otherwise explain why or how such conditions are consistent with safe return for Somali nationals.[172]

187.   Nor does the Termination notice review or acknowledge the Level 4 travel advisory that the Department of State published on May 14, 2025—which emphasizes that "violence and explosive attacks can happen anywhere in Somalia, at any time" and that armed groups "continue to plot kidnappings, bombings, and other attacks in Somalia… with little or no warning," targeting nearly every public space, from airports, seaports, hotels and restaurants, shopping areas, public places that attract large crowds and tourists, and government, military, and other convoys.[173] The Termination notice does not explain why or how such conditions that make even temporary travel to Somalia ill-advised could be consistent with safe return there for its nationals.[174]

188.   The absence of both sources from the notice reflects an unexplained departure from past agency practice, through which the government had reviewed comparable evidence.[175] And it otherwise reflects pretext from Defendants here: asserting the possibility of supposedly safe return for purposes of the Termination, while sounding alarm elsewhere to caution against even temporary travel to Somalia.

189.   *Cherry-Picked Evidence Concerning Areas of Somalia Supposedly Safe for Return*: In support of its purported termination of Somalia's armed conflict designation for TPS, the Termination notice asserts the possibility of safe return to Somalia categorically or in given parts

---

[171] *Compare generally* 91 Fed. Reg. at 1,547–53, *with* Continuation of the National Emergency With Respect to Somalia, 90 Fed. Reg. 15,391 (Apr. 10, 2025).
[172] *See* 91 Fed. Reg. at 1,547–53.
[173] U.S. Dep't of State, *Somalia Travel Advisory*, *supra* note 166.
[174] *See* 91 Fed. Reg. at 1,547–53.
[175] *Compare* 91 Fed. Reg. at 1,547–53, *with* 89 Fed. Reg. at 5,9137–38 (reviewing evidence of threats to safety that al-Shabaab and other armed groups pose), *and* 88 Fed. Reg. at 1,5437 (same).

of the country, relying either on subjective statements or on cherry-picked content from sources that otherwise contain objective evidence of unsafe conditions.

190.    For example, the Termination notice states that Somalia "is no longer experiencing an ongoing armed conflict" but points only to selective, subjective, unsubstantiated statements by the Somali President at the United Nations about Somalia's transition away from the civil conflict, without any consideration of the nature or context of the source.[176]

191.    The Termination notice likewise asserts that "requiring Somali nationals to return to Somalia would not pose a serious threat to their personal safety as there are areas within Somalia where Somali nationals may live in safety." It suggests, as an example, Somaliland, which declared independence from Somalia in 1991, characterizing it as a supposed "oasis" for stability in a turbulent region.[177] The Termination notice cites to a January 2025 Council of Foreign Relations report to support that assertion.[178] However, the Termination notice fails to acknowledge that the same report further elaborates that Somaliland will struggle without broad international recognition or a compromise with Somalia and that diplomacy will also "likely to be complicated by Somalia's ongoing battle against al-Shabaab Islamist insurgent group, as well as deteriorating security and stability in the broader Horn of Africa region."[179] The Termination notice does not cite to these portions of the report, nor explain why they are irrelevant to the statutory consideration of the safety of returning nationals.

---

[176] *See* 91 Fed. Reg. at 1,549.

[177] *Id.* at 1,549 n. 40 (citing European Union Agency for Asylum, *Country of Origin Information Report—Somalia: Country Focus* (May 2025), https://www.euaa.europa.eu/publications/coi-report-somalia-country-focus ("EUAA May 2025 Somalia Report")).

[178] 91 Fed. Reg. at 1,549 n. 40 (citing Council on Foreign Relations, *Somaliland: The Horn of Africa's Breakaway State* (Jan. 21, 2025), https://www.cfr.org/ backgrounder/somaliland-horn-africas-breakaway-state.

[179] Council on Foreign Relations, *Somaliland: The Horn of Africa's Breakaway State, supra* note 179.

192.    The Termination notice characterizes Puntland as another destination within Somalia where Somali nationals supposedly can safely return, relying on a report by the European Union Agency for Asylum ("EUAA").[180] However, that same report discusses how armed groups in Puntland forcibly "continued to recruit children." and how repeated forms of female-genital mutilation are rampant there.[181] The Termination notice does not review these portions of the report, nor explain why they are irrelevant to the statutory consideration of the safety of returning nationals.

193.    Likewise, the Termination notice cites the United Nations High Commissioner for Refugees ("UNCHR") in asserting that "parts of the country are suitable" for the return of Somali nationals.[182] However, a more fulsome review of that source reveals widespread internal displacement driven by drought, floods, conflict, and other precarity, across multiple regions.[183] The Termination notice does not review these data, nor explain why they would be irrelevant to the statutory consideration of the safety of returning nationals.

194.    The evidence of ongoing armed conflict and other extraordinary circumstances lurking within the sources that are cited in the Termination notice are relevant to considerations assessed within prior periodic reviews of Somalia's TPS designation.[184] Although the Termination notice does acknowledge some of these conditions, it only does so to present them against supposed "improvements" in conditions.

---

[180] EUAA May 2025 Somalia Report, *supra* note 177 at 25, 37–38.

[181] *Id.* at 26, 37.

[182] 91 Fed. Reg. at 1,549 n. 41 (citing U.N. High Comm'r for Refugees (UNHCR), *Somalia Internal Displacement* (Sep. 8, 2017), https://data.unhcr.org/en/dataviz/1?sv=1&geo=192) ("UNHCR Somalia Internal Displacement 2017") (last updated Feb. 2026).

[183] *See* UNHCR Somalia Internal Displacement 2017, *supra* note 181.

[184] *Compare* 91 Fed. Reg. 1,549, 1,552, *with* 89 Fed. Reg. 59135, 59137–38.

195. These discrepancies between the stated rationales within the Termination notice and the contents of the evidence she claims to have reviewed indicate pretext and a preordained goal of concluding safe return is possible for Somalis to Somalia.

196. *Cherry-Picked Evidence of Supposed "Improvements":* The Termination notice demonstrates the same pattern as to the extraordinary conditions ground for Somalia's TPS designation. It points to supposed economic improvements in Somalia, but information from the same sources cited contradict that premise.[185] And the notice's review of conditions including climatic shocks, food insecurity, and violence from armed groups departs without explanation from prior reviews of comparable conditions.

197. The Termination notice acknowledges "ongoing challenges" in Somalia relevant to the extraordinary circumstances basis for its TPS designation, stating that: "In a recent press briefing, the United Nations Secretary-General spokesperson stated: 'severe drought in the country is putting millions of people's lives at risk' and 'approximately 3.4 million people in Somalia are currently experiencing high levels of acute food insecurity.'"[186] The notice further acknowledges that al-Shabaab "continues to exploit the Somalian government's limited state capacity and the

---

[185] *Compare* 91 Fed. Reg. at 1550 (asserting "building boom" without explaining its putative relevance to statutory consideration of safe return and citing *Rising From The Ashes: Mogadishu's Building Boom*, Barron's (Nov. 23, 2025) https://www.barrons.com/news/rising-from-the-ashes-mogadishu-s-building-boom-53c34085?reflink=desktopwebshare_permalink), *with Rising From the Ashes: Mogadishu's Building Boom* ("Al-Shabaab has retaken some 200 villages in a surge around the capital this year" . . . "'Wealthy officials and foreigners may enjoy increased security and living standards, but 'that is completely different from the day-to-day experience of people in other parts of the city'").

[186] 91 Fed. Reg. at 1,549; *id*. at n.42 (citing U.N., Daily Press Briefing by the Office of the Spokesperson for the Secretary- General (Nov. 13, 2025), https://press.un.org/en/2025/db251113.doc.htm.

country's dire humanitarian crises to launch indiscriminate attacks against government forces, foreign peacekeepers, and civilians."[187]

198.    Nevertheless, the Termination notice concludes that Somalia has supposedly made "significant progress" in its governance, security, and economic management, citing a "building boom" in the capital Mogadishu.[188] But a source cited in the Termination notice contradicts this assertion by discussing Al-Shabaab's stronghold over Mogadishu, including in "collecting taxes on large and small businesses on the big markets of the city and also from individuals building houses or shops."[189]

199.    Secretary Noem also failed to consider a U.N. Secretary General report and other objective and available sources that provides a contrasting perspective on the economic developments and ongoing reforms in Somalia. For example, the U.N. report notes that Somalia's "economic outlook is clouded by climate shocks, slow domestic revenue growth and emerging challenges in global trade and aid policy, including a rapid decline in official development assistance."[190]

200.    The Termination notice did not review competing narratives on Somalia's conditions within sources that it cited or otherwise within other available objective evidence relevant to the statutory consideration of safe return and analogous to evidence in prior reviews.[191]

---

[187] *Id*. at 1,549.

[188] *Id*.

[189] EUAA May 2025 Somalia Report, *supra note* 178 at 100.

[190] U.N. Sec. Council, *Report of the Secretary-General on Somalia* 3 (Sep. 30, 2025), https://docs.un.org/en/S/2025/613.

[191] *Compare* 91 Fed. Reg. 1,547, *with* 89 Fed. Reg. 59,135 (citing ongoing armed conflict, floods, droughts, food insecurity, and disease outbreaks), *and* 88 Fed. Reg. 15,434 (citing ongoing armed conflict, droughts, floods, disease outbreaks, malnutrition, food insecurity, gender-based violence, and recruitment of child soldiers).

201.    Discrepancies between the stated rationales within the Termination notice, the actual contents of the evidence claimed to have been reviewed, and the available and objective evidence that appears not to have been reviewed indicate pretext and a preordained goal of concluding safe return is possible for Somalis to Somalia.

***Impermissible Consideration of the Administration's Construction of Domestic "National Interest"***

202.    *Statutory Construction and Past Agency Practice:* Congress categorically omitted consideration of domestic "national interest" from periodic reviews of TPS designations. It textually limited periodic reviews to consideration only of the "conditions in the foreign state" for which "a designation is in effect," in order to determine "whether the conditions for such designation . . . continue to be met." *See* 8 U.S.C. § 1254a(b)(3)(A).

203.    Likewise, Congress omitted reference to domestic "national interest" from the provision governing terminations of TPS designations. That provision states that if the Attorney General determines that "a foreign state no longer continues to meet" the "conditions for designation," the Attorney General "shall terminate" the designation. *See* 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

204.    Both periodic reviews and resultant terminations of TPS designations turn on the "conditions" in the foreign state—which are the "conditions" for designation.

205.    As discussed above, the TPS statute defines three grounds for a TPS designation: one based on ongoing armed conflict, one based on environmental disaster, and one based on extraordinary and temporary conditions rendering return unsafe. *See* 8 U.S.C. §§ 1254a(b)(1)(A) (armed conflict); *id*. § 1254a(b)(1)(B) (environmental disaster); *id*. § 1254a(b)(1)(C) (extraordinary and temporary conditions).

206.    Of those three grounds for TPS designation, *only one* refers in any way to domestic "national interest": the extraordinary circumstances ground.

207.    Its text provides that the Attorney General "may designate" if she finds that "there exist extraordinary and temporary conditions in the foreign state that prevent" people "who are nationals of the state from returning to the state in safety**, unless** the Attorney General finds that permitting" the people "to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C) (emphases added).

208.    The structure of the provision makes clear that the text preceding "unless" concerns the "conditions" for designation, which are the relevant ones in the foreign state. By contrast, the Attorney General's ability to consider domestic "national interest"—defined in the text that follows "unless"— functions *not* as a "condition" for designation *but as an exception to it*.

209.    This reading of the statute is consistent with past agency practice concerning periodic reviews and resulting terminations of TPS designations. Prior to 2025, the administration's views of domestic "national interest" were not invoked as the basis for any termination. *See, e.g.*, *supra* ¶¶ 59, 78.

210.    By contrast, DHS Secretary Noem invoked a "contrary to national interest" rationale to justify the purported termination of the TPS designation for Somalia without explaining the shift in agency practice.

211.    *Pretextual Assertion of Supposed "National Interest" Within the Termination Notice for Somalia's TPS Designation:* The Secretary's assertions of "national interest" in the Termination notice appear to be boilerplate language lifted directly from prior TPS termination

notices.[192] The Termination Notice includes references to data that are either unsubstantiated or irrelevant to Somali TPS beneficiaries, belying DHS Secretary Noem's asserted "national interest" rationales.

212.    The Termination Notice claims that there are Somali nationals (or non-citizens who last habitually resided in Somalia) "who are [TPS] beneficiaries or applicants who are or have been subject the subject of administrative investigations for fraud, public safety, and national security," citing to fraud and public safety violations as contrary to the national interest.[193]

213.    There is no reference to where these individuals are located or how many there purportedly are.[194] Of the case examples provided, none are TPS holders and some include alleged federal prosecutions of individual U.S. citizens who are Somali-Americans from over a decade ago.[195]

214.    Nearly every one of the asserted national interest justifications collapses into a core theme: alleged deficiencies in vetting and screening that she purports make it "virtually impossible" to confirm eligibility for the Somali community. For example, the Termination Notice asserts a supposed "national interest" relating to the rate of overstays of Somali nationals with B-1 and B-2 visas and exchange visitors (F, M, J)—i.e. Somali nationals who do not hold TPS.

215.    The Termination Notice makes no effort to explain what if any correlation those overstay rates have with the periodic review for Somalia or how they implicate the "national interest" asserted in reviewing Somalia's designation for TPS. Nor does the Notice explain how reliance on this rationale squares with Congress's deliberate decision *not* to condition individual

---

[192] *See, e.g.*, 90 Fed. Reg. 50,484, 50,486 (South Sudan); 90 Fed Reg. 45,398, 45,401 (Syria); 90 Fed. Reg. 20,309, 20,311 (Afghanistan); 90 Fed. Reg. 54,733, 54,737 (Haiti).
[193] 91 Fed. Reg. at 1,551.
[194] *Id.*
[195] *Id.* at 1,551–52.

TPS eligibility on having a particular, or any, immigration status. *See* 8 U.S.C. § 1254a(c) (setting out eligibility requirements).

216.    Additionally, the asserted rationale concerning visa overstay rates does not appear to be the true rationale behind this decision—since, as described above, the Administration's immigration-related policy changes have not targeted countries such as the United Kingdom or Canada— who also have high overstay rates and are predominantly white.[196]

217.    The Termination Notice also repeatedly refers to unsubstantiated claims[197] that members of the Somali community in Minneapolis—the largest Somali community outside of Africa[198]—have engaged in public benefits fraud and money laundering and fails to cite any objective evidence for these claims. Neither issue has any bearing under the TPS statute on whether safe return to Somalia is possible for its nationals or whether the conditions warranting TPS designation continue to exist there.

218.    The Termination Notice fails to consider or explain the relevance of these national interest considerations to Somali TPS holders or applicants. TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are inadmissible on grounds relating to national security, foreign policy, or on many other bases.[199]

---

[196] Margy O'Herron & Doug Rand, *New Entry Bans, Same Faulty Reasoning*, *supra* note 131.

[197] Clay Masters, *Minnesota Somali community bears brunt of Trump administration policies*, NPR (Jan. 3, 2026), https://www.npr.org/2026/01/03/nx-s1-5662619/minnesota-somali-community-bears-brunt-of-trump-administration-policies; *see also* Press Release, *AG Brown issues statement on reports of harassment of daycare providers* (Dec. 30, 2025), https://www.atg.wa.gov/news/news-releases/ag-brown-issues-statement-reports-harassment-daycare-providers.

[198] Andrew Hazzard, *How Minnesota became the center of the Somali diaspora*, Sahan Journal (Dec. 10, 2025), https://sahanjournal.com/immigration/somali-history-in-minnesota/.

[199] 8 U.S.C. §§ 1254a(c)(1)(A), (c)(2)(B); *id.* § 1182; *id.* § 1158(b)(2)(A).

219.    The Termination notice does not explain how or why the stringent individual eligibility criteria for obtaining and maintaining TPS, and the related, stringent vetting and screening to which applicants are subject, are insufficient to address the stated concerns regarding domestic "national interest." Further, the statement in the Termination Notice that vetting is "virtually impossible" conflicts with existing TPS screening mechanisms, continuous re-registration requirements, and biometric and background checks that are baked into getting and maintaining TPS holder status.

### *Unexplained Departure from Past Agency Practice of Orderly Transition Periods*

220.    The Termination notice here was published a mere 60 days prior to the effective date,[200] the minimum required under the statute. This is a significant and unexplained departure from established policy and practice, prior to 2025, and including during President Trump's prior term, of affording more orderly transition period of 6 months or longer—and typically 12 to 18 months.[201] The longer period permitted TPS beneficiaries and their families and communities to more easily navigate the immense physical, social, economic, administrative and other transitions that may be involved with loss of TPS status.

### EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR SOMALIA IS TERMINATED IMMINENTLY AND UNLAWFULLY

221.    Defendants' decision to terminate TPS imminently and unlawfully for Somalia would strip TPS status from an estimated 1,082 Somali TPS recipients, including the Individual Plaintiffs and other members of Plaintiffs ACT and PANA; revoke access to TPS and to related benefits available to applicants with prima facie eligibility for TPS, for at least 1,383 Somali nationals with pending applications for TPS; and cause significant hardship for the U.S. citizen

---

[200] 91 Fed. Reg. at 1,552.
[201] *See* Transition Periods Chart, *supra* note 24.

and lawful permanent resident dependents and immediate relatives of recipients and applicants. Some of these people, such as the Individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities. If Defendants' unlawful and imminent Termination were to take effect as of 11:59 p.m. on March 17, 2026, the resulting harms would be myriad and severe.

222.    For Somali TPS beneficiaries, including all of the Individual Plaintiffs and other members of ACT and PANA, those harms can include: immediately losing TPS as a sole source of immigration status and related eligibility for federal benefits (such as work authorization) and state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; facing forced removal to Somalia and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning climatic shocks, mass internal displacement, acute food insecurity, and barriers to accessing humanitarian aid and lifesaving medical treatment; or facing forced removal to unsafe third countries.

223.    For Somali TPS applicants, including Plaintiff Alexander Doe and other members of ACT and PANA, the harms include no longer having any basis for consideration of their pending application for TPS.

224.    For the Individual Plaintiffs, other members of ACT and PANA, and all other Somali TPS beneficiaries and their U.S.-citizen family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the current TPS beneficiaries could face grave harm, including death, if forcibly removed to Somalia.

225.    The most immediate harms the Termination would cause are automatic loss of TPS status and access to related benefits.

226.    TPS beneficiaries (including applicants) reliant on TPS for work authorization would automatically lose employment eligibility because of the Termination. This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders and applicants risk losing their homes or other material assets, leading to further economic harm. And TPS beneficiaries and their families would also lose employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security, TPS holders also face the loss of that crucial benefit.

227.    Take Plaintiff Mohamed Doe, for example. His sole immigration status is TPS, on which he relies for work authorization: earning his livelihood as a beloved teacher. He depends on his livelihood to support himself and his wife, who just recently gave birth to their first child. If the Termination takes effect imminently and unlawfully, he will lose the critical ability to earn a lawful income, at a time when his blossoming family needs it most.

228.    TPS beneficiaries (including applicants) who are reliant on TPS for driver's license eligibility would automatically become ineligible for that benefit as a result of the Termination—losing related mobility and freedom of movement—because, in many states, driver's licenses and state-issued identification are limited to those with lawful immigration status.[202]

229.    For example, consider Plaintiff Tyson Doe, who is also a beloved teacher. The town where he lives does not have public transit, and he relies on his TPS-based driver's license to be

---

[202] *See, e.g.*, *REAL ID Checklist*, California Dep't of Motor Vehicles, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

able to get around by car to take care of virtually all the needs of his daily life, like getting to the elementary school where he teaches, buying groceries, and attending mosque.

230. All of the harms of the Termination compound because of how the Administration has only provided a 60-day wind-down period to Somali TPS beneficiaries, which is insufficient for them and their families to be able to plan adequately for their futures and which starkly departs from a longstanding agency practice of more orderly transition periods of at least 6 months but more typically 12–18 months.

231. The insufficiency of the 60-day wind-down period is compounded by a myriad of severe and new policy changes within DHS that restrict access to alternative forms of immigration status in the U.S., both affirmatively and defensively (within removal proceedings).

232. A November 27, 2025, policy change of USCIS requires "significant, negative" consideration of "country-specific" factors in the review of any pending or newly filed application for any discretionary USCIS immigration benefit. This policy change refers, illustratively, to the sorts of "country-specific factors" referenced in the entry ban for Somali nationals the President instituted effective June 9, 2025. *See supra* ¶ 131.

233. A December 2, 2025, set of policy changes from USCIS announced (1) a blanket pause on the adjudication of affirmative asylum applications and (2) a blanket pause on the adjudication of other immigration benefits applications for Somali applicants subject to the entry bans instituted effective June 9, 2025. *See supra* ¶ 132.

234. A January 21, 2026, policy of the U.S. Department of State has indefinitely paused the issuance of immigrant visas (entry permits) to Somali nationals. *See supra* ¶ 133.

235. The blanket USCIS pause on asylum adjudications that is currently in place renders virtually impossible any affirmative access to asylum for Somali TPS holders and/or applicants, ahead of the March 17, 2026, termination date for TPS for Somalia.[203]

236. The blanket USCIS pause on the adjudication of other immigration benefits applications filed by Somalis renders virtually impossible any access they have to any other immigration status, ahead of the March 17, 2026, termination date for TPS for Somalia. Even if the pause were to lift, the November 27, 2025, USCIS policy indicates that Somali nationality alone may precipitate denials of applications. Additionally, the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which another form of active legal status is a prerequisite.

237. Any current beneficiary of TPS for Somalia (holder or applicant) against whom immigration enforcement precipitates because of the imminent and unlawful Termination of Somalia's TPS designation would necessarily begin experiencing harms that Congress wanted them *to avoid*. *See* 8 U.S.C. §§ 1254a(1)(A) (protection from deportation), (d)(4) (protection from immigration confinement); 8 C.F.R. § 244.10(e) (protections extend to given applicants).

238. Harms arising from immigration enforcement would compound because of how the Administration is aggressively seeking to alter access to standard removal proceedings by, instead, leaning hard into an expansive interpretation of its statutory authority to undertake expedited removals with few, if any, procedural rights for the targeted individuals. *See, e.g.*, *Make the Rd.*

---

[203] On June 5, 2026, the U.S. District Court for the District of Rhode Island vacated this policy, ruling that it was unlawful. *Dorcas Int'l Inst. of Rhode Island v. United States Citizenship & Immigr. Servs.*, No. 26-CV-132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026), *judgment entered*, No. 26-CV-132-JJM-PAS, 2026 WL 1695954 (D.R.I. June 11, 2026). USCIS is appealing the order.

*New York v. Noem*, No. 25-5320, 2025 WL 3563313, *14 (D.C. Cir. Nov. 22, 2025) (litigation challenging DHS policy expanding the scope of expedited removal).

239.    Even within standard removal proceedings, the Administration has otherwise severely constrained access to asylum through a litany of restrictive policies that specifically targeted against Somalis.[204]

240.    Moreover, Congress established TPS as a form of humanitarian protection that *does not turn* on *individualized* persecution and harm, the way that asylum and related forms of protection do and which not all TPS holders and applicants may be able to establish.

241.    Somali TPS holders, including all the Individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[205]

242.    The entry bans on Somalis that President Trump instituted on June 6, 2025 separately frustrate, if not obviate, the possibility of return to the U.S. for current Somali TPS holders and applicants who leave the U.S. due to the Termination.

243.    Furthermore, Somali TPS holders who may be entitled to a fear-based form of immigration relief in the U.S.—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155

---

[204] Bustillo, *Immigration courts fast-track hearings for Somali asylum claims*, *supra* note 90.
[205] 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(i)(II).

(2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward. *Id.*

244.    The risk of deportation anywhere renders Somali TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many Somali TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind, potentially without the ability to reunite with them in the U.S., or bringing their U.S. citizen children (or other family members) to a country that is unsafe, where the children have never lived and, in many cases, have never even visited due to the safety risks there.

245.    Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Somali TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the purported Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date of the Termination approaches.

246.    Take Plaintiff Alexander Doe, for example. He has been panicked since learning of the Termination: afraid of forced return to unsafe conditions in Somalia and trying to resign himself to the possibility that his hard work pursuing two associate's degrees at once, with his graduation to take place within a few months, may be tragically erased because of the Termination.

247.    Like Alexander, Plaintiff Nina Doe is in her twenties and is also an educator. She has been feeling terrified since learning of the Termination. She is terrified of being "rounded up,

76

kidnapped, and taken to an ICE detention center far away from my family, my community, and my loved ones." And she fears a lot of unsafe conditions in Somalia, including sexual and gender-based violence there.

248.    All Somali TPS beneficiaries have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, and national-origin discrimination.

249.    Plaintiff Tyson Doe, like all of the Individual Plaintiffs, is also an educator. And through that lens he sees chilling historical parallels in his own recent experiences: "In my time in the U.S., I've not witnessed the administration have this level of racism and hate towards any other group. I am being constantly demonized simply for being Somali. To be Somali in the United States today feels like what I imagine it was like to be Japanese in the United States in 1942."

**CLASS ACTION ALLEGATIONS**

250.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of classes defined as follows:

251.    All nationals of Somalia or individuals without any nationality who last habitually resided in Somalia who are present in the U.S. and are current recipients or holders of TPS for Somalia (the "Recipient Class"); and

252.    All nationals of Somalia or individuals without any nationality who last habitually resided in Somalia who are present in the U.S. and have pending applications for TPS for Somalia that reflect their *prima facie* eligibility for it (the "Applicant Class").

253.    The proposed classes are each sufficiently numerous so as to make joinder of all members impracticable. Based on Defendants' own accounting in the Federal Register notice, the Recipient Class consists of approximately 1,082 current TPS holders, and the Applicant Class consists of approximately 1,383 TPS applicants. *See* 91. Fed. Reg. at 1,552.

254.    There are questions of law and fact common to the classes, including:

255.    Whether Defendants' decision to terminate Somalia's TPS designation provided constitutionally adequate process for the property and liberty interests TPS status and benefits implicate, as required by the Due Process Clause of the Fifth Amendment;

256.    Whether Defendants' decision to terminate Somalia's TPS designation was impermissibly motivated by discriminatory intent or animus based on race and national origin, in violation of the Fifth Amendment;

257.    Whether Defendants' decision to terminate Somalia's TPS designation is *ultra vires* because the Attorney General, not the Secretary of Homeland Security, has the sole authority to terminate a TPS designation;

258.    Plaintiffs' claims are typical of those of the Recipient and Applicant classes.

259.    Plaintiffs will fairly and adequately protect and represent the interests of the Recipient and Applicant classes. The interests of the Plaintiffs are not antagonistic to the classes.

260.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

261.    Defendants' unlawful termination of TPS for Somalia applies generally to the entire class, such that class-wide relief is appropriate.

## CAUSES OF ACTION

### COUNT ONE
**Fifth Amendment**
**U.S. Constitution, Am. 5**
*Due Process Clause*
**(All Plaintiffs Against All Defendants)**

262.    Plaintiffs incorporate by reference the above allegations.

78

263.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

264.    Plaintiffs have significant liberty and property interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of TPS for Somalia.

265.    Defendants' purported termination of TPS arbitrarily deprives Plaintiffs of the process to which they are entitled, as shown by, for example, the Administration's departure from and apparent disregard of the process for termination of TPS set forth in 8 U.S.C. § 1254a.

266.    Plaintiffs will suffer irreparable injury resulting from the termination of the TPS designations without due process of law.

267.    Defendants' purported Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
*Contrary to Constitutional Right, Power, Privilege, or Immunity – Due Process*
**(All Plaintiffs Against All Defendants)**

268.    Plaintiffs incorporate by reference the above allegations.

269.    Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

270.    Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

79

271.    "Courts analyze procedural due process claims in two steps: first, courts 'ask whether there exists a liberty or property interest'; if so, courts 'ask whether the procedures followed by the [Government] were constitutionally sufficient.'" *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 148 (D. Mass. 2026) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)).

272.    TPS holders and applicants with *prima facie* eligibility have significant liberty and property interests, protected by the Due Process Clause, in the attendant benefits that the TPS statute confers.

273.    Specifically, TPS holders and prima facie applicants have liberty interests in the work authorization and protections from removal and immigrant detention that TPS status confers. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 333 ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law[.]"); *Destino v. FCI Berlin, Warden*, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025) (finding that plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Tenemasa-Lema v. Hyde*, 810 F. Supp. 3d 244, 258 (D. Mass. 2025) (The "disruption of established family ties further compounds [a plaintiff's] deprivation of liberty."); *Bridges v. Wixon*, 326 U.S. 135, 155 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982))).

274.    TPS holders and *prima facie* applicants also have property interests in the work authorization and protections from removal and immigrant detention that TPS status confers. *See,*

*e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018); Rodas v. Chertoff, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005).

275.    TPS holders and *prima facie* applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (A person's interest in continuing to hold a valid driver's license "is a substantial one."); *Belezos v. Bd. of Selectmen of Hingham*, 2019 WL 2870733, at *6 (D. Mass. July 3, 2019) ("In general, the 'Due Process Clause applies to the deprivation of a driver's license by the State.'" (quoting *Dixon v. Love*, 431 U.S. 105, 112 (1977))); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) ("freedom to make use of one's own property, here a motor vehicle, as a means of getting about from place to place, whether in pursuit of business or pleasure, is a 'liberty' which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law" (citation omitted)).

276.    Once the government grants TPS to an individual, the benefits conferred such as employment authorization, are mandatory. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B) (providing that, once the Attorney General grants an individual TPS, the Attorney General "shall not remove the alien from the United States" and "shall authorize the alien to engage in employment in the United States"). The use of the compulsory term "shall" makes clear that the Attorney General has no discretion about providing removal and work authorization for those granted TPS. *Cf., e.g.*, *id.* (the Attorney General "may grant the alien temporary protected status" (emphasis added)).

81

277.    Similarly, once an individual applies for TPS and makes a prima facie showing of eligibility, the government must grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(A) ("In the case of an alien who can establish a prima facie case of eligibility . . . the Attorney General shall provide for the benefits of [protection from removal and work authorization]."); *see also Mansor*, 685 F. Supp. 3d at 1013–14.

278.    The purported Termination deprived Somali TPS holders and applicants of liberty and property interests without constitutionally adequate safeguards.

279.    The procedural safeguards in the TPS statute conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls[.]") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)).

280.    Those procedures reflect the application of the "three-part balancing test articulated in *Mathews*[]," *D.V.D.*, 821 F. Supp. 3d at 148, namely "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021) (quoting *Mathews v Eldridge*, 424 U.S. 319, 335 (1976)).

281.    For example, 8 U.S.C. § 1254a provides that TPS status may be terminated only "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A)–(B).

282.    But prior to the Termination, the Secretary did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A); *supra* ¶¶ 162-70. Similarly, the decision to terminate TPS designations must be based on a "review [of] the conditions in the foreign state," and the statute requires publication of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)–(B).

283.    But here, the Secretary's decision-making was predetermined, pretextual, and procedurally deficient. *See supra* ¶¶ 147-153.

284.    Accordingly, Defendants' purported Termination violates Plaintiffs' liberty and property rights guaranteed by the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

285.    Defendants' purported Termination of Somalia's TPS designation must therefore be held unlawful and set aside.

**COUNT THREE**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
***Equal Protection Under the Law***
**(All Plaintiffs Against All Defendants)**

286.    Plaintiffs incorporate by reference the above allegations.

287.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a racially discriminatory intent or purpose.[206] A facially neutral law violates equal protection of the laws when it is the product of intentional discrimination based on race and/or national origin and has a discriminatory effect.[207]

---

[206] *Washington v. Davis,* 426 U.S. 229, 239 (1976).
[207] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252, 265–66 (1977).

Discrimination based on race or national origin receives exacting scrutiny.[208] Defendants' periodic review of Somalia's TPS designation and decision to terminate it impermissibly and intentionally discriminates against Plaintiffs as Somali people because of their race and/or national origin.

288.    Defendants' own statements and derogatory comments prior to, during, and after the periodic review and purported Termination categorically used racial slurs against Somali people, among them calling Somalis criminals, pirates, scammers, thugs, and gang members even as they recognized, the crime, lack of governance, and other security issues in Somalia that would support the need for a TPS designation. These statements evince the Administration's racist and xenophobic motivations to exclude Somali people from the country. At the same time, the Administration has expressed preferences for white immigrants as "nice" and welcome in the U.S and created protections for white Afrikaner refugees from South Africa.

289.    The Trump Administration's consistent policies and practices of targeting Somali people based on unjustified narratives of Black and Somali immigrants as taking advantage of the country also support a finding of discriminatory intent in terminating TPS for Somalia. Misleading allegations regarding high-profile instances of fraud in state programs in Minnesota by individuals of Somali descent were an explicit catalyst for the Administration's intent to end Somali TPS. Simultaneously, the Administration also launched an intensive immigration enforcement operation against the Somali population in Minnesota, arresting mostly Somali immigrants, including children, who have already undergone intensive vetting in the United States and putting them at risk of immigrant detention and deportation.

---

[208] *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) ("The Court has thus far reserved most stringent judicial scrutiny for classifications based on race or national origin.")

290. This sequence of events demonstrates Defendants' clear intent to target Somali people for expulsion from the country based on their race and national origin via a series of enforcement operations and policy changes that targeted Somali people. The flawed periodic review process for Somalia and purported Termination "bear[] more heavily on"[209] the Somali people who are majority Black and were singled out for discriminatory treatment by Defendants.

291. Defendants' substantive and procedural departures from the requirements in the TPS Statute that resulted in the designation of Somalia for TPS for the last thirty-five years also support a finding of discriminatory intent. Defendants failed to consult with appropriate agencies, failed to provide notice of the actual basis for the determination, and disregarded evidence in the record that had previously been considered in periodic reviews as well as the Administration's own recognition of unsafe conditions in Somalia.

292. In contrast, the Trump Administration has left TPS protections for majority-white Ukraine undisturbed and made it easier for white Afrikaners from South Africa to enter the United States under a refugee resettlement program. Defendants' purported Termination was thus motivated by intent to discriminate against Somali people specifically and was not simply a general attempt to curb immigration or the TPS program in general. Somali people's race and national origin were at least one motivating factor in Defendants' cancellation of TPS for Somalia, thus violating equal protection of the laws.

293. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination that violated their Fifth Amendment rights under the U.S. Constitution.

---

[209] *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252, 266 (1977).

294.    Defendants' purported Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT FOUR**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
*Contrary to Constitutional Right, Power, Privilege, or Immunity – Equal Protection*
**(All Plaintiffs Against All Defendants)**

295.    Plaintiffs incorporate by reference the above allegations.

296.    Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

297.    The Fifth Amendment's Due Process Clause "contains an equal protection component" that prohibits the federal government from invidiously discriminating between individuals or groups.[210]

298.    Defendants' periodic review and purported termination of Somalia's TPS designation were impermissibly motivated, at least in part, by intent to discriminate against Somali people based on their race and national origin, as evidenced by Defendants' use of racial stereotypes and racially-charged language labeling Somali people criminals, animals searching for prey, and pirates to justify the expulsion of Somali people from the country, including via the purported Termination. Defendants' substantive and procedural deviations from the well-established parameters of the TPS statute that resulted in Somalia's TPS designation for the last thirty-five years and their pursuit of enforcement operations and immigration policies specifically aimed at expelling Somali people from the country by any means possible also favor a finding of unconstitutional motives.

---

[210] *Washington v. Davis*, 426 U.S. 229, 230 (1976).

299. Because race and national origin were at least one factor in Defendants' flawed periodic review of Somalia's TPS designation and the purported Termination, Defendants' purported Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

300. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

301. Defendants' purported Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## COUNT FIVE
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(C)
### *Agency Action in Excess of Statutory Authority*
### (All Plaintiffs Against All Defendants)

302. Plaintiffs incorporate the foregoing allegations to the extent they are consistent with the allegations that follow.

303. Federal agencies are creatures of statute; they may act only in accordance with authority that Congress bestows. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

304. The APA directs that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

305. Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General.

87

306.    Specifically, the TPS statute provides that a foreign-state designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." 8 U.S.C. § 1254a(b)(2)(B); *see also Nat'l TPS Alliance v. Noem*, 166 F.4th 739 762–63 & n.12 (9th Cir. 2026) (paragraph (3)(B) supplies the sole process for ending a TPS designation).

307.    And paragraph (3)(B) names who may act: "[i]f the Attorney General determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation . . . the Attorney General shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

308.    DHS has pointed to 6 U.S.C. § 557 as a source of TPS authority. *See* 6 U.S.C. § 557 ("With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.").

309.    But that provision does not independently transfer any authority. It just simplified the process of amending the code by altering certain statutory "references" to "any function" that was actually "transferred by or under" the Homeland Security Act. *See* 6 U.S.C. § 557. TPS termination authority was not so "transferred."

310.    The power to terminate TPS designations is therefore assigned by statute to the Attorney General of the United States, *see* 8 U.S.C. § 1254a(b)(3)(B), who has not exercised it to terminate the designation of Somalia. That power was never properly transferred to the Secretary of Homeland Security, and therefore Noem's purported March 17, 2026, termination of Somalia's

TPS designation is void as statutorily *ultra vires* and is contrary to law and in excess of statutory jurisdiction, authority, or limitations in violation of the Administrative Procedure Act.

311.   The Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the TPS holders' loss of TPS automatically and without further notice or right of appeal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Declare that the Defendants' periodic review and resulting termination of Somalia's TPS designation is unlawful under the APA and unconstitutional under the Fifth Amendment;

2.   Stay, and/or postpone the termination of TPS for Somalia from taking effect or being put into effect, or otherwise enjoin Defendants from enforcing it ahead of its March 17, 2026, effective date;

3.   Set aside or otherwise vacate the termination of TPS for Somalia as beyond Defendants' authority and/or unlawful under the APA;

4.   Under the Fifth Amendment, enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of Somalia's TPS designation; and order Defendants to take all steps necessary to ensure that the TPS designation for Somalia remains in full force and effect unless and until it lawfully expires or is lawfully terminated;

5.   Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

6.   Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 30, 2026

Respectfully submitted,

*/s/Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice*)
Sadaf Hasan (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Sadaf@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/Kacey Mordecai*
Kacey Mordecai (*pro hac vice*)
Mide Odunsi (*pro hac vice*)
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W. Suite 600
Washington, D.C. 20005
202.682.1300
Kmordecai@naacpldf.org
Modunsi@naacpldf.org

Ashley Burrell (*pro hac vice*)
Lauren Carbajal (*pro hac vice*)
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street #5
New York, NY 10006
202.965.2200
aburrell@naacpldf.org
Lcarbajal@naacpldf.org

*Counsel for Plaintiffs*

90

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2026, this document will be sent electronically through this Court's CM/ECF system to all registered parties.

*/s/ Kacey Mordecai*
Kacey Mordecai
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
