**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE,  MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No. 1:26-cv-11201-ADB <br><br><br> <u>ORAL ARGUMENT REQUESTED</u> <br><br><br> Leave to file granted on July 30, 2026 |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR POSTPONEMENT & MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

    I.    Plaintiffs Are Likely to Succeed on the Merits Because the Termination Violated the Fifth Amendment. ....................................................................................................... 5

        A.    Defendants Violated Plaintiffs' Fifth Amendment Due Process Rights. ................ 5

        B.    Defendants Discriminated Against Somali People Based on Their Race and National Origin. ...................................................................................................... 10

        C.    Plaintiffs' Constitutional Claims Are Reviewable. ............................................... 24

    II.    Plaintiffs Are Likely to Succeed Because TPS Termination Authority Is Vested Exclusively in the Attorney General. ..................................................................... 25

        A.    The DHS Secretary Acted *Ultra Vires* in Purporting to Terminate Somalia's TPS Designation. ....................................................................................................... 25

        B.    Plaintiffs' *Ultra Vires* Claim Is Reviewable Notwithstanding *Mullin* ................ 29

    III.    Plaintiffs Face Irreparable Harm, and the Balance of Hardships, Equities, and Public Interest Favors Them. ......................................................................................... 31

        A.    Plaintiffs Will Face Irreparable Harm Absent a Postponement or Preliminary Injunction. ............................................................................................................. 31

        B.    The Balance of the Equities and the Public Interest Favor Plaintiffs. ................. 33

CONCLUSION .................................................................................................................. 34

CERTIFICATE OF SERVICE ........................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*,
No. CV 25-968, 2026 WL 759439 (D.D.C. Mar. 18, 2026).......................................................28

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014) .......................................................................................................8

*Afr. Cmtys. Together v. Mullin*,
No. 26-1832 (1st Cir. July 21, 2026) ...........................................................................................4

*Afr. Cmtys. Together v. Noem*,
828 F.Supp.3d 235 (D. Mass. 2026) ...........................................................................................29

*Am. Honda Fin. Corp. v. City of Revere*,
471 F. Supp. 3d 399 (D. Mass. 2020) (Burroughs, J.) .................................................................9

*Aponte-Torres v. Univ. of P.R.*,
445 F.3d 50 (1st Cir. 2006).........................................................................................................6

*Asylumworks v. Mayorkas*,
590 F. Supp. 3d. 11 (D.D.C. 2022).............................................................................................29

*Batalla Vidal v. Wolf*,
501 F. Supp. 3d 117 (E.D.N.Y. 2020) ........................................................................................28

*Bell v. Burson*,
402 U.S. 535 (1971).....................................................................................................................8

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
996 F.3d 37 (1st Cir. 2021)........................................................................................................18

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*,
145 S. Ct. 15 (2024) (Alito, J., dissenting from denial of certiorari)....................................14

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*,
89 F.4th 46 (1st Cir. 2023).........................................................................................................11

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)...................................................................................................................25

*Buck v. Davis*,
580 U.S. 100 (2017)...................................................................................................................14

*California v. Kennedy*,
  802 F. Supp. 3d 273 (D. Mass. 2025) ..............................................................................5

*California v. Mullin*,
  No. 25-cv-13829, 2026 WL 1649160 (D. Mass. June 8, 2026)................................28

*Capen v. Campbell*,
  134 F.4th 660 (1st Cir. 2025)................................................................................30

*Carey v. Piphus*,
  435 U.S. 247 (1978)...............................................................................................6

*CASA de Maryland, Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018)......................................................................25

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
  332 F. Supp. 3d 393 (D. Mass. 2018) ..................................................................12

*Cervantes v. Holder*,
  597 F.3d 229 (4th Cir. 2010) ...............................................................................27

*Ching v. Mayorkas*,
  725 F.3d 1149 (9th Cir. 2013) ...............................................................................7

*City of Providence v. Barr*,
  954 F.3d 23 (1st Cir. 2020)...................................................................................25

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
  543 U.S. 157 (2004)..............................................................................................30

*Copeland v. Rosen*,
  38 F. Supp. 2d 298 (S.D.N.Y. 1999).....................................................................15

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989).................................................................................30

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998).............................................................................31

*Dep't of Homeland Sec. v. Regents of Univ. of. Cal.*,
  591 U.S. 1 (2020).............................................................................................13, 28

*Destino v. FCI Berlin, Warden*,
  No. 1:25-cv-374-SE-AJ, 2025 WL 4010424 (D.N.H. Dec. 24, 2025) .....................7

*Devitri v. Cronen*,
  289 F. Supp. 3d 287 (D. Mass. 2018) ...................................................................33

*Doe v. Noem*,
    784 F. Supp. 3d 437 (D. Mass. 2025) ..................................................................24, 32

*Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immig. Servs.*,
    No. 26-cv-132-JJM-PAS, 2026 WL 1622708 (D.R.I. 2026)....................................21

*Dorce v. Wolf*,
    506 F. Supp. 3d 142 (D. Mass. 2020) .......................................................................31

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ....................................................................................29

*Febres v. Challenger Caribbean Corp.*,
    214 F.3d 57 (1st Cir. 2000)........................................................................................13

*Foster v. Chatman*,
    578 U.S. 488 (2016)...................................................................................................16

*Gaffney v. Silk*,
    488 F.2d 1248 (1st Cir. 1973).....................................................................................7

*Heckler v. Mathews*,
    465 U.S. 728 (1984)...................................................................................................32

*Jimenez v. Cronen*,
    317 F. Supp. 3d 626 (D. Mass. 2018) .........................................................................8

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)...............................................................................................2, 25

*Lackey v. Stinnie*,
    604 U.S. 192 (2025)...................................................................................................30

*League of Women Voters of United States v. Newby*,
    238 F. Supp. 3d 6 (D.D.C. 2017) ..............................................................................29

*Leiva–Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ....................................................................................32

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)...................................................................................................25

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...................................................................................................29

*Mansor v. U.S. Citizenship & Immigr. Servs.*,
    685 F. Supp. 3d 1000 (W.D. Wash. 2023)..................................................................7

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)......................................................................................6, 8, 9

*Mayor & City Council of Balt. v. Trump*,
    416 F. Supp. 3d 452 (D. Md. 2019).....................................................................13

*Mejia Rodriguez v. Dep't of Homeland Sec.*,
    562 F.3d 1137 (11th Cir. 2009) ..........................................................................27

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)................................................................................14

*Mullin v. Doe*,
    146 S. Ct. 2121 (2026)..............................1, 2, 3, 4, 10, 11, 15, 16, 17, 24, 29, 30, 31

*Nahar v. ADR Ventures WPR LLC*,
    No. 23-CV-3835, 2024 WL 4042433 (S.D.N.Y. Sep. 3, 2024)..............................16

*Najera v. United States*,
    926 F.3d 140 (5th Cir. 2019) ..............................................................................27

*Nat'l Ass'n of Broads. v. FCC*,
    39 F.4th 817 (D.C. Cir. 2022).........................................................................25, 28

*Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*,
    No. 25-CV-293-LM, 2025 WL 2807652 (D.N.H. Oct. 2, 2025)...........................32

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health
    Admin.*,
    595 U.S. 109 (2022)............................................................................................25

*New Jersey v. Trump*,
    131 F.4th 27 (1st Cir. 2025)..................................................................................3

*New York v. McMahon*,
    784 F. Supp. 3d 311 (D. Mass. 2025) .................................................................33

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................................5, 33

*Noem v. Nat'l TPS All.*,
    No. 24A1059 (U.S. May 1, 2025)........................................................................27

*Perry v. Sindermann*,
    408 U.S. 593 (1972)............................................................................................28

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ................................................................7

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................7, 25

*Sampiao v. Hyde*,
  799 F. Supp. 3d 14 (D. Mass. 2025) ........................................................................33

*Somerville Pub. Schs. v. McMahon*,
  139 F.4th 63 (1st Cir. 2025).....................................................................................33

*United States v. Jones*,
  159 F.3d 969 (6th Cir. 1998) ...................................................................................14

*Univ. of Tex. v. Camensich*,
  451 U.S. 390 (1981)..............................................................................................5, 30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* (*Arlington Heights*),
  429 U.S. 252 (1977).........................................................10, 11, 12, 14, 18, 21, 22, 24

*Washington v. Davis*,
  426 U.S. 229 (1976)..................................................................................................18

*Washington v. Seattle Sch. Dist. No. 1*,
  458 U.S. 457 (1982)..................................................................................................12

*Webster v. Fall*,
  266 U.S. 507 (1925)........................................................................................3, 30, 31

*Whitman v. United States*,
  574 U.S. 1003 (2014)................................................................................................30

*Withrow v. Larkin*,
  421 U.S. 35 (1975)....................................................................................................10

*Zadvydas v. Davis*,
  533 U.S. 678 (2001)....................................................................................................5

**Statutes**

5 U.S.C. § 705.................................................................................................................3, 5

5 U.S.C. § 706(2) ....................................................................................................2, 25, 28

5 U.S.C. § 706(2)(B).........................................................................................................1

5 U.S.C. § 706(2)(C).......................................................................................................25

6 U.S.C. § 542 note.........................................................................................................27

6 U.S.C. § 552(d)............................................................................................................28

6 U.S.C. § 557 ......................................................................................................................28

8 U.S.C. § 1103(a)(1) ...........................................................................................................27

8 U.S.C. § 1103(g) ...............................................................................................................27

8 U.S.C. § 1158(b)(2)(A) .....................................................................................................16

8 U.S.C. § 1182 ....................................................................................................................16

8 U.S.C. § 1252(b)(9) ...........................................................................................................24

8 U.S.C. § 1254a(a)(1) ..........................................................................................................26

8 U.S.C. § 1254a(a)(1)(A)-(B) ...............................................................................................6

8 U.S.C. § 1254a(a)(4)(B) ..................................................................................................6, 8

8 U.S.C. § 1254a(b)(1) ............................................................................................................7

8 U.S.C. § 1254a(b)(3)(A) ......................................................................................................9

8 U.S.C. § 1254a(b)(3)(B) .............................................................................................2, 9, 25

8 U.S.C. § 1254a(b)(5)(A) ..........................................................................................24, 29, 30

8 U.S.C. § 1254a(c)(1)(A) .....................................................................................................16

8 U.S.C. § 1254a(c)(2)(B) .....................................................................................................16

8 U.S.C. § 1254a(d)(3) ............................................................................................................2

8 U.S.C. § 1254a(d)(4) ............................................................................................................6

**Other Authorities**

8 C.F.R. § 244.1 ...................................................................................................................26

8 C.F.R. § 244.2 ...................................................................................................................26

8 C.F.R. § 244.6 ...................................................................................................................26

8 C.F.R. § 244.7 ...................................................................................................................26

56 Fed. Reg. 618 (Jan. 7, 1991) ...........................................................................................26

56 Fed. Reg. 46805 (Sep. 16, 1991) .....................................................................................28

57 Fed. Reg. 2930 (Jan. 24, 1992) ........................................................................................26

57 Fed. Reg. 32232 (July 21, 1992)......................................................................................18

58 Fed. Reg. 7582 (Feb. 8, 1993) .......................................................................................26

63 Fed. Reg. 15437 (Mar. 31, 1998)...................................................................................26

65 Fed. Reg. 52789 (Aug. 30, 2000)...................................................................................26

67 Fed. Reg. 48950 (July 26, 2002)....................................................................................18

68 Fed. Reg. 23744 (May 5, 2003) .................................................................................2, 26

75 Fed. Reg. 3476  (Jan. 21, 2010) ....................................................................................27

82 Fed. Reg. 47228  (Oct. 11, 2017)...................................................................................27

89 Fed. Reg. 59135 (July 22, 2024)...............................................................................18, 20

90 Fed. Reg. 9497 (Feb. 12, 2025) .....................................................................................22

91 Fed. Reg. 1547 (Jan. 14, 2026) ..................................................................................3, 10

91 Fed. Reg. 32069 (May 29, 2026) ...................................................................................23

Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. TIMES (July 1, 2026) ...............................................................................32

Madison McVan, *U.S. Rep. Tom Emmer Makes Wildly Inaccurate Claim About Somali Crime on National TV*, Minnesota Reformer (Dec. 4, 2025) .....................................16

Miriam Jordan, *ICE Arrested Dozens of Refugees in Minnesota and Sent Them to Texas*, *Lawyers Say*, N.Y. Times (Jan. 13, 2026) ...................................................................19

Nadiya N. Ali, *How AI Resurrects Racist Stereotypes and Disinformation - and Why Fact-Checking isn't Enough*, The San Diego Voice & Viewpoint (Mar. 13, 2026) ..........................................................................................................................15

Nicole Javorsky, *Trump's Assault on Somali Refugees Goes Way Beyond Just Ilhan Omar*, Mother Jones, (July 19, 2019)................................................................21

Ryan P. Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis*, 11 Mich. J. Race & L. 325 (2006) .......................................14

*Somali Fraud in Minnesota-The Tip of the Iceberg: Hearing Before the Subcomm. on Border Sec. & Immigr. of the S. Comm. on the Judiciary*, 119th Cong. (2026) (statement of David J. Bier, Dir. of Immigr. Stud., Cato Inst.)....................................19

*U.S. Citizenship & Immig. Servs.*, Court Order on Hold Policies (June 12, 2026)........................21

Ximena Bustillo, *Immigration Courts Fast-Track Hearings for Somali Asylum Claims*, NPR (Feb. 9, 2026)...................................................................................................................19

**INTRODUCTION**

Plaintiffs file a renewed motion[1] requesting emergency postponement of agency action under 5 U.S.C. § 705 of the effective date of the termination of Somalia's Temporary Protected Status ("TPS") designation and a preliminary injunction enjoining Defendants' actions under the U.S. Constitution.[2] This Court should grant the request because Plaintiffs are likely to succeed on the merits of their existing equal protection claims, as well as newly added claims that were not before the Supreme Court in its most recent decision involving a TPS termination: that the termination of Somalia's TPS designation ("Termination") violates the Fifth Amendment's procedural due process guarantee and is *ultra vires* agency action. *Cf. Mullin v. Doe*, 146 S. Ct. 2121, 2138-40 (2026). The equitable factors continue to overwhelmingly favor relief.

*First*, Plaintiffs newly allege that the Termination violates the Fifth Amendment's Due Process Clause. The TPS statute confers benefits that implicate property and liberty interests and therefore trigger mandatory procedural safeguards under the Constitution. The U.S. Secretary of Homeland Security ("Secretary") flouted the TPS statute's procedural safeguards when issuing the purported Termination. The Termination thus violates the Fifth Amendment's procedural due process guarantee and should also be set aside as contrary to a constitutional right under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(B).

*Second*, Plaintiffs have marshalled overwhelming direct and circumstantial evidence that intentional discrimination against Somalis based on their race and national origin motivated the

---

[1] Plaintiffs originally requested postponement of the Termination under 5 U.S.C. § 705 because Defendants' actions violated the equal protection component of the Fifth Amendment's Due Process Clause. Plaintiffs now also request postponement under § 705 based on their new claims that the Termination violated the Fifth Amendment's due process protections and that the DHS Secretary acted *ultra vires* when issuing the Termination because that authority is vested exclusively in the Attorney General. In addition, Plaintiffs also newly request a preliminary injunction under Federal Rule of Civil Procedure 65 for both their equal protection and due process Fifth Amendment claims.

[2] Plaintiffs also seek an administrative stay to the extent one is necessary to preserve the status quo while this Court considers Plaintiffs' motion for postponement and preliminary injunction. *See* Dkt. 33 (entering administrative stay in this case for that same purpose).

Termination in violation of the equal protection component of the Fifth Amendment. Defendants' statements as well as those of President Trump are overtly racial and are direct evidence of their discriminatory intent. They categorically smear Somali people as dangerous and violent criminals, animals, and pirates, all terms rooted in racial stereotypes about Black people's alleged propensity for violence and criminality. Moreover, the Termination was one in a series of actions Defendants instituted to expel Somali people by any means possible, which cannot be written off as "race-neutral" or a mere "policy choice." *Cf. Mullin*, 146 S. Ct. at 2138. Coupled with notable departures from the TPS statute and existing practices that maintained Somalia's TPS designation for the last thirty-five years, the evidence that discriminatory purpose motivated the Termination is overwhelming. Because the Termination violates the Constitution's equal protection guarantee, it also is contrary to constitutional right under the APA.

*Finally*, Plaintiffs newly allege that the Termination is *ultra vires* because only the Attorney General, not the Secretary, has the authority to terminate a TPS designation. When Congress established TPS in 1990, it repeatedly and unambiguously made clear that only the "Attorney General" possesses the authority to terminate a TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). For more than a decade, the TPS statute was administered accordingly, with the Attorney General alone terminating TPS designations. But starting in 2003, the Department of Homeland Security ("DHS") claimed that Congress had transferred *all* TPS-related authority from the Attorney General to the Secretary.[3] That shift, however, was based on a fundamental misreading of the statutory scheme, and because "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986), the Termination is *ultra vires* and must be "set aside." 5 U.S.C. § 706(2).

---

[3] *See* Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23744 (May 5, 2003).

2

The Supreme Court's decision in *Mullin* did not address Plaintiffs' new claims, much less foreclose them. *Mullin* declined to extend the judicial review bar to constitutional claims, like Plaintiffs' equal protection and procedural due process claims. *See* 146 S. Ct. at 2138. Neither party raised, and *Mullin* did not address, an *ultra vires* claim, and questions that "merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Now this question is properly before this Court.

Plaintiffs have been unlawfully deprived of constitutionally-protected interests by an official with no authority to take the challenged action. Relief is warranted because Plaintiffs are "likely to succeed on the merits;" will "suffer irreparable harm in the absence" of relief; and both the "balance of equities" and the public interest favor Plaintiffs. *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); 5 U.S.C. § 705. This Court should grant preliminary relief.

## BACKGROUND

In January 2026, the Secretary issued a notice in the Federal Register announcing the purported Termination, effective March 17, 2026. Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547 (Jan. 14, 2026). Plaintiffs filed this lawsuit on March 9, 2026, to prevent the termination of TPS for approximately 1,082 Somali TPS holders and 1,383 Somali nationals with pending TPS applications. Dkt. 1. This Court issued an administrative stay of the Termination on March 13, 2026. Dkt. 33. After the Parties jointly agreed, on May 1, 2026, this Court stayed proceedings pending the Supreme Court's decision in *Mullin v. Doe* and ordered the Parties to submit a joint status report fourteen days after the *Mullin* decision issued. *See* Dkt. 73.

The Supreme Court issued its decision on June 25, 2026. In considering respondents' APA claims challenging the procedures leading to a termination of TPS, *Mullin* held that the TPS statute generally bars review of non-constitutional claims. 146 S. Ct. at 2127. The Court declined to extend the judicial review bar to constitutional claims, *id.* at 2137, but held that the Haitian plaintiffs were unlikely to succeed on their equal protection claim based on the specific record in that case, *id.*

On July 1, 2026, Defendants filed a motion to lift the abeyance and the administrative stay. Dkt. 77. The next day, this Court lifted the abeyance but declined to lift the administrative stay. Dkt. 78. The Parties submitted a joint status report on July 9, 2026, stating their positions on the impact of *Mullin* and proposing briefing schedules. Dkt. 79. This Court entered a scheduling order for supplemental briefing on July 13, 2026. Dkt. 82.

On July 20, 2026, Defendants filed a notice of appeal in the United States Court of Appeals for the First Circuit. Dkt. 84. The following day, Defendants filed a motion for summary reversal and vacatur of the district court's order, or in the alternative a writ of mandamus directing the district court to dissolve the administrative stay. Defs.' Mot. Summ. Disposition, *Afr. Cmtys. Together v. Mullin*, No. 26-1832 (1st Cir. July 21, 2026). On July 24, 2026, Plaintiffs filed a response to Defendants' appeal. Pls.' Resp. to Defs.' Mot Summ. Disposition, *Afr. Cmtys. Together v. Mullin*, No. 26-1832 (1st Cir. July 24, 2026). Defendants filed their reply on July 27, 2026. Defs.' Reply Supp. Summ. Disposition, *Afr. Cmtys. Together v. Mullin*, No. 26-1832 (1st Cir. July 27, 2026).

Concurrent with this brief, Plaintiffs filed an amended complaint raising three new claims as grounds for preliminary relief: that the Termination deprived Plaintiffs of their procedural due process rights, violative of the U.S. Constitution (Count I), and the APA (Count II), and that the

4

DHS Secretary acted *ultra vires* because TPS termination authority is vested solely in the Attorney General, (Count V).[4] Dkt. 90.

## LEGAL STANDARD

Plaintiffs request interim relief via postponement under § 705 of the APA for their claims arising under the APA and a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 for their claims arising under the U.S. Constitution. Under § 705, courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" judicial review. 5 U.S.C. § 705. The same standard governs the issuance of a § 705 stay and a preliminary injunction. *See, e.g.*, *California v. Kennedy*, 802 F. Supp. 3d 273, 281 (D. Mass. 2025). Under that standard, relief is warranted "when the moving party demonstrates that 1) he is likely to succeed on the merits of his case, 2) he is likely to suffer irreparable harm in the absence of injunctive relief, 3) the 'balance of equities' favor him and 4) [preliminary relief] is in the public interest." *Id.* (quoting *New Jersey*, 131 F.4th at 33); *Nken v. Holder*, 556 U.S. 418, 434 (2009). Preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camensich*, 451 U.S. 390, 395 (1981).

## ARGUMENT

I.     **Plaintiffs Are Likely to Succeed on the Merits Because the Termination Violated the Fifth Amendment.**

A. *Defendants Violated Plaintiffs' Fifth Amendment Due Process Rights.*

The Due Process Clause applies "to all 'persons' within the United States, including [non-citizens]," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and "imposes constraints on

---

[4] Plaintiffs also claim that unconstitutional motivations drove the Termination in violation of the Fifth Amendment's equal protection component (Count III) and the APA (Count IV).

governmental decisions which deprive individuals of 'liberty' or 'property' interests," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). It is meant to protect individuals from the government's arbitrary decision making. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). To succeed on a procedural due process claim, "a plaintiff must identify a protected liberty or property interest" and show that defendants deprived him of that interest "without constitutionally adequate process." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006) (citation omitted). Plaintiffs have property and liberty interests in individual statutory benefits that vest through the TPS statute. Termination of the country's TPS designation necessarily extinguishes those individual statutory benefits, and thus, cannot be terminated without due process of law. Plaintiffs are likely to succeed on the merits of their due process claim because the Secretary moved to terminate Somalia's TPS designation without constitutionally adequate process, thereby violating the Fifth Amendment and the APA.

    *1.  The Termination of TPS Status Implicates Significant Property and Liberty Interests.*

First, Plaintiffs have constitutionally-protected property interests because the TPS statute grants TPS holders three mandatory benefits: employment authorization, protection from detention, and protection from removal. 8 U.S.C. § 1254a(a)(1)(A)–(B), (d)(4) (A TPS holder "*shall* [be] authorize[d]" to engage in employment in the United States; "*shall* not be detained" by the Attorney General on the basis of immigration status; and "*shall* not [be]remove[d]" from the United States by the Department of Homeland Security) (emphases added); Am. Compl. ¶¶ 225–38. While whether to grant TPS to an individual applicant is discretionary, the attendant benefits of the status are not. So too for TPS applicants who are *prima facie* eligible: once an individual applies for TPS and makes a *prima facie* showing of eligibility, the government "shall" grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(B). Due process safeguards attach when "benefits that had been accorded to plaintiffs

6

are 'a matter of statutory entitlement[.]'" *Gaffney v. Silk*, 488 F.2d 1248, 1250 (1st Cir. 1973) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970)). Courts have repeatedly recognized these TPS benefits as cognizable property interests within the meaning of the Due Process Clause. *See, e.g.*, *Mansor v. U.S. Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) (holding that "a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018) (stating "Plaintiffs arguably have a property interest in loss of TPS status" in evaluating plaintiffs' due process claim).

Second, the TPS statute confers a liberty interest in Plaintiffs' ability to remain in the United States to work and live with their family members, including U.S. citizens. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law . . . ."); *Destino v. FCI Berlin, Warden*, No. 1:25-cv-374-SE-AJ, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025) (concluding plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process.") (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982)); *see also* Am. Compl. ¶¶ 34, 39, 43, 244.

The government has discretion whether to *designate* a foreign state for TPS. *See* 8 U.S.C. § 1254a(b)(1) (providing that "[t]he Attorney General, after consultation with appropriate agencies of the Government, *may* designate any foreign state") (emphasis added). However, once designated, Congress *mandates* the provision of benefits for *prima facie* eligible applicants and

7

TPS beneficiaries, *see, e.g.*, *id.* § 1254a(a)(4)(B) (mandating provision of work authorization), and that benefit cannot be terminated in an arbitrary manner, *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("[Licenses] may become essential in the pursuit of a livelihood . . . . [They] are not to be taken away without [ ] procedural due process."). Thus, while the TPS statute does not guarantee a country's continued designated for TPS, the benefits that attach once the status is conferred are not discretionary. The Secretary's purported termination strips TPS holders and applicants of benefits made non-discretionary by the TPS statute: it thus requires a constitutionally-sufficient process.

### 2. The Government's Process was not Constitutionally Sufficient.

Plaintiffs have a high risk of erroneous deprivation of these protected property and liberty interests. They risk losing employment authorization, being detained, and being torn from their families as a result of an unconstitutional termination. Am. Compl. ¶¶ 220–48.

The procedures Congress prescribed in the TPS statute—reliable information gathering, reasoned decision-making, and notice of the actual basis for the deprivation—closely track the functions due process serves and therefore inform what process is constitutionally due. *See Mathews*, 424 U.S. at 343–49 (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures). Defendants failed to follow the baseline process mandated by Congress. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls . . . .") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)); *see also Jimenez v. Cronen*, 317 F. Supp. 3d 626, 638 (D. Mass. 2018) ("When regulations are promulgated to protect a fundamental right derived from the

8

Constitution or a federal statute, . . . the Due Process Clause *requires* federal agencies to follow them . . . .") (emphasis added).

TPS may only be terminated if the government "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). To mitigate "the risk of an erroneous deprivation," *Mathews*, 424 U.S. at 335, the TPS statute provides that a designation may be terminated only after "consultation with appropriate agencies of the Government" and a "review" of "the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). Historically, that has meant solicitation and receipt of a full-country conditions report from the State Department. ECF 5-4; Am. Compl. ¶¶ 74, 163, 181. These safeguards impose a minimal administrative burden on the government while reducing the risk that a TPS termination decision, and termination of the benefits it confers, will be based on inaccurate information. *See Mathews*, 424 U.S. at 343–49.

Furthermore, the TPS statute mandates the publication of the "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A). This requirement serves an important due process function by providing notice of the reasons for the government's decision. *See Am. Honda Fin. Corp. v. City of Revere*, 471 F. Supp. 3d 399, 407 (D. Mass. 2020) (Burroughs, J.) ("At a minimum, 'the government [must] provide some notice and some opportunity to be heard prior to final deprivation of a property interest.'") (quoting *Property v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991)) (alteration in original). Disclosure of the true rationale motivating a termination ensures that TPS holders and applicants may assess and potentially challenge infirmities in the decision as due process requires.

Here, the Secretary failed to follow any of the TPS statute's mandated procedures. She undertook no "consultation with appropriate agencies." 8 U.S.C. § 1254a(b)(3)(A); Am. Compl.

¶¶ 71, 164 – 67, 177 – 83. Despite the notice's perfunctory assertion that the Secretary "consult[ed] with appropriate U.S. Government agencies," 91 Fed. Reg. at 1548, the certified administrative record ("CAR") contains only a single-line email exchange between DHS and the State Department regarding only "foreign policy objections to a change in TPS for Somalia[.]" Dkt. 42-2 at AR-000733; *see also* Pls. Suppl. Mem. in Supp. of Pls.' Mot. to Postpone, Dkt. 43 at 5–8 ("Supp. Br.").

The CAR also confirms the Secretary failed to provide the true basis for the purported Termination. A DHS memorandum identifies November 5, 2025, as the "estimated start date" for the termination of Somalia's TPS designation, Dkt. 42-1 at AR-000286, but the agency's reporting on relevant country conditions was not completed until November 17, 2025, almost two weeks later. *See* Dkt. 42-1 at AR-000016, AR-000019, AR-000041. These documents reveal that the Secretary had already made the decision to terminate Somalia's TPS designation prior to executing the TPS statute's required steps. The justification for the Termination in the notice is pretextual, which violates Plaintiffs' due process rights. *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (noting due process forbids practice that poses "risk of actual bias or prejudgment").

The Secretary failed to undertake statutorily-required consultation or publish the actual rationale for the purported Termination. Her decision deprived Plaintiffs of constitutionally-interests without regard for the procedural safeguards detailed in the TPS statute and required by the Due Process Clause, violating the Fifth Amendment and the APA.

### B. Defendants Discriminated Against Somali People Based on Their Race and National Origin.

In *Mullin*, the Supreme Court applied the seminal *Arlington Heights* framework to a challenge that the termination of Haiti's TPS designation was racially discriminatory in violation of the Fifth Amendment. 146 S. Ct. at 2138; *see also Vill. of Arlington Heights v. Metro. Hous.*

10

*Dev. Corp.* (*Arlington Heights*), 429 U.S. 252 (1977). This framework requires determining whether "a 'discriminatory purpose [was] a motivating factor in the decision,'" *Mullin*, 146 S. Ct. at 2138 (quoting *Arlington Heights*, 429 U.S. at 265–66), and looks to circumstantial and direct evidence regarding the decision-making process, subjecting it to "heightened scrutiny." *Mullin*, 146 S. Ct. at 2138. Government action can survive this "daunting review" only in "rare and compelling circumstances." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89 F.4th 46, 56 (1st Cir. 2023) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023)).

### 1. President Trump and Defendants' Statements are Direct Evidence of Discriminatory Intent.

Contemporary statements by a decision maker are "highly relevant" direct evidence of intent to discriminate. *Arlington Heights*, 429 U.S. at 268. The Supreme Court held in *Mullin* that agency defendants' and President Trump's statements did not sufficiently show an intent to discriminate against Haitians because the statements were not "overtly racial." *Mullin*, 146 S. Ct. at 2138. Instead, the statements only 1) "express[ed] strong objections" to immigration and immigrants or generally "associate[d] immigrants with crime and other social ills;" 2) "express[ed] great displeasure with TPS;" 3) "broadly denigrate[d]" TPS countries; or 4) "malign[ed]" Haitians in the United States. *Id.* Likewise, statements by the DHS Secretary consisted of comments showing "antipathy" towards those from countries subject to the government's travel ban; "derogatory comments about immigration and its effects;" or comments that "criticized past implementation of TPS." *Id.* The Supreme Court concluded "in substance, all [the statements] expressed policy views that could rest on race-neutral justifications." *Id.*

Unlike the statements in *Mullin*, President Trump's and Defendants' statements about Somali people are overtly racial; reference Somalis specifically, rather than general immigrant

11

populations; explicitly tie racialized notions about Somalis' alleged criminality to demands for their expulsion; and were reiterated by Defendants during the announcement of the purported Termination. Defendants and President Trump explicitly invoked Somali people's race through overtly racist language, racial stereotypes, and racially-charged code words that referred to Somali people as deadly criminals, gang members, animals who prey on people, and "pirates," all of which have racist origins. *See, e.g.*, Dkt. Nos. 5-19; 5-22; 5-31; 5-34; 5-46; Am. Compl. ¶¶ 95–129. These statements were made in the two months prior to the Termination and were used to justify it, demonstrating that the Administration's racial discrimination infected Defendants' decision.

To be clear, President Trump's statements are relevant to the *Arlington Heights* analysis because the President had authority and influence over Defendants' decision. *See Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 414–45 (D. Mass. 2018) (concluding President's statements were relevant to determination of whether agency action was motivated by unlawful animus because the President exercised influence over the decision); *cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (finding discriminatory intent based on the comments of sponsors and proponents of a policy). Unified statements made by Defendants and President Trump on the day of the Termination, the President's public demands to end TPS for Somalia during the decision-making process, and Defendants' repetition of President Trump's Termination rationales and racialized rhetoric demonstrate that President Trump's discriminatory motives toward Somalis influenced the Termination decision.

President Trump purported to end TPS for Somalia on November 21, 2025, a few weeks before the Termination, and many of Defendants' and President Trump's racially explicit statements about Somali people were made in the two-month period leading up to the Termination. Ex. 14 (timeline of statements on Somalia). Therefore, these statements "bear squarely on the

12

contested decision," and support a finding that the Termination was motivated by discriminatory intent. *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000).

The day DHS issued the purported Termination notice, the White House tagged then DHS Secretary Noem directly in President Trump's social media announcement of the Termination suggesting he had influence over the Secretary's decision. The post featured a screenshot of a Fox News headline stating: "BREAKING: President Trump ENDS TPS for thousands of Somalis amid massive fraud scandals in Minnesota. 'We are putting Americans first.' -@Sec_Noem." Dkt. 5-32. Defendant DHS also posted a screenshot of the same Fox News headline, this time noting: "DHS is ENDING Temporary Protected Status for Somalians [sic] in the United States. Our message is clear. Go back to your own country, or we'll send you back ourselves." Dkt. 5-33. This post echoed statements President Trump made that Somali immigrants should "go back to where they came from." Dkt. 5-23 at 61. These coordinated exchanges emphasize President Trump's nexus to the Termination and the direct link between President Trump's intent to end TPS for Somalia and Defendants' actions as executive officials implementing his objective. *See Dep't of Homeland Sec. v. Regents of Univ. of. Cal.*, 591 U.S. 1, 35 (2020) (noting that timing and context of President's contemporary statements indicate whether the statements are "probative of the decision at issue") (citing *Arlington Heights*, 429 U.S. at 268); *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 491 (D. Md. 2019) (finding President's racial animus and influence over State Department action would be sufficient to find that agency action violated equal protection).

President Trump consistently used racially discriminatory language to refer to Somali people, calling them "convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, dangerous people from foreign mental institutions and insane asylums, and

other deadly criminals," whom "ICE want[s] to . . . remove" from the state. Dkt. 5-34. This language invokes a "powerful racial stereotype" of Black people as crime and "violence prone" that is indicative of unconstitutional discrimination. *Buck v. Davis*, 580 U.S. 100, 121 (2017) (discussing prejudicial testimony that a Black person's race indicated an "increased probability" of future violence). "[R]acially charged code words" like those used by President Trump "send[] a clear message and carry[] the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609, 611 (2d Cir. 2016) (calling out code words like "low-income" or "minority housing" as indicative of race-based animus under *Arlington Heights*); *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 145 S. Ct. 15 (2024) (Alito, J., dissenting from denial of certiorari) (noting statements that an administrator "hates" a predominantly white neighborhood of Boston were "[o]verwhelming direct evidence of intentional discrimination").

President Trump also smeared Somali people with racist imagery of violent animals. He said "Somalian gangs are roving the streets looking for 'prey.'" Dkt. 5-22. In the United States, using animal imagery to describe Black people is a slur rooted in racism. Since Reconstruction, the characterization of "'Black men as innately savage, animalistic, destructive and criminal— deserving of punishment' . . . was [meant] to invoke fear on the part of the White audience, and to justify repressive measures towards Black Americans."[5] Comparing Somali people to animals who "prey" on others invokes this racist imagery and indicates animus against Somali people based on their race. *See, e.g.*, *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998) (noting "[g]iven the history of racial stereotypes against African-Americans and the prevalent one

---

[5] *See* Ex. 8; Ryan P. Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis*, 11 Mich. J. Race & L. 325, 345 (2006) (quoting David Pilgrim, *The Brute Caricature*, http://www.ferris.edu/news/imcrow/brute/).

of African-Americans as animals or monkeys, it is a reasonable—perhaps even an obvious— conclusion that" it was intended as a "racial insult"); *see also Copeland v. Rosen*, 38 F. Supp. 2d 298, 309 (S.D.N.Y. 1999) (concluding an "inference of discrimination" had "easily been satisfied" with evidence that defendant "expressed animus towards blacks generally by describing students as 'monkeys'"). Weaponizing unsubstantiated allegations of fraud and violent crime in Minnesota to compare Somali people to animals who violently prey on others is explicitly racist and represents a marked contrast from immigrants being generally "associate[d]" "with crime and other social ills." *Mullin*, 146 S. Ct. at 2138 (cleaned up). Such racial epithets cannot be categorized as race neutral.

In the months leading up to the Termination, President Trump and Defendants also repeatedly used pirate imagery to malign Somali people which "draw[s] from the same anti-Black racial grammar" where "Blackness is rendered fraudulent, criminal, and morally deficient, cast as both a personal failing and national burden."[6] For example, President Trump questioned "how do [Somali people] go into Minnesota and steal all that money? . . . you know they're pirates, they're good pirates." Dkt. 5-46. Defendant DHS reposted USCIS's announcement of the Termination, adding a line from a Somali pirate in the movie "Captain Phillips": "I am the captain now." Dkt. 5-31. The reference employed derogatory language based on Somali people's race and national origin to seemingly mock their powerlessness vis-a-vis the Administration. Far from being a term broadly associated with immigrants, Defendants' use of the word "pirate" employs racially discriminatory stereotypes about Black people in a way that is unique to Somalis and specific to

---

[6] *See* Ex. 12; Nadiya N. Ali, *How AI Resurrects Racist Stereotypes and Disinformation – and Why Fact-Checking isn't Enough*, The San Diego Voice & Viewpoint (Mar. 13, 2026), https://sdvoice.info/how-ai-resurrects-racist-stereotypes-and-disinformation-and-why-fact-checking-isnt-enough/.

15

the Administration's unfounded demonization of the Somali community.[7] *Cf. Mullin*, 146 S. Ct. at 2138. This singling out of Somali people is not race neutral and cannot be explained as the Administration's policy view; it is hard to imagine more overt and targeted racism. *Cf. Id.* at 2139.

These statements are not a "single isolated misrepresentation," nor do they have any "grounding in fact," which indicates discriminatory intent. *Foster v. Chatman*, 578 U.S. 488, 502, 512–13 (2016). President Trump's claims about Somali crime in Minnesota are widely exaggerated.[8] Although Minnesota does not track crime by nationality, a state crime dashboard shows that only 37% of people arrested in the State since 2021 were Black, so claims that Somali people are responsible for a majority or even most crimes are grossly overstated given that Somalis comprise only a portion of the total Black population.[9] These allegations are also irrelevant to Somali TPS holders. TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are inadmissible on grounds relating to national security, foreign policy, or on many other bases. 8 U.S.C. §§ 1254a(c)(1)(A), (c)(2)(B); *id.* § 1182; *id.* § 1158(b)(2)(A). However, the CAR reveals Defendants cherry-picked articles that accused Somali people who are not TPS holders of crimes to validate their racially discriminatory motives for the purported Termination. Dkt. 42-2 at AR-000614-63; Dkt. 43, Supp. Mem. In Support of Pls.' Mot. to Postpone at 18–19; Dkt. 88-1, Ex. Decision Mem. at 12–13.

---

[7] President Trump has also made derogatory statements about Somalis that invoke their Muslim faith. In a November 27, 2025, Truth Social post President Trump referred to Somali-American Congresswoman Ilhan Omar as "always [being] wrapped in her swaddling hijab." Dkt. No. 5-22. On July 6, 2026, President Trump shared a video on Truth Social featuring a group of Somali-American kindergarteners at a Minnesota school with the caption "Every girl is in a hijab . . . in kindergarten." Ex. 5. These statements demonstrate President Trump's religious animus towards Somali people in addition to discrimination based on their race and national origin. *Nahar v. ADR Ventures WPR LLC*, No. 23-CV-3835, 2024 WL 4042433, at *5 (S.D.N.Y. Sep. 3, 2024) (concluding employer's comments regarding employee's hijab "give rise to an inference of religious-based discrimination").

[8] *See* Ex. 2; Madison McVan, *U.S. Rep. Tom Emmer Makes Wildly Inaccurate Claim About Somali Crime on National TV*, Minnesota Reformer (Dec. 4, 2025), https://minnesotareformer.com/briefs/u-s-rep-tom-emmer-lies-about-somali-crime-on-national-tv/.

[9] *Id.*

Relying on racial stereotypes about Black people, President Trump and Defendants intentionally exploited inaccurate allegations to brand Somali people as criminals to validate the Termination. *See, e.g.*, Am. Compl. ¶¶ 96, 100, 103, 108. These expressions of discrimination are targeted at Somali people and cannot be excused as a race-neutral policy view.

The Administration's statements tying the Termination to racialized falsehoods and racial slurs are even more glaring considering Defendants' acknowledgement that country conditions in Somalia are unsafe: the very assessment Defendants' TPS decision is supposed to rest on. For example, a week after he announced that he was terminating Somalia's TPS designation President Trump referred to Somalia as "a decadent, backward, and crime ridden nation, which is essentially not even a country for lack of Government, Military, Police, schools, etc. . . . ." Dkt. 5-22. He called the country "devastated," "crime-ridden," and "a mess." Dkt. 5-21. A week later, he expressed that "Somalia is considered by many to be the worst country on earth." Dkt. 5-24. Nevertheless, President Trump stated Somali people could be sent to Somalia because "what the Somalian [sic] people have done to Minnesota is not even believable." Dkt. 5-24. Defendants themselves acknowledged unsafe conditions in Somalia in the CAR. *See, e.g.*, Dkt. 42-1 at AR-000019, AR-000021, AR-000024, AR-000027, AR-000044; Dkt. 43-2 at AR-00084. Defendants' and President Trump's recognition of the dangerous conditions in Somalia is not simply "broadly denigrat[ing]" Somalia or giving "harshly unfavorable description[s] of living conditions" there. *See Mullin*, 146 S. Ct. at 2138. Nor are they neutral policy assessments of the conditions in Somalia. They are an admission that the Defendants' purported Termination decision could not have been based on a legitimate assessment of country conditions and evidence that Defendants intended to send Somali people back to Somalia regardless of the harms they faced there because of their race and national origin-based discriminatory views of Somali people.

17

2.  *Circumstantial Evidence Also Supports Finding Defendants Acted with Discriminatory Intent.*

In addition to the direct evidence of discriminatory intent from President Trump and Defendants' own statements, discriminatory purpose may also "be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). *Arlington Heights* looks to several circumstantial factors that support discriminatory intent; all weigh in favor of finding that Defendants singled out Somali people to expel them from the country based on their race and national origin, indicating discriminatory intent behind the Termination. 429 U.S. at 266–67; *see also Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021).

### i.    Sequence of Events Surrounding the Termination

The specific sequence of events leading up to the Termination shows that Defendants abruptly departed from decades of past practice to purportedly terminate Somalia's TPS designation while simultaneously pursuing operations and policies that targeted Somali people for investigation, detention, and removal from the country. No groups other than Somali people faced the Administration's singular focus, which suggests discriminatory intent.

Since it was initially designated for TPS in 1991, only one year after the TPS program was created, Somalia has been continuously designated for TPS based on the "extraordinary and temporary conditions" ground for designation, and, additionally, since 2002, based on the "ongoing armed conflict" ground.[10] Defendants' termination of Somalia's TPS designation in 2026 represents an abrupt departure from more than three decades of U.S. policy that is not

---

[10] *See, e.g.*, Extension of Designation of Somalia Under Temporary Protected Status Program, 57 Fed. Reg. 32232 (July 21, 1992); Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 Fed. Reg. 48950 (July 26, 2002); Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59135 (July 22, 2024). For full list, *see* Am. Compl. ¶ 86 n. 30.

justified by current country conditions, including the State Department's Level 4 travel advisory advising that individuals "not travel to Somalia for any reason."[11] *See also* Dkt. 6-37.

Moreover, in the weeks leading up to the Termination, Defendant DHS launched the "largest immigration enforcement operation ever carried out by the agency," to target Somali people in Minnesota. *See* Dkt. 5-28; Ex. 1. The timing of this operation was not by chance. The directive for the Minnesota ICE operation came after the series of inflammatory remarks made by President Trump starting in November 2025 and immediately preceded the Termination. *See* Dkt. 5-28; Ex. 14. Somali Americans were "detained or interrogated because they looked Somali or were speaking Somali," and at least one was mistakenly taken to an ICE facility.[12] On January 9, 2026, a week before the Termination, Defendant DHS announced that it had launched "a sweeping initiative reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims,"[13] which targeted Somali refugees who had already passed security screening and background checks. Not even a week later, federal immigration agents reportedly arrested dozens of refugees in Minnesota, a majority of whom were from Somalia and some of whom were children.[14]

Three weeks after the Termination, asylum hearings for dozens of Somali immigrants were fast-tracked from dates in 2028 to March 2026, when the Termination was slated to take effect.[15] The accelerated hearings have uniquely targeted Somali asylum applicants and "appear[ed] to be

---

[11] Ex. 3; U.S. Dept. of State, Travel Advisory – Federal Republic of Somalia, issued May 21, 2026, Somalia Travel Advisory | Travel.State.gov.

[12] *See* Ex. 13; *Somali Fraud in Minnesota—The Tip of the Iceberg: Hearing Before the Subcomm. on Border Sec. & Immigr. of the S. Comm. on the Judiciary*, 119th Cong. (2026) (statement of David J. Bier, Dir. of Immigr. Stud., Cato Inst.)

[13] *See* Ex. 6; USCIS, *DHS Launches Landmark USCIS Fraud Investigation in Minnesota* (January 9, 2016), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota.

[14] *See* Ex. 7; Miriam Jordan, *ICE Arrested Dozens of Refugees in Minnesota and Sent Them to Texas*, *Lawyers Say*, N.Y. Times, (Jan. 13, 2026), https://www.nytimes.com/2026/01/13/us/ice-arrests-refugees-minnesota.html.

[15] Dkt. 6-19; Ximena Bustillo, *Immigration Courts Fast-Track Hearings for Somali Asylum Claims*, NPR (Feb. 9, 2026), https://www.npr.org/2026/02/09/nx-s1-5707217/somali-asylum-cases-rescheduled.

a coordinated effort between the Executive Office for Immigration Review and [Defendant DHS] to reject Somali asylum applications without court hearings." [16] Reports suggest Somali immigrants' cases have been referred to immigration judges who deny asylum at higher rates than the national average, compounding the likelihood of Somali people's detention and removal.[17]

The Termination was one in a series of adverse immigration actions directed specifically towards Somali people to harm their ability to enter or lawfully remain in the country, thus supporting an inference that unconstitutional motives drove the Termination.

### ii. _Substantive and Procedural Departures from the Norm_

The Termination's clear departures from the TPS statute's consultation requirement and the Secretary's failure to publish the true basis for the determination, _see supra_ Section I (A)(2), as well as notable procedural departures like reliance on the domestic national interest and the Secretary's abandonment of the prior practice of reviewing the State Department's country conditions reporting and recommendations to inform her decision, _see_ Supp. Br. at 5–7, Dkt. 43; Am. Compl. ¶¶ 164, 173 – 76, 178, further reinforce Defendants' racially discriminatory purpose.

Moreover, considerable evidence in the record suggests that conditions in Somalia are unsafe, pointing to a substantive departure from Somalia's thirty-five years of TPS designations. _See_ Am. Compl. ¶¶ 181, 185 – 88. As recently as 2024, Somalia's redesignation noted that "Somalia continues to experience widespread insecurity due to armed conflict involving state and non-state actors" as well as severe environmental impacts, healthcare-related needs, and food insecurity, with around half of Somalia's population in need of humanitarian assistance. 89 Fed. Reg. at 59137–38. Yet, Defendants failed to explain why comparable evidence in 2026 did not require redesignation and cherry-picked evidence of supposed improvements in country conditions

---

[16] _See_ Ex. 7.
[17] _Id._

to justify the Termination. Am. Compl. ¶¶ 189 – 201; Supp. Br. at 8–15, Dkt. 43. Defendants also failed to account for the State Department's Level 4 Travel Advisory for Somalia indicating extremely unsafe conditions there. Dkt. 6-37. Thus, "[t]he factors usually considered important by the decisionmaker [in prior decisions about Somalia's TPS designation] strongly favored a decision contrary to the one reached" in the Termination. *Arlington Heights*, 429 U.S. at 267 (noting "sudden" changes in longstanding zoning designations would be suggestive of a racially discriminatory motive).

### iii. *The Historical Background of the Decision*

The Administration's history of targeting Somali people also supports that discriminatory purpose motivated the Termination. During President Trump's first presidency, Somalia was included in a 2018 entry ban that barred certain nationals from entering the United States. *See* Dkt. 5-52. During this time period, the Trump Administration barred refugees but the policy "especially affected refugees from Somalia,"[18] resulting in a decline in Somali admissions that suggested "what the Trump administration is doing [regarding Somalia] is really an anomaly." [19]

In his second term in office, President Trump has continued his targeting of Somali nationals. On June 9, 2025, he proclaimed that Somali nationals were fully suspended from entering the United States. Dkt. 8-4. A few months later, Defendant USCIS instituted a new policy[20] that affected Somali immigrants by (1) pausing all asylum processing in the United States,

---

[18] *See* Ex. 4; Nicole Javorsky, *Trump's Assault on Somali Refugees Goes Way Beyond Just Ilhan Omar*, Mother Jones, (July 19, 2019), https://www.motherjones.com/politics/2019/07/trumps-assault-on-somali-refugees-goes-way-beyond-just-ilhan-omar/.

[19] *See* Ex. 4.

[20] This policy is currently vacated but now on appeal. *U.S. Citizenship & Immig. Servs.*, Court Order on Hold Policies (June 12, 2026), https://www.uscis.gov/newsroom/alerts/court-order-on-hold-policies; *see Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immig. Servs.*, No. 26-cv-132-JJM-PAS, 2026 WL 1622708 (D.R.I. 2026) (ordering vacatur of four USCIS policies under the APA in which statements by President and former Secretary of ethnic hostility and prejudice toward individuals from thirty-nine countries revealed agency decisionmakers' bad faith and impermissible animus).

(2) pausing the processing of immigration benefits applications, including applications for TPS; (3) announcing the re-vetting of approved beneficiaries of immigration benefits, including beneficiaries of TPS; and (4) directing immigration officers to treat nationality as a negative factor when deciding applications. Dkt. 8-4. In January 2026, the Department of State commenced a policy of indefinitely pausing the issuance of immigrant visas (entry permits) to Somali nationals. Dkt. 9-2. Somalia has consistently been one of the first targeted countries for Defendants' xenophobic and racially discriminatory efforts. This history shows that Defendants and other officials in the Trump administration have unfailingly targeted Somali people, evidence of their discriminatory intent.

### iv.    *The Termination's* Discriminatory Effect on Somali People

Lastly, the disparate "impact of the official action" and "whether it bears more heavily on one race," is obvious in this case and is a key indicator of discriminatory intent. *Arlington Heights*, 429 U.S. at 266. Here, the impact of the Termination is felt overwhelmingly by Somali people who Defendants have targeted for detention and deportation because of their race and national origin while Defendants have implemented or extended immigration pathways and relief from immigration enforcement for immigrants from predominantly white countries. Am. Compl. ¶¶ 144–54.

For example, in February 2025, soon after he took office, President Trump signed an executive order directing the DHS Secretary to prioritize humanitarian relief, including admission and resettlement in the United States, for Afrikaners in South Africa who are victims of unjust racial discrimination. Exec. Order No. 14204, 90 Fed. Reg. 9497 (Feb. 12, 2025). The Administration has also explicitly juxtaposed its preference for white immigrants from

22

Scandinavian countries with Somali people, indicating a preference for "nice" white immigrants over Somalis, demonstrating specific animus against Somali people. Dkt. 5-26.

For example, President Trump has invoked the so-called "Replacement Theory," which posits that non-white immigrants will "replace" the white race, and in doing so, undermine a perception of the United States' white foundation, history, and culture. Dkt. 5-72. President Trump and his Administration have repeatedly used the term "remigration," which "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing." Dkt. 6-8; Dkt. 6-10. President Trump also adopted eugenic rhetoric by embracing the so-called "racehorse theory," a theory used to justify selective breeding of people, Dkt. 5-73, and referred to it in remarks to a predominantly white crowd in Minnesota during his first term: "You have good genes, you know that, right? . . . You have good genes. A lot of it is about the genes, isn't it? Don't you believe? The racehorse theory. You think we're so different? You have good genes in Minnesota." Dkt. 5-73. These comments in Minnesota are even more glaring considering his repeated statements about how Somalis are ruining the state, *supra* Section I.B.1.

And, although the Secretary has terminated the TPS designation for every country up for review so far, the recent auto-extension of Lebanon's TPS designation[21] underscores that the Administration does not simply oppose the TPS program. Although the TPS designation of Ukraine—the only predominantly white country among the fifteen with active TPS designations at the time the Administration took office in January 2025—is not set to expire until October 19, 2026, President Trump has stated that he does not plan to revoke TPS for Ukrainians: "[w]e're not looking to hurt them. Especially Ukrainians, they've gone through a lot." *See* Dkt. 5-

---

[21] *See* Ex. 9; Extension of Lebanon Designation for Temporary Protected Status, 91 Fed. Reg. 32069 (May 29, 2026).

64; Ex. 10. Moreover, this Administration has already favored white Ukrainian immigrants. In March 2025, DHS revoked the parolee status of all beneficiaries under the Cuban, Haitian, Nicaraguan, and Venezuela parole program, while leaving the "United 4 Ukraine" parole program in place for the majority white nationals of Ukraine. *See Doe v. Noem*, 784 F. Supp. 3d 437, 451 (D. Mass. 2025).

***

No justification exists for the Termination's targeting of Somali people other than unconstitutional motives. *See Arlington Heights*, 429 U.S. at 266-67. Together, these factors demonstrate that the termination decision was motivated, at least in part, by Defendants' discrimination on the basis of Somali people's race and national origin. Plaintiffs are therefore likely to succeed on the merits of their Equal Protection claims.

### C. Plaintiffs' Constitutional Claims Are Reviewable.

The TPS statute's judicial review bar, 8 U.S.C. § 1254a(b)(5)(A), does not bar Plaintiffs' constitutional claims. In *Mullin v. Doe*, the Supreme Court declined to extend the bar to constitutional claims, instead proceeding directly to the merits of plaintiffs' constitutional challenge. 146 S. Ct. at 2137 (reaffirming the bedrock principle that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.") (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)).[22] Congress expressed no "clear" intent to bar constitutional claims under the TPS statute as it has elsewhere, and thus these claims are properly before this Court.[23] *Cf., e.g.*, 8 U.S.C. § 1252(b)(9) (precluding "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions").

---

[22] The Government conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] . . . to argue that there's no review of [] constitutional claims" under Section 1254a(b)(5)(A). Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026).

[23] Courts have similarly held that "the fact that Congress specifically included constitutional jurisdiction-stripping provisions elsewhere in the [Immigration and Nationality Act] but did not do so in the TPS statute strongly suggests

24

## II.    Plaintiffs Are Likely to Succeed Because TPS Termination Authority Is Vested Exclusively in the Attorney General.

### A.    The DHS Secretary Acted Ultra Vires in Purporting to Terminate Somalia's TPS Designation.

"[An] administrative agency's power . . . is limited to the authority granted by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).[24] Under the APA, a court must "hold unlawful and set aside agency action" issued "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C); *see also City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act.") (citations omitted). An agency must "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022).

Defendant DHS has not done so here. Congress unambiguously assigned the authority to terminate TPS designations to the Attorney General, and it never transferred that authority to the DHS Secretary. The DHS Secretary therefore acted *ultra vires* in purporting to terminate Somalia's TPS designation, and the Termination must be "set aside." 5 U.S.C. § 706(2).

### 1.    The TPS Statute Vests Termination Authority in the Attorney General.

Congress expressly authorized only the Attorney General to terminate TPS designations. The TPS statute provides: "If the *Attorney General* determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the *Attorney General* shall terminate the designation." 8 U.S.C. § 1254a(b)(3)(B) (emphases added). The Secretary is not mentioned;

---

Congress did not intend to eliminate jurisdiction over constitutional claims." *Saget*, 345 F. Supp. 3d at 296; *see also CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 319–321 (D. Md. 2018) (holding TPS's jurisdiction-stripping provision did not preclude judicial review of plaintiffs' claim that the Secretary's action violated § 706(2) of the APA).

[24] *See also, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities."); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."); *La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

nor is any other government official. That delegation was consistent with Congress's choice to exclusively vest the Attorney General with other key TPS authorities, including to designate a country for TPS, grant TPS to individuals, and authorize employment. *Id.* § 1254a(a)(1), (b)(1).

Subsequent regulations adopted by the Department of Justice delegated certain operational TPS functions pertaining to the adjudication of individual TPS and work authorization applications to the former Immigration and Naturalization Service ("INS"). *See* Temporary Protected Status, 56 Fed. Reg. 618, 618–20 (Jan. 7, 1991) (codified as amended at 8 C.F.R. §§ 244.2, 244.6, 244.7). But the regulations maintained the *Attorney General*'s TPS termination authority, defining an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *Id.* at 619 (codified at 8 C.F.R. § 244.1) (emphasis added). And in practice, the Attorney General issued all terminations until 2002.[25]

2.  *The Homeland Security Act Did Not Transfer TPS Termination Authority to the DHS Secretary.*

DHS has asserted TPS termination authority pursuant to the Homeland Security Act of 2022, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("the Act").[26] But the Act did not transfer the Attorney General's TPS termination authority to the DHS Secretary. Instead, it provided that:

> The Secretary of [DHS] shall be charged with the administration and enforcement of this chapter [*i.e.*, the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General . . . .*

---

[25] *See, e.g.*, Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52789, 52791 (Aug. 30, 2000); Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15437, 15438 (Mar. 31, 1998); Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7582 (Feb. 8, 1993); Termination of Designation of Kuwait Under Temporary Protected Status Program, 57 Fed. Reg. 2930, 2931 (Jan. 24, 1992).

[26] *See, e.g.*, Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23744 (May 5, 2003).

26

8 U.S.C. § 1103(a)(1) (emphases added).[27] In other words, "powers, functions, and duties" expressly conferred upon the "Attorney General"—even those "relating to the immigration and naturalization of aliens"— remained vested in the Attorney General notwithstanding the transfer of *other* such authorities to DHS.[28]

To be sure, the Act did transfer to DHS "all . . . adjudications performed by the [INS] immediately before" the effective date of the Act, 6 U.S.C. § 271(b)(5), including the adjudication of individual TPS applications, *see supra* Section I(A). But TPS terminations were *not* "performed by [INS] immediately before" the Act's "effective date," and so those authorities were *not* transferred to DHS. Nor were those authorities transferred by the congressionally required executive Reorganization Plan, which did not address TPS or immigration-related powers exclusively vested in the Attorney General. *See* 6 U.S.C. § 542 note. By contrast, other portions of the Plan specifically addressed the transfer of particular Attorney General functions.[29]

DHS has cited 6 U.S.C. § 552(d) and § 557 for its TPS termination authority.[30] But those provisions did not independently transfer any authority; they streamlined the process of amending

---

[27] While the first part of the statute gives the Secretary of DHS general responsibility for the "administration and enforcement" of immigration laws, it cannot be construed as having transferred the TPS designation authority because under the TPS statute, that authority is reserved for the Attorney General and the Section 1103 exception clearly retains all such express "powers, functions, and duties conferred upon the ... Attorney General." To hold otherwise would be to read the exception out of the statute. Moreover, the fact that 8 U.S.C. § 1103(g) states the Attorney General retains authorities and functions previously exercised by the Executive Office for Immigration Review (EOIR) does not cabin the scope of powers retained by the Attorney General pursuant to § 1103(a) because the text does not contain such a restriction and such a reading would contradict the rest of the statute, which is full of examples of powers that are expressly vested in the Attorney General that go beyond the scope of the EOIR.

[28] Other provisions similarly confirmed that particular immigration-related powers would remain with the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(g) (providing that Attorney General would retain authority over functions "exercised by the Executive Office for Immigration Review").

[29] *See, e.g.*, 6 U.S.C. § 542 note (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)).

[30] *See, e.g.*, Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476, 3477 n.1 (Jan. 21, 2010); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47228, 47229 n.1 (Oct. 11, 2017); Pet'rs' Appl. for Stay 5 n.2, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025). Various courts have cited these provisions in dicta, but the courts never grappled with any argument that the Attorney General's TPS termination authority was not actually transferred to DHS. *See, e.g.*, *Najera v. United States*, 926 F.3d 140, 142 (5th Cir. 2019); *Cervantes v. Holder*, 597 F.3d 229, 231 n.2 (4th Cir. 2010); *Mejia Rodriguez v. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009).

the code by providing that certain "references" would be "deemed to refer" to the Secretary *only* where those functions were *actually transferred* to the Secretary. 6 U.S.C. § 557 provides:

> *With respect to any function transferred by or under this chapter* . . . reference in any other Federal law to any department, commission, or agency or any officer or office *the functions of which are so transferred* shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

(Emphases added). And 6 U.S.C. § 552(d) similarly provides: "References *relating to an agency that is transferred* to the Department . . . shall be deemed to refer, as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions." (Emphasis added). These are housekeeping provisions, not substantive grants of authority.

Because the DHS Secretary has purported to terminate Somalia's TPS designation without identifying a valid statutory grounding for that authority, *see Nat'l Ass'n of Broads.*, 39 F.4th at 819, Plaintiffs are likely to succeed on their claim that the Termination was *ultra vires* and contrary to law. *See* 5 U.S.C. § 706(2);[31] *California v. Mullin*, No. 25-cv-13829, 2026 WL 1649160, at *16 (D. Mass. June 8, 2026) (vacating agency action where no statute granted executive agencies the power to take such action); *3Nod Digital (Hong Kong) Ltd. v. U.S. Dep't of State*, No. CV 25-968, 2026 WL 759439, at *6 (D.D.C. Mar. 18, 2026) (vacating agency action after finding that agency official was not the official authorized to take that action); *Batalla Vidal v. Wolf,* 501 F. Supp. 3d 117, 132 (E.D.N.Y. 2020) (holding that DHS Acting Secretary's action "was not an exercise of

---

[31] If this Court agrees that the DHS Secretary lacked the authority to issue the Termination, that would not also invalidate the initial TPS *designation* for Somalia because Somalia was initially designated for TPS by the Attorney General. Designation of Somalia for Temporary Protected Status, 56 Fed. Reg. 46805 (Sep. 16, 1991). Even if that were not the case, this APA suit challenges only the Termination, and any challenge to the initial TPS designation would need to be considered in the context of a separate and otherwise justiciable lawsuit. Furthermore, even when the cited basis for an agency program turns out to be invalid, the APA requires the government to explore alternatives to outright termination. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24–28 (2020). Finally, "mutually explicit understandings" related to TPS status and the legitimate reliance interests of TPS holders and applicants give rise to vested due process interests notwithstanding any statutory violation. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also supra Section* I.A.

legal authority" where he was without "statutory authority" to serve as DHS's Acting Secretary); *cf. Asylumworks v. Mayorkas*, 590 F. Supp. 3d. 11 (D.D.C. 2022) (vacating agency rules promulgated by the improper official).

### B.  Plaintiffs' Ultra Vires Claim Is Reviewable Notwithstanding Mullin.

This Court may review Plaintiffs' *ultra vires* claim because "a corollary" of the APA's directive to set aside agency actions taken in excess of statutory authority is "that courts reviewing agency action must determine that 'the particular official acting on behalf of the agency [was] delegated the authority to act; otherwise such agency action is invalid.'" *League of Women Voters of United States v. Newby,* 238 F. Supp. 3d 6, 11 (D.D.C. 2017) (quoting *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 12 (D.D.C. 2011)); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665–66 (9th Cir. 2021) (noting that courts are "responsible for reviewing whether the government has overstepped its delegated authority under the INA"). Indeed, the Supreme Court has squarely held that courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Because this claim concerns an exercise of extra-statutory authority, not a determination under the TPS statute, the TPS review bar does not apply, and *Mullin* does not foreclose review because it did not consider this argument.

*First*, the TPS statute poses no bar to reviewing Plaintiffs' *ultra vires* claim. "As with all questions of statutory interpretation, the Court 'begin[s] with the text.'" *Afr. Cmtys. Together v. Noem*, 828 F.Supp.3d 235, 247 (D. Mass. 2026) (quoting *SEC v. Lemelson*, 138 F.4th 618, 623 (1st Cir. 2025)). Here, the text is straightforward. The TPS statute's review bar provides: "There is no judicial review of any determination *of the Attorney General* with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). But Plaintiffs' lawsuit is directed exclusively at the *DHS*

29

*Secretary*'s unlawful TPS termination.

*Second*, *Mullin* does not foreclose Plaintiffs' *ultra vires* claim. There, no party advanced the argument that Plaintiffs press now—*i.e.*, that the Attorney General alone has the authority to terminate a TPS designation.[32] No party disputed that the DHS Secretary lacked authority to issue a TPS termination by virtue of her *office*. To the contrary, the parties assumed that the Secretary possessed the requisite TPS authority and could at some point issue a valid TPS termination as long as the action adhered to the statute's *procedural* requirements. In short, no "party in [*Mullin*] briefed or argued the question" that Plaintiffs now present. *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989) (declining to interpret a Supreme Court case as deciding an unpresented and unaddressed issue). Nor did the Supreme Court consider Plaintiffs' *ultra vires* argument. [33] In addressing the judicial review bar, the Court focused on the meaning of "determination," *See Mullin*, 146 S. Ct. at 2133, and did not interpret—or even mention—the statute's language limiting the review bar to actions "of the Attorney General." 8 U.S.C. § 1254a(b)(5)(A); *see Mullin*, 146 S. Ct. at 2133. As a result, *Mullin* addressed the entirely different question of whether the review bar reaches non-constitutional claims challenging *how* the Secretary exercised her (in that case) unchallenged TPS authority, not *whether* the Secretary could exercise that authority *at all*. The Supreme Court presumed the validity of the DHS Secretary's

---

[32] It is well-established that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster*, 266 U.S. at 511; *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (declining to resolve an issue based on a prior Supreme Court decision which "did not address" key, relevant considerations); *Whitman v. United States*, 574 U.S. 1003, 1005 (2014) (mem.) (prior decision's "drive-by ruling . . . deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue).

[33] Because *Mullin* was decided in a preliminary posture, the Supreme Court is free to revisit its conclusions, including based on new arguments. Moreover, likelihood-of-success determinations "do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025); *see also Univ. of Tex.*, 451 U.S. at 395 ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding"). The Court has therefore "cautioned against treating preliminary injunctions as tantamount to decisions on the underlying merits." *Lackey*, 604 U.S. at 201 (citation modified); *see also Capen v. Campbell*, 134 F.4th 660, 676 & n.10 (1st Cir. 2025) (cautioning that "future developments in . . . the parties' arguments[] may possibly warrant a different outcome beyond the preliminary-injunction stage").

authority, *see id.*, but an unpresented question "lurk[ing]" in the background carries no precedential effect, *Webster*, 266 U.S. at 511.

Because this Court has jurisdiction to hear Plaintiffs' claim that the Secretary lacks the statutory authority to terminate Somalia's TPS designation and *Mullin* did not consider this argument, Plaintiffs' claim is reviewable by this Court.

### III. Plaintiffs Face Irreparable Harm, and the Balance of Hardships, Equities, and Public Interest Favors Them.

#### A. Plaintiffs Will Face Irreparable Harm Absent a Postponement or Preliminary Injunction.

This Court has twice already considered the non-merits factors, and on both occasions, has held in Plaintiffs' favor. *See* Dkt. 33 ("[I]mplement[ing] an administrative stay and defer[ing] ruling on postponement until the administrative record has been produced and the parties have fully briefed the issues presented."); Dkt. 78 (ordering that "the administrative stay will remain in place … to permit this Court to resolve the issues presented by Plaintiffs' emergency motion").

Plaintiffs now again face the same imminent and irreparable harm forming the basis of this Court's prior stay grants, among them, cognizable violations of their constitutional rights,[34] and separation from families, loved ones, and communities—all of which flow directly from the unlawful termination that Plaintiffs seek to postpone. Am. Compl. ¶¶ 221–49. Absent a postponement or injunction, the termination of TPS for Somalia would (1) immediately strip Plaintiffs of immigration status and access to related federal and state benefits, including work authorization, driver's licenses, and healthcare coverage and (2) subject them to deportation proceedings and related immigration confinement that would tear them apart from loved ones and

---

[34] Plaintiffs have established a clear certainty of irreparable harm because they allege cognizable violations of their constitutional rights and even "a prospective violation of a constitutional right constitutes irreparable injury." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *see also Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (finding petitioner has established irreparable harm on constitutional rights claim).

31

community and expose them to forced removal to Somalia or other third countries where they will face serious and even deadly danger. *See* Dkt. 2-2; Dkt. 2-3; Dkt. 2-4; Dkt. 2-5. And, even without removal, TPS holders face irreparable harm because a gap in immigration status could cause loss of work authorization and ineligibility for certain immigration relief. *See Doe v. Noem*, 784 F. Supp. 3d at 465–66. Plaintiffs also face stigmatic harms from unconstitutional racial and national origin discrimination.[35]

For example, should the Termination proceed, Plaintiffs face the irreparable harm of separation from their family members, including U.S. citizen family members. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (identifying "separation from family" as an irreparable harm); *see also* Dkt. 2-3 (Mohamed Doe has a wife and U.S. citizen young child); Dkt. 2-4 (Tyson Doe has a U.S. citizen brother); Dkt. 2-5 (Nina Doe has a U.S. citizen host family who consider to be like a daughter). They would be immediately subject to arrest and detention pending deportation if the Termination goes into effect. In light of the Administration's recent push for mass immigration arrests—which has roughly doubled the rate of arrests to 2,000 a day—the risk of arrest and detention facing Somali TPS holders and applicants is imminent and concrete.[36]

Further, Termination would also cause Plaintiffs to lose their work authorization and jeopardize their ability to support their families. *See Nat'l Educ. Ass'n-N.H. v. NH Att'y Gen.*, No. 25-CV-293-LM, 2025 WL 2807652, at *24 (D.N.H. Oct. 2, 2025) ("Loss of the ability to practice one's chosen profession is irreparable harm.") (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,

---

[35] *See, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) ("Rather, as we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.") (internal citations omitted).

[36] *See* Ex. 11; Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. TIMES (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html (describing major surge of arrests by federal immigration officials, including during traffic stops and on the streets).

32

630 F.3d 1153, 1165 (9th Cir. 2011)); Am. Compl. ¶¶ 225–28. In many states, TPS holders would lose their drivers' licenses—losing both their mobility and their only state-issued identification. *See, e.g.*, Am. Compl. ¶ 229.

These injuries are severe and irreparable and weigh heavily in favor of this Court granting preliminary relief. The Government, in contrast, has documented no actual harm in the several months that Somali TPS holders and applicants have continued to live and work in safety with their families in the United States during the pendency of this Court's previously granted stays.

### B.   The Balance of the Equities and the Public Interest Favor Plaintiffs.

The remaining stay factors—the balance of the equities and public interest—merge when the government is the party opposing the relief. *Nken*, 556 at 418; *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018). These considerations, too, weigh heavily in favor of Plaintiffs. While the government has an important interest in implementing lawful immigration policy, "[t]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (quotation omitted). Further, there is "no public interest in the perpetuation of unlawful agency action," *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025); *see also, e.g.*, *McMahon*, 784 F. Supp. 3d at 372 (public interest in agencies' compliance with the rule of law); *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 33–34 (D. Mass. 2025) (unlawful immigration enforcement hurts public interest). However, the Secretary's unlawful termination of Somalia's TPS designation will impose significant economic, social, and cultural harms on the communities where Somali TPS holders currently live.

Because all factors relevant to the § 705 postponement and preliminary injunction inquiry favor Plaintiffs, this Court should grant Plaintiffs' motion for preliminary relief.

33

## CONCLUSION

Plaintiffs respectfully ask this Court to postpone the effective date of the Termination or otherwise enjoin Defendants from enforcing the termination of Somalia's TPS designation pending final judgment and issue an administrative stay pending resolution of this motion.

Dated: July 30, 2026

Respectfully submitted,

*/s/ Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Sadaf Hasan*
Melissa Keaney*
Collin Poirot*
Abbey Rutherford*
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Sadaf@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew*
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/ Kacey Mordecai*
Kacey Mordecai*
Mide Odunsi*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W. Suite 600
Washington, D.C. 20005
(202) 682-1300
kmordecai@naacpldf.org
modunsi@naacpldf.org

Ashley Burrell*
Lauren Carbajal*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(202) 965-2200
aburrell@naacpldf.org
lcarbajal@naacpldf.org

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2026, this brief will be sent electronically through this

Court's CM/ECF system to all registered parties.

*/s/ Kacey Mordecai*
Kacey Mordecai
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
