UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, *et al.*, <br> Plaintiffs, <br><br> v. <br><br> MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, *et al.*, <br><br> Defendants. | Case No. 26-cv-11201-ADB <br> **LEAVE TO FILE GRANTED** <br><br> **ON AUGUST 5, 2026** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR POSTPONEMENT AND MOTION FOR PRELIMINARY INDUNCTION**

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ *Robert E. Richardson*
  ROBERT E. RICHARDSON
  Assistant U.S. Attorney

Defendants (the "government") respectfully submit this memorandum of law in opposition to the renewed motion filed by the plaintiffs ("Plaintiffs") to postpone the effective date of agency action, Dkt. No. 92 ("Pl. Br.").

## PRELIMINARY STATEMENT

Plaintiffs originally claimed that the Secretary of Homeland Security's termination of Somalia's Temporary Protected Status ("TPS") designation violated the Administrative Procedure Act ("APA") and their Fifth Amendment equal-protection rights. In June, however, the Supreme Court made clear that neither the APA claim nor the equal-protection claim is viable. *See Mullin v. Doe*, 146 S. Ct. 2121 (2026). Plaintiffs have now pleaded two new claims. They assert that the termination was *ultra vires* because only the Attorney General, and not the Secretary, may terminate a TPS designation, and that they were deprived of procedural due process. They also have renewed their equal protection claim. Plaintiffs seek the same relief—postponement under § 705—on these claims.

None of these claims can support that relief. The *ultra vires* and due process claims are, under binding precedent, barred by the TPS statute's prohibition on judicial review, which the Supreme Court construed broadly in *Mullin v. Doe*, and all of the claims fail on the merits in any event. As to the *ultra vires* claim, the Supreme Court held that the review bar reaches all non-constitutional claims, stated that responsibility for TPS decisions rests with the Secretary of Homeland Security, and construed the bar as applying to the Secretary's determinations. Plaintiffs' premise—that only the Attorney General may terminate a designation—cannot be reconciled with those holdings. The claim also fails on its own terms, because the Homeland Security Act transferred authority over TPS to the Secretary. And the claim is also self-defeating: if the

2

Secretary lacked authority to terminate Somalia's designation, the Secretary equally lacked authority to extend Somalia's TPS status beginning in 2003, and newly designate Somalia for TPS, which would leave Plaintiffs with no status to preserve.

Plaintiffs' due process claim fares no better. It is, at bottom, the same challenge to the Secretary's consultation and decision-making process that the Supreme Court has since held unreviewable—now nominally recast in constitutional terms. A constitutional label cannot render reviewable what Congress placed beyond review. The claim also fails on the merits, for several reasons. Plaintiffs have no protected interest in the continuation of a country-wide designation committed to the Secretary's discretion. The individualized procedures they demand do not apply to a categorical determination about conditions in a foreign country and the national interest. And Plaintiffs in any event received the process the statute prescribes and the Constitution requires.

And Plaintiffs' equal protection claim fails, as it is virtually indistinguishable from the claim the Supreme Court rejected in *Mullin v. Doe.*

Because Plaintiffs cannot show a likelihood of success, and because the equities and public interest favor allowing the Secretary's lawful determination to take effect, the renewed motion should be denied.

## BACKGROUND

### I.  Statutory Background

#### A.  TPS Statute

The Immigration Act of 1990 established TPS to allow for temporary, discretionary shelter in the United States for qualifying nationals from designated foreign countries. Pub. L. No. 101-

3

649, 104 Stat. 4978. The statute permits the Secretary, [1] "after consultation with appropriate agencies," to designate countries for TPS if the Secretary determines that certain statutorily specified conditions are met. 8 U.S.C. § 1254a(b)(1). As relevant here, one condition is that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C). Another is that "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety." *Id.* § 1254a(b)(1)(A).

TPS designations are discretionary and last "not less than 6 months and not more than 18 months." *Id.* § 1254a(b)(2). At least 60 days before the end of the initial designation and any later extension, the Secretary, after consulting with appropriate agencies, must "review the conditions in the foreign state . . . for which a designation is in effect" and "determine whether the conditions for such designation . . . continue to be met." *Id.* § 1254a(b)(3)(A). If the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation." *Id.* § 1254a(b)(3)(B).

Congress enacted a broad prohibition on judicial review of the Secretary's exercise of TPS authority: "There is no judicial review of any determination of the [Secretary] with respect to the

---

[1] As discussed below, Congress transferred the Attorney General's TPS authority to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002) (codified at 6 U.S.C. § 557); 8 U.S.C. § 1103(a).

4

designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

### B.  The Homeland Security Act

The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (codified in principal part at 6 U.S.C. § 101 *et seq.*) (the "Act"), established the Department of Homeland Security ("DHS") and, among other things, charged it with certain functions that had previously been administered by the Attorney General. Relevant here, the "administration and enforcement" of all laws "relating to the immigration and naturalization of aliens" was transferred to the Secretary of Homeland Security, subject to limited exceptions for certain "powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers[.]" 8 U.S.C. § 1103(a)(1).

Rather than update all laws that previously vested these immigration functions in the Attorney General, the Act incorporated a reference provision providing that, "[w]ith respect to any function transferred by or under this chapter," a "reference in any other Federal law to any . . . officer or office the functions of which are so transferred shall be deemed to refer to the Secretary." 6 U.S.C. § 557.

## II.  Factual and Procedural History

Somalia was initially designated for TPS on September 16, 1991, based on a determination that there were "extraordinary and temporary conditions" in Somalia that prevented Somali nationals from returning in safety. *Designation of Nationals of Somalia for [TPS]*, 56 Fed. Reg. 46804 (Sept. 16, 1991). Following the initial designation, Somalia's TPS designation was extended nine times between September 17, 1992, and September 17, 2001. *See* Termination, 91

5

Fed. Reg. at 1547-48 & nn.1-10.  In September 2001, Somalia's TPS designation was extended and newly redesignated.  *Id.* at 1548 & n.11.  The designation was then extended eight times, between September 17, 2002, and September 17, 2012.  *Id.* & nn.12-19.  A redesignation in July 2002 designated Somalia for TPS on the dual bases of ongoing armed conflict and extraordinary and temporary conditions, and subsequent designations included these dual bases as justification for continued designation.  *Id.* & n. 20.  In May 2012, the designation was extended, and Somalia again was newly redesignated.  *Id.* & n.21.  The designation was extended five more times, from March 18, 2014, to September 17, 2021.  *Id.* & nn.22-26.  After that, Somalia's TPS designation was extended and newly redesignated three times, from September 18, 2021, to March 17, 2026.  *Id.* & nn.27-29.

On January 14, 2026, the Secretary of Homeland Security announced the Termination, which provides that, "[a]fter reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Somalia no longer continues to meet the conditions for designation for [TPS]."  91 Fed. Reg. at 1547.

Plaintiffs sued on March 9, 2026, asserting claims under the APA and the equal-protection guarantee of the Fifth Amendment. Dkt. No. 1.  That same day, they filed an emergency motion seeking an administrative stay and a postponement under 5 U.S.C. § 705 to postpone the effective date of the Secretary's termination of Somalia's TPS designation. Dkt. Nos. 2-5, 11.  On March 13, 2026, this Court granted the motion in part, implementing an administrative stay and deferring ruling on the postponement until the administrative record had been produced and the parties had fully briefed the issues. Dkt. No. 33.  On April 29, 2026, after the administrative record had been

6

filed and the parties had submitted their briefs, the Court entered an electronic order asking whether the parties opposed a stay of the litigation pending the decision of the Supreme Court in *Mullin v. Doe* and *Trump v. Miot.* Dkt. No. 70. Upon being advised that neither party opposed such a stay, this Court implemented it on May 1, 2026. Dkt. No. 73.

On June 25, 2026, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," while also finding that an equal-protection claim— analogous to the one asserted by Plaintiffs here—was flawed and not likely to succeed on the merits. *Mullin v. Doe*, 146 S. Ct. 2121, 2137–40 (2026).

On July 1, 2026, Defendants filed a motion to lift the abeyance and the administrative stay. Dkt. No. 77. The Court lifted the abeyance but not the administrative stay. Dkt. No. 78. On July 9, 2026, the parties submitted a joint status report that included their positions on a briefing schedule, and on July 13, 2026, the Court issued a scheduling order. Dkt. Nos. 79, 82.

On July 20, 2026, Defendants filed a notice of appeal in the First Circuit Court of Appeals, and the following day filed in the First Circuit a motion for summary reversal and vacatur of this Court's administrative stay, or in the alternative, a writ of mandamus directing the Court to dissolve the administrative stay. On July 24, 2026, Plaintiffs filed a response to Defendants' appeal, and on July 27, 2026, Defendants filed their reply.

On July 30, 2026, Plaintiffs filed a renewed motion for postponement and for a preliminary injunction. Dkt. No. 91. The Court entered an electronic order on July 31, 2026, in which the Court, *inter alia,* dissolved the Court's previous administrative stay and entered a new administrative stay to be in effect until further order of the Court. Dkt. No. 94. In light of this

7

order, the First Circuit declined to retain jurisdiction and remanded for further proceedings.  Dkt. No. 95 (Judgment).  On August 3, 2026, Defendants filed a motion to lift the new administrative stay.  Dkt. No. 97.  On August 4, 2026, the Court issued an order that, *inter alia,* amended the briefing schedule.  Dkt. No. 98.

## LEGAL STANDARD

"The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction."  *California v. Kennedy*, No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025).  Accordingly, to obtain their requested relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).  But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

## ARGUMENT

### I. Plaintiffs Cannot Demonstrate a Likelihood of Success

#### A.    Plaintiffs' Due Process Claim Is Fatally Flawed

Plaintiffs contend that the termination deprived them of "liberty and property interests without constitutionally adequate process." Am. Compl. ¶ 278; *see* Pl. Br. at 6. The claim fails for four independent reasons. First, section 1254a(b)(5)(A) bars review of the claim. Second, Plaintiffs have no protected liberty or property interest in the continuation of a discretionary, country-wide

8

designation. Third, the individualized procedural protections they invoke have no application to the Secretary's across-the-board determination to terminate a country's designation. Finally, in any event, Plaintiffs received the process the Constitution requires.

### 1.    Section 1254a(b)(5)(A) Bars Plaintiffs' Due Process Claim

Section 1254a(b)(5)(A) bars review of Plaintiffs' due process claim. The Supreme Court reasoned that this jurisdictional bar applies not only to the substantive TPS determination, but to claims based on purported procedural errors and any subsidiary determinations as well. *Mullin v. Doe*, 146 S. Ct. at 2136–37. The Supreme Court reserved the question whether the bar reaches constitutional claims generally. *Id.* at 2137. It does, as Justice Thomas explained in his concurring opinion. 146 S. Ct. at 2139-44 But the Court need not fully resolve that question here, because Plaintiffs' due process claim simply repackages the challenges that *Mullin v. Doe* held unreviewable. The respondents there, like Plaintiffs here, challenged a TPS termination on the ground that the Secretary failed to consult appropriate agencies and reached a preordained result. The Court rejected the argument that the review bar "applies only to substantive claims, not those based on alleged procedural errors," and identified "her decision to consult the State Department in a particular manner" as subject to the bar. *Id.* at 2134. Having held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," the Court noted that the bar cannot be evaded "by creative pleading or clever lawyering." *Id.* at 2136–37.

That is what Plaintiffs attempt here. Their due process claim rests on the same alleged defects, *i.e.*, inadequate consultation and a preordained decision, that were before the Supreme Court, now recast in constitutional terms. *See* Am. Comp. ¶¶ 281-283.  A court must "look beyond the literal meaning of the language used to ascertain the real cause of the complaint." *Jimenez-*

9

*Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) (Breyer, J.). Any other approach would allow parties to "evade" the review bar "by relabeling their" statutory claims as constitutional ones. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Were it otherwise, section 1254a(b)(5)(A) would impose little constraint and every challenge that *Mullin v. Doe* placed beyond review could be reasserted, unchanged in substance, as a claim for denial of due process.

### 2.    Plaintiffs Have No Protected Liberty or Property Interest

Even if Plaintiffs' due process claim were reviewable, it would fail on the merits. The Due Process Clause constrains governmental action only where it deprives a person of a protected liberty or property interest, and a protected property interest requires "a legitimate claim of entitlement," not merely "a unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also* Pl. Br. at 13. TPS supplies no such entitlement. A TPS designation is temporary by name and design; an initial designation lasts "not less than 6 months and not more than 18 months," 8 U.S.C. § 1254a(b)(2), and its continuation beyond that period is never guaranteed. Whether a designation is extended or terminated turns on the Secretary's periodic review of country conditions and his discretionary determination whether the statutory criteria "continue to be met." *Id.* § 1254a(b)(3)(A); *see id.* § 1254a(b)(3)(B) (the Secretary "shall terminate" a designation upon determining that the country "no longer continues to meet the conditions for designation"). The benefit rests on discretionary judgments at each stage. The Secretary "may grant" TPS to an eligible national of a designated country, *id.* § 1254a(a)(1)(A), and an applicant "may in the discretion of the director be granted" that status only upon establishing eligibility, 8 C.F.R. § 244.2. The underlying country-wide designation is likewise committed to the Secretary's discretion. *See Mullin*, 146 S. Ct. at 2128 (the Secretary "may

10

designate" a country for TPS "after consultation with appropriate agencies of the Government" (internal quotation marks omitted); 8 U.S.C. § 1254a(a)(1)(A).

Moreover, the decision whether to grant an alien's TPS application is discretionary. *See* 8 U.S.C. § 1254a(a)(1)(A) (providing that DHS "may grant" TPS to a qualifying national of a designated country); 8 C.F.R. § 244.2 ("an alien may in the discretion of the director be granted [TPS] if the alien establishes that he or she" meets the eligibility criteria). As the First Circuit has long recognized, "discretionary forms of relief do not rise to the level of . . . a protected [due process] interest." *Rivera v. Sessions,* 903 F.3d 147, 151 (1st Cir. 2018) (quoting *DaCosta v. Gonzalez,* 449 F.3d 45, 50 (1sr Cir. 2006); *accord Hernandez v. Sessions*, 884 F.3d 107, 112 (2d Cir. 2018) ("aliens have no constitutionally-protected 'liberty or property interest' in . . . a discretionary grant of relief for which they are otherwise statutorily ineligible.").. Justice Thomas made the same point about TPS in *Mullin v. Doe*, explaining that "[t]he termination of Haiti's TPS designation does not deprive respondents of 'life, liberty, or property'" because the "discretionary and limited status that a TPS designation provides, like any immigration status for aliens, is a government-created privilege, not a core private right." 146 S. Ct. at 2143 (Thomas, J., concurring). The courts of appeals have likewise treated TPS as a "discretionary form of relief." *Tobar v. Garland*, 65 F.4th 195, 196 (5th Cir. 2023); *Bah v. Cangemi*, 548 F.3d 680, 685 (8th Cir. 2008) (noting that it was appropriate for the district court not to evaluate "whether the government's rejection of [a] TPS application had been substantially justified" because "the district court lacked jurisdiction to review the government's discretionary action"). And the "explicitly temporary nature of the [TPS] program" forecloses any claim of protected

11

reliance. *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 328 (D. Md. 2018). At most, Plaintiffs held a "unilateral expectation" that a discretionary designation would continue—not the "legitimate claim of entitlement" that a protected property interest requires. *Roth*, 408 U.S. at 577.

Plaintiffs' contrary theory misapprehends the discretionary nature of the TPS designation decision. Plaintiffs assert that TPS's benefits become mandatory once the status is granted. *See* Pl. Br. At 6.  But a statute confers a protected entitlement only where it imposes "substantive limitations on official discretion" and "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (quotation marks omitted); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). The TPS statute does neither. The decision whether a designation is made or continues rests on the Secretary's discretionary judgment about country conditions and the national interest: the Secretary "*may* designate" a country in the first instance. A scheme that turns on that kind of judgment does not mandate a defined outcome and creates no entitlement. And even when a country is designated, the decision whether to grant TPS to any particular eligible individual remains discretionary. *See id.* § 1254a(a)(1)(A) (the Secretary "may grant" TPS to an eligible national of a designated country).

The district court decisions Plaintiffs cite do not establish otherwise. *Ramos v. Nielsen* held that any due process interest was "co-extensive with [plaintiffs'] ability to prove that Defendants violated the APA or equal protection guarantee." 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018). Plaintiffs cannot make that showing here. *Mullin v. Doe* forecloses their APA challenge. Plaintiffs

12

also cite *Mansor v. USCIS* for the proposition that prima facie eligible applicants possess a distinct interest, but *Mansor* concerned employment authorization for TPS applicants whose country designation remained in effect, and held only that "a prima facie eligible TPS applicant has a property interest in temporary employment authorization." 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023). Here, the TPS designation for Somalia has ended.[2]

Plaintiffs separately assert a liberty interest in the "removal protection" and freedom from "status-based detention" that accompany TPS. Pl. Br. at 6. But their liberty theory fails for the same reason as their property theory: they have "no constitutionally-protected 'liberty or property interest' in . . . a discretionary" immigration benefit. *Hernandez*, 884 F.3d at 112. Once Somalia's designation was lawfully terminated, Plaintiffs stood in the position of any other noncitizen without lawful status, and "the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law." *United States ex rel. Turner v. Williams*, 194 U.S. 279, 290 (1904); *see also Mullin*, 146 S. Ct. at 2143 (Thomas, J., concurring) (quoting *Turner* in the TPS context).

### 3. The Individualized Process Plaintiffs Demand Does Not Apply to a Categorical Country Determination

Even setting the absence of a protected interest aside, the procedural protections that Plaintiffs invoke do not apply to a determination of this kind. Due process "is flexible and calls for

---

[2] Plaintiffs citation to *Saget* is inapposite. The court there declined to reach the plaintiffs' due process claim. *See Saget v. Trump*, 375 F. Supp. 3d 280, 366 n.24 (E.D.N.Y. 2019) ("Plaintiffs allege they have protectable property and liberty interests in ensuring lawful compliance with the TPS statute. . . . Because Plaintiffs' claim is unnecessary to the disposition of the case . . . the Court need not reach Plaintiffs' procedural due process claim." (citation, alteration, and quotation marks omitted)).

13

such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation and quotation marks omitted), and it has long distinguished between agency action that "adjudicate[s] disputed facts in particular cases" and action involving "the formulation of a basically legislative-type judgment, for prospective application only," *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245–46 (1973); *see also Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). The termination of a country's TPS designation is a determination of the latter kind: a categorical judgment about conditions in a foreign state and the national interest, applicable to an entire class of nationals, not an adjudication of any Plaintiff's particular circumstances. The Due Process Clause does not entitle every affected individual to an individualized hearing before the government adopts a generally applicable policy. *See Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals . . . without giving [them] a chance to be heard." (quoting *Bi-Metallic Inv.*, 239 U.S. at 445; internal quotation marks omitted)); *see also Dawson v. Milwaukee Hous. Auth.*, 930 F.2d 1283, 1286 (7th Cir. 1991) ("[T]he due process clause does not require individual hearings before a governmental body takes decisions that affect the interests of persons in the aggregate."). Plaintiffs' claim rests on the three-factor balancing of *Mathews*, *see* Pl. Br. at 8, but that test governs individual adjudications, which the cases Plaintiffs cite make clear. *See Mathews*, 424 U.S. at 323 (Social Security disability benefits); *Bell v. Burson*, 402 U.S. 535, 535–37 (1971)

14

(driver's license). None applied that framework to a generally applicable determination like the termination of a *country's* TPS designation.

### 4.    Plaintiffs Received Whatever Process Was Due

Even if the individualized framework applied, Plaintiffs received whatever process could be due. Plaintiffs do not contend that the Constitution requires anything beyond the steps Congress prescribed: the Secretary must consult appropriate agencies, review conditions in the foreign state, and publish notice of the determination and its basis in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A). The Secretary did so here. *See* 91 Fed. Reg. 1547.

Plaintiffs' claim thus reduces to the contention that the Secretary did not adequately follow the statute—that is, that the consultation was "a single-line email exchange"—and that the Secretary failed to provide the true basis for the termination. Pl. Br. at 10. But an alleged statutory violation does not necessarily amount to a constitutional procedural due process violation. *See, e.g.*, *United States v. Caceres*, 440 U.S. 741, 751–52 (1979) ("It is equally clear that the violations of agency regulations disclosed by this record do not raise any constitutional questions."); *Kopunek v. Dir. of Internal Revenue*, 528 F. Supp. 134, 137 (S.D.N.Y. 1981) (same). An agency's failure to observe statutory procedures gives rise to a statutory claim, not a constitutional one, and a litigant cannot recast a statutory claim as a constitutional due process claim merely by invoking the Due Process Clause. *See Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011) (litigants who have procedural objections should rely on the statute and the regulations rather than "intoning 'due process' in the hope that it will cover all bases"). Plaintiffs do not argue that the Due Process Clause itself, independent of the TPS statute, would require interagency consultation or Federal Register publication before a designation could be terminated. Their objections go to the

15

Secretary's statutory compliance and to the substance of her determination, not to the denial of any procedure the Constitution guarantees. And the Secretary did comply with the statute's procedural requirements, as the government explained in its opposition to plaintiffs' previous motion for preliminary relief. *See* Defendants' Opposition to Plaintiffs' Motion to Postpone, Dkt. No. 55, at 15-21.

Plaintiffs' remaining authorities, Pl. Br. at 17, are not to the contrary. *Withrow v. Larkin* addressed the impartiality required of a decisionmaker in an adjudicative proceeding. 421 U.S. 35, 46–47 (1975). It does not govern a categorical country determination, and, as the Supreme Court has explained, "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." *Mathews*, 424 U.S. at 348. Plaintiffs' predetermination theory fails as well. A policymaker's general disposition toward a policy outcome does not offend due process, and the Supreme Court has already identified the administration's "obvious antipathy toward past administrations' TPS policies," reflected in its termination of every designation that came up for review, as a permissible, race-neutral explanation for these decisions. *Mullin*, 146 S. Ct. at 2139. For all these reasons, Plaintiffs have not shown a likelihood of success on their due process claim.

**B.      Plaintiffs' Equal Protection Claim Is Unlikely to Succeed on the Merits**

Plaintiffs' equal-protection claim is likewise unlikely to succeed following the Supreme Court's decision. The Supreme Court rejected a materially indistinguishable equal-protection claim regarding Haiti's TPS designation.  Indeed, so clear was the outcome that the Supreme Court assumed, without deciding, that the heightened of *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977), applied, and still determined that the claim failed.  Specifically, the Court held that

the claim could not succeed because all the cited statements—including statements that contained "heated language," "broadly denigrate the countries for which TPS designations have been granted," "malign Haitians who have come to the United States," "expressed antipathy toward travelers from countries covered by a renewed travel ban," and made "derogatory comments about immigration and its effects"—were no basis for an equal-protection claim because they "all expressed policy views that could rest on race-neutral justifications." *Doe*, 146 S. Ct. at 2138-39. And the termination of Haiti's TPS designation and the statements had "a strong, race-neutral explanation": "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* at 2139. Plaintiffs' equal protection claim here fails for the same reasons.

An effort to tack on a "national origin" characterization of the claim likewise fails. Distinctions drawn among nationalities by the Executive are a permissible feature of immigration law and "must be upheld so long as they are not wholly irrational." *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations and quotation marks omitted); *see Doe*, 146 S. Ct. at 2144 (Thomas, J., concurring) ("[O]ur immigration laws have distinguished among aliens based on their national origin from the beginning," and "applicants for immigration are treated differently based on their nationality as a matter of course."). Indeed, TPS designations expressly distinguish based on national origin, and if such distinctions were unconstitutional, TPS—a Congressionally-authorized program via statute— itself would be impermissible.

Plaintiffs' claims thus provide no basis for continuing to prevent the Executive Branch from effectuating the Secretary's decision. Recognizing the weakness of these claims, another judge properly refused, after adversarial briefing, to enter even an administrative stay in favor of these claims. *Abdo Doe v. Noem*, No. 26-CV-2280 (DEH) (S.D.N.Y. July 24, 2026).

17

**C.      Plaintiffs' *Ultra Vires* Claim Is Foreclosed by *Mullin v. Doe* and Otherwise Fails on the Merits**

Plaintiffs contend that the termination of Somalia's TPS designation is void because Congress vested the authority to terminate TPS designations exclusively in the Attorney General, and that authority was never transferred to the Secretary of Homeland Security. Pl. Br. at 25-29. In *Mullin v. Doe*, the Supreme Court foreclosed this argument thrice. First, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Mullin v. Doe*, 146 S. Ct. at 2137. Because the *ultra vires* claim is non-constitutional in nature, it is plainly foreclosed by the Supreme Court's decision. Second, contrary to Plaintiffs' view that the Attorney General has authority over TPS, the Supreme Court concluded that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." *Id.* at 2129 (citing 6 U.S.C. §§ 552(d), 557). Third, the Supreme Court made clear that the TPS statute's bar on judicial review applies to determinations by the Secretary, stating that 8 U.S.C. § 1254a(b)(5)(A) "provides: 'There is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.'" *Id.* at 2133 (alterations in original) (quoting 8 U.S.C. § 1254a(b)(5)(A)). Thus, Plaintiffs' contention that the statutory review bar "only applies to determinations 'of the Attorney General'" (Pl. Br. at 2) is not viable.

Thus, Plaintiffs' *ultra vires* argument is squarely at odds with Supreme Court precedent. Plaintiffs contend that *Mullin v. Doe* is not binding on this issue because it merely "lurk[ed]" in the background. Pl. Br. at 30-3. But the Supreme Court did not simply assume in passing that the Secretary possessed authority over TPS. Instead, the Supreme Court expressly stated that

responsibility for TPS decisions rests with the Secretary, cited statutory provisions that supported this conclusion (e.g., 6 U.S.C. § 557), and then construed § 1254a(b)(5)(A) by replacing "Attorney General" with "Secretary of Homeland Security" in the statutory text. *Mullin v. Doe*, 146 S. Ct. at 2129–30, 2133. This understanding was essential to the Court's application of the review bar to the Secretary's TPS terminations. This aspect of the decision is therefore binding. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").[3]

Plaintiffs also suggest that the Supreme Court's decision was not binding because it was reviewing decisions granting preliminary relief. Pl. Br. at 30 n.33. But "regardless of a decision's procedural posture, its 'reasoning—its *ratio decidendi*'—carries precedential weight in 'future cases.'" *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) (quoting *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020)); *see also Bucklew v. Precythe*, 587 U.S. 119, 136 (2019) ("[J]ust as binding as [a] holding is the reasoning underlying it."); *Giambalvo v. Suffolk Cnty., New York*, 155 F.4th 163, 177 n.4 (2d Cir. 2025) ("a well-considered conclusion of law by a panel of this Court in a published opinion, which addresses a pure issue of law . . . is binding precedent," even if the decision is issued "in the preliminary injunction posture").

---

[3] Even if this discussion were mere dictum (it is not), the dictum would still command "'great deference.'" *Estle v. IBM*, 23 F.4th 210, 214 n.2 (2d Cir. 2022) ("[W]e are obligated to accord great deference to Supreme Court *dicta*, absent a change in the legal landscape.") (quoting *United States v. Harris*, 838 F.3d 98, 107 (2d Cir. 2016)).

19

Even putting aside *Mullin v. Doe*, the *ultra vires* argument fails on the merits. When Congress created the Department of Homeland Security in 2002 and reorganized the Executive Branch's immigration functions, it transferred authority over TPS from the Attorney General to the Secretary. The Homeland Security Act charged the Secretary with the "administration and enforcement" of all laws "relating to the immigration and naturalization of aliens," with certain exceptions. 8 U.S.C. § 1103(a)(1). Section 1103(a) includes a carve-out stating that functions are transferred to the Secretary, "except insofar as" the relevant laws "relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State," and certain other officials. *Id.*

Plaintiffs seize on the carve-out for functions "'conferred upon the . . . Attorney General'" to mean that *all* previous statutory references to the Attorney General are not transferred to the Secretary of Homeland Security. Pl. Br. at 7. But that would be self-defeating: Section 1103(a) would transfer the Attorney General's functions in one breath while reserving them to the Attorney General at the very same time.  It is a cardinal rule of statutory construction that courts should "avoid" interpreting a statute in a way that would render "some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). Yet Plaintiffs would have the proviso swallow the rule that immigration functions were transferred to DHS.

Instead, § 1103(a)'s proviso is properly understood to explain that the transfer covered functions except otherwise provided elsewhere.  For instance, the same section specifies that the Attorney General continues to retain "such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the

20

Executive Office for Immigration Review, or by the Attorney General with respect to [EOIR] . . ."
8 U.S.C. § 1103(g). On Plaintiffs' view, this provision is superfluous because those functions were already excepted from transfer by § 1103(a)'s proviso. Plaintiffs identify no provision that would place TPS in the exception created by the proviso rather than in the general group of immigration functions that were transferred to DHS—for example, EOIR did not previously administer the TPS statute. Therefore, the Attorney General did not retain such functions, which have been transferred to the Secretary.

Congress did not rewrite each of the TPS statute's references to the "Attorney General" because it relied on the transfer and reference-updating provisions in the Homeland Security Act. While 8 U.S.C. § 1103 charged the Secretary with the "administration and enforcement" of the immigration laws, 6 U.S.C. § 557 operated to update all other federal laws with respect to functions that were transferred to the Secretary. Specifically, § 557 provided that, with respect to "any function transferred by or under this chapter," a "reference in any other Federal law to any . . . officer or office the functions of which are so transferred shall be deemed to refer to the Secretary." 6 U.S.C. § 557. Because TPS administration was a function transferred to the Secretary, § 557 updates every reference to the Attorney General in 8 U.S.C. § 1254a to mean the Secretary.

Reflecting the statutes' clarity, lower courts had universally adopted this construction even before the Supreme Court decided *Mullin v. Doe. See, e.g.*, *Mejia Rodriguez v. DHS*, 562 F.3d 1137, 1140 (11th Cir. 2009) ("Although the statute governing TPS refers to the Attorney General as the decisionmaker, the authority to designate countries for inclusion in the TPS program and for adjudicating the eligibility of individual applicants for TPS has been transferred to the Secretary

21

of the Department and the district directors at USCIS." (citing 8 U.S.C. § 1103(a)); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (D. Md. 2025) (noting that "certain authorities granted by statute to the Attorney General, including those relating to TPS," were conferred "to the Secretary of Homeland Security" (citing 6 U.S.C. § 557)); *Saget v. Trump*, 375 F. Supp. 3d 280, 297 (E.D.N.Y. 2019) ("Congress . . . transferred authority to make TPS designations from the Attorney General to the Secretary of the Department of Homeland Security[.]" (citing 8 U.S.C. § 1103; 6 U.S.C. § 557)). Plaintiffs meanwhile cite no decision holding that the Secretary lacks authority to make or terminate a TPS designation.

Finally, Plaintiffs' theory is almost wholly self-defeating. Both the designation and termination provisions of the TPS statute refer to the "Attorney General." 8 U.S.C. § 1254a(b)(1), (b)(3)(B). If that reference deprived the Secretary of authority to terminate Somalia's TPS designation, it equally deprived the Secretary of authority to repeatedly *re*designate Somalia for TPS in the years since the creation of DHS. On Plaintiffs' reading, then, each redesignation and extension would be a legal nullity, leaving Plaintiffs—or at minimum the vast majority of Somali TPS holders—with no TPS protection. Their success on the *ultra vires* claim would therefore eliminate the very benefit they seek to preserve.[4] *See* 91 Fed. Reg. 1547.

---

[4] Plaintiffs offer three responses to this problem in a footnote, Pl. Br. at 11 n.5, but none succeeds. First, Plaintiffs argue that this suit challenges only the termination as a single final agency action. But that framing ignores the underlying problem: if the Secretary has no authority over TPS, then the designation Plaintiffs seek to preserve is just as *ultra vires* as the termination—so a ruling in their favor would compel the termination of the designation. Second, Plaintiffs misread *DHS v. Regents of the Univ. of California*, 591 U.S. 1 (2020), which they cite for the proposition that the government must consider "alternatives" to termination. That case involved a program with two components: one allegedly unlawful, the other concededly lawful. The Supreme Court faulted DHS for rescinding both without considering whether to preserve the lawful one. 591 U.S. at 28–22

## II.   **The Equitable Factors Favor the Government**

Because the merits decisively favor the Government, the importance of the equitable factors is diminished. *Cf. Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 49 (2d Cir. 2020) ("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a stay." (citation omitted)); *see also Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("[L]ikelihood of success is the main bearing wall of the four–factor framework."). In any event, the equities favor the Government as explained below.

Specifically, the remaining considerations—irreparable harm, the balance of equities, and the public interest—favor the Government, and where the Government is the opposing party those inquiries merge. *See We The Patriots USA*, 17 F.4th at 295 ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge."). Each day a lawful termination of Somalia's TPS designation is postponed, the Government and the public are harmed by the judicial suspension of an authority Congress committed to the Secretary's unreviewable judgment. *See Mullin*, 146 S. Ct. at 2137; *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by

---

29. Plaintiffs' theory here offers no lawful component to preserve: if the Secretary lacks TPS authority altogether, he cannot retain Somalia's designation as an "alternative" to terminating it. And third, Plaintiffs' reference to "mutually explicit understandings" creating "vested due process interests" is misplaced. To the extent Plaintiffs assert a substantive due process right to continuation of a TPS designation that, on their own theory, was *ultra vires* from the start, no such right is remotely rooted in the Nation's history and tradition. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (substantive due process protects only rights "deeply rooted in this Nation's history and tradition") (citation omitted). If Plaintiffs instead mean to argue that they have a procedural due process claim, that argument fails for the reasons explained already.

23

representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers))); *Nken v. Holder*, 556 U.S. 418, 435–36 (2009) (rejecting the assumption that delaying immigration enforcement causes an "absence of any injury to the public interest"). The harm is concrete here: the relief Plaintiffs seek would require the United States to permit thousands of foreign nationals to remain in the country notwithstanding the Secretary's determination that their continued presence is "contrary to the national interest." 91 Fed. Reg. at 1550. Compelling that result is "an improper intrusion by a federal court into the workings of a coordinate branch of the government." *INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305–06 (1993). The Supreme Court has twice stayed orders postponing TPS terminations, confirming that the Government suffers irreparable harm when it is prevented from giving effect to those determinations. See *Noem v. NTPSA*, 145 S. Ct. 2728 (2025); *Noem v. NTPSA*, 146 S. Ct. 23, 24 (2025). Those decisions "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

Plaintiffs' asserted injuries do not outweigh that harm. Because the merits foreclose relief, that is dispositive. *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("[A]ny irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success."). And in any event, the injuries Plaintiffs identify follow from the statutory scheme itself, not from any unlawful act. TPS is, by design, "temporary." *Mullin*, 146 S. Ct. at 2130. A designation lasts "not less than 6 months and not more than 18 months," 8 U.S.C. § 1254a(b)(2), and Plaintiffs had no

24

entitlement to retain work authorization or protection from removal once Somalia's designation was lawfully terminated. The loss of those benefits is the ordinary consequence of a lawful termination, and Plaintiffs remain free to pursue any other immigration relief for which they may be eligible.

Because Plaintiffs cannot show a likelihood of success on any of their claims, and because the equities and the public interest favor allowing the Secretary's lawful determination to take effect, the renewed motion should be denied.

<div align="center"><strong>CONCLUSION</strong></div>

For the foregoing reasons, the Court should deny Plaintiffs' renewed motion to postpone the effective date of agency action.

Dated: August 5, 2026

<div style="margin-left:50%">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Robert E. Richardson*
Assistant United States Attorney
1 Courthouse Way, Ste. 9200
Boston, MA 02210
Tel.: 617-748-3247
robert.richardson@usdoj.gov

</div>