**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr>
<td>

AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE,  MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,

<em>Plaintiffs</em>,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, and UNITED STATES OF AMERICA,

<em>Defendants</em>.

</td>
<td>

Case No. 1:26-cv-11201-ADB

**Leave to File Excess Pages Granted on July 31, 2026**

<u>ORAL ARGUMENT REQUESTED</u>

</td>
</tr>
</table>

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR RENEWED MOTION FOR POSTPONEMENT & MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs stand to lose everything—imminent and irreparable harm to their lives and livelihoods looms—because of Defendants' purported termination of Temporary Protected Status ("TPS") for Somalia (the "Termination"). Defendants seek to violate the Constitution by stripping Somalis of critical benefits—including employment authorization and protection from the imminent threats of detention and removal—without due process. The Termination is rooted in a discriminatory agenda to target Somali people for expulsion based on their race and national origin. Moreover, the TPS statute is clear that the Secretary lacked the authority to take such action, making the Termination *ultra vires* and unlawful under the Administrative Procedure Act ("APA"). *Mullin v. Doe* did not resolve any of these issues. None of Plaintiffs' claims are barred by the TPS statute: *Mullin* expressly left open judicial review of constitutional claims, including Plaintiffs' due process and equal protection claims under the Fifth Amendment and nothing in *Mullin* addresses Plaintiffs' due process or *ultra vires* claims, which are properly before this Court for the first time.

Plaintiffs are likely to succeed on their claims. First, Defendants dismiss Plaintiffs' procedural due process claim as a repackaging of Plaintiffs' original APA claims, but the claims are not coextensive: Plaintiffs' due process claim rests on procedural protections built into the TPS statute that are core to well-recognized due process constraints (*e.g.*, the concept of adequate notice). And under relevant case law, Somali TPS beneficiaries unquestionably have protected liberty and property interests. Second, Defendants' overt racial statements and the wealth of circumstantial evidence indicating their discriminatory motives against Somali people cannot be cabined as "policy views that could rest on race-neutral justifications." *See Mullin v. Doe*, 146 S. Ct. 2121, 2138 (2026). Lastly, Defendants urge this Court to not reach the merits of Plaintiffs' *ultra vires* claim: little wonder because they fail to point to a statutory provision that clearly

transferred TPS termination authority from the Attorney General to the DHS Secretary. *Contra* Defs.' Mem. of L. in Opp. to Pls.' Renewed Mot. for Postponement and Mot. for Prelim. Inj. at 20, 22, ECF No. 102 ("Opp."). The remaining factors—including the irreparable harm that Plaintiffs will face if the TPS termination becomes effective—still overwhelmingly favor relief. As this Court itself has recognized, Defendants' efforts have inflicted "shameful cruelty" on productive and deeply rooted Somali community members actively facing the threat of deportation. Mem. & Order at 4, ECF No. 98. This Court should grant Plaintiffs' renewed motion for postponement and preliminary injunction.

## ARGUMENT

### I. Plaintiffs are entitled to relief on their due process claims.

#### a) Mullin *Left Intact This Court's Ability to Review Plaintiffs' Constitutional Due Process Challenge*

It has long been the law that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Nothing in the TPS statute provides such a clear intent and the Supreme Court in *Mullin v. Doe* did not hold otherwise. *See* 146 S. Ct. at 2137. In *Mullin*, five justices appeared to agree that the jurisdiction stripping provision on which the government has relied (8 U.S.C. § 1254a(b)(5)(A)) does not bar review of constitutional claims. *Id.* at 2134–37 (six Justices joining jurisdictional analysis as to non-constitutional claims); *id.* at 2137 (four Justices assuming without deciding that there is jurisdiction over constitutional claim, indicating two others found jurisdiction); *id.* at 2145–47, 2148–50 (Kagan, J., dissenting) (three other Justices finding jurisdiction over statutory and constitutional claims). Moreover, the government itself has never argued that constitutional challenges to TPS determinations are unreviewable. *See* Br. for the United States at 45–51, *Mullin*

2

*v. Doe,* 146 S. Ct. 2121 (2026) (No. 25-1083). Nothing in *Mullin* forecloses judicial review of constitutional claims such as Plaintiffs' Fifth Amendment claims.

In asserting that Plaintiffs' procedural due process claim simply repackages prior APA claims (themselves jurisdictionally barred), Defendants ignore that Plaintiffs do not merely allege that the government failed to comply with statutory procedural requirements, such as inadequate consultation and notice—instead Plaintiffs assert that the deprivation of their constitutionally-protected property and liberty interests in TPS and its attendant benefits mandates due process of law. *See infra* Sec. I (b-d); *see Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (To maintain a procedural due process claim, the plaintiff first "must identify a protected liberty or property interest"). Plaintiffs' do not maintain that every TPS statutory violation would constitute a due process violation. Rather, Plaintiffs allege that the core set of procedures mandated by the TPS statue inform the process due to Plaintiffs under the Due Process Clause, which is a wholly distinct claim from those considered in *Mullin*. *Mullin,* therefore, does not apply to Plaintiffs' procedural due process claim and this Court should not be swayed by Defendants' statements to the contrary.

### b)  *Once Conferred, TPS Status and Benefits Are Not Discretionary*

Plaintiffs plainly have a liberty and property interest in TPS status and its attendant benefits, even if Defendants' decision to designate a country for TPS is discretionary. *Cf.* Opp. at 10–13. To determine whether a plaintiff has a legitimate claim of entitlement to a protected interest, the court must "examine closely the language of the relevant statutes and regulations." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989). A statute gives rise to a constitutionally protected interest when a statute contains "explicitly mandatory language" that provides "specific directives

to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Id.* at 463.

Here, the TPS statute includes such explicit mandatory language. It provides that once a country has been designated for TPS and an applicant makes a *prima facie* showing of eligibility, the applicant "shall" be granted removal protection and work authorization. 8 U.S.C. 1254a(a)(1)(A)–(B), (d)(4). "[I]t is axiomatic that the word 'shall' has a mandatory connotation." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 46 (1st Cir. 2014). The TPS statute therefore mandates that these benefits *must* be provided to any TPS beneficiary or *prima facie* eligible applicant. This mandatory language creates non-discretionary benefits that constitute property and liberty interests protected by the Fifth Amendment's guarantee of procedural due process. *See Rodi v. Ventetuolo*, 941 F.2d 22, 26 (1st Cir. 1991) (holding that "[t]he repeated use of such unmistakably mandatory terms as 'will' and 'shall'" demonstrated the statute conferred a cognizable liberty interest); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 165–66 (D. Mass. 2011) (concluding that "mandatory language" in the statutes at issue clearly demonstrated statutorily-created property interests).

Plaintiffs do not dispute that the TPS designation decision and decisions over individual TPS applications are discretionary. But Plaintiffs' procedural due process claim rests neither on Somalia's initial designation nor its subsequent extensions. Instead, Plaintiffs' procedural due process claim is grounded in the non-discretionary benefits that are provided *after* that initial designation takes effect. After a country has been designated for TPS, and an applicant demonstrates *prima facie* eligibility, the deciding official is statutorily required to provide the removal protections and work authorizations that the TPS statute confers upon those eligible. *See* 8 U.S.C. §§ 1254a(a)(1)(A)–(B), (a)(4). These benefits cannot be terminated unless the deciding

4

official issues a constitutionally valid termination based on statutorily prescribed criteria or withdraws an individual's TPS pursuant to regulatory procedures. *See* 8 U.S.C. § 1254a(b); 8 C.F.R. § 244.14. Furthermore, "[g]rants of discretion, even broad discretion, to a decisionmaker are not inevitably dispositive of a due process claim." *Connor B.*, 771 F. Supp. 2d at 166. The presence of criteria affording discretion to the decisionmaker does not preclude a procedural due process claim so long as the regulatory scheme mandates that a particular outcome is "required" after the decisionmaker "determines (in its broad discretion) that the necessary prerequisites exist." *Bd. of Pardons v. Allen*, 482 U.S. 369, 376 (1987); *compare Jones-Booker v. United States*, 16 F. Supp. 2d 52, 60 (D. Mass. 1998) (holding statute that "restricts the discretion of its decision-makers" creates legitimate claim of entitlement to benefits); *with Rivera v. Sessions*, 903 F.3d 147, 151 (1st Cir. 2018) (rejecting due process claim for benefit subject to immigration judge's unfettered discretion). Although TPS applicants are subject to an initial eligibility and approval process, as explained above, the related benefits are automatically granted once that process is complete. Even if TPS benefits were discretionary for individuals granted TPS and *prima facie* eligible applicants, this discretion would not allow Defendants to circumvent their procedural due process obligations. *Smith v. Goodnow*, No. C83-120-L, 1983 WL 2229, at *6 (D.N.H. Sept. 26, 1983) (noting that even if a decision is discretionary, "[t]he decision to comply with the constraints of due process was not.").

None of Defendants' citations foreclose Plaintiffs' due process claims, which are grounded in mandatory, non-discretionary benefits afforded to every *prima facie* eligible TPS applicant.[1]

---

[1] Defendants' attempts to distinguish cases where courts have recognized TPS benefits as cognizable liberty and property interests fall flat. The court's reasoning in *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018), regarding the plaintiffs' "arguable[] property interest in loss of TPS status" applies here because Plaintiffs, similar to the *Ramos* plaintiffs, also have a "plausible claim" that the Defendants violated the Equal Protection Clause. *Id.* at 1122. Additionally, Defendants provide no support for their argument that the status of the TPS designations informed the court's conclusion that the *prima facie* eligible TPS applicant plaintiffs in *Mansor v. U.S. Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000 (W.D. Wash. 2023) had a "property interest in temporary employment

Rather, Defendants' inapposite cases all consider a governing body's discretion to deny a benefit to a statutorily ineligible applicant. Opp. at 11–12; *Tobar v. Garland*, 65 F.4th 195, 196–97 (5th Cir. 2023) (denying review petition brought by TPS applicant that was *statutorily ineligible* for TPS status); *Hernandez v. Sessions*, 884 F.3d 107, 112 (2d Cir. 2018) (comparing the mandatory benefits conferred to *prima facie* asylum applicants with a "discretionary grant of relief" to "statutorily ineligible" beneficiaries); *Bah v. Cangemi*, 548 F.3d 680, 685 (8th Cir. 2008) (describing habeas petition filed by former TPS beneficiary whose TPS status was revoked due to a felony conviction). Plaintiffs have already demonstrated their *prima facie* eligibility for TPS, and therefore their eligibility for its attendant benefits is not discretionary. Furthermore, the "reliance interests" in the TPS statute at issue in *CASA de Maryland, Inc. v. Trump*, are legally distinct from Plaintiffs' constitutionally protected liberty and property interests in the benefits conferred by TPS. 355 F. Supp. 3d 307, 328 (D. Md. 2018).

Defendants' reliance on *United States ex rel. Turner v. Williams*, 194 U.S. 279, 290 (1904) to undermine Plaintiffs' protected liberty interests is similarly misplaced. Opp. at 13. *Turner* held that a noncitizen has no liberty interest protected by due process when he is found to be in the country unlawfully. 194 U.S. at 291–92. Plaintiffs and other Somali TPS beneficiaries are lawfully in this country and, as stated above, the TPS statute confers mandatory work authorization and protections from deportation to those who are *prima facie* eligible, which due process protects.

---

authorization subject to due process protections." *Id.* at 1013. The *Mansor* plaintiffs argued that the defendants unlawfully deprived them of property interests mandated by the TPS statute, *see id.* at 1013–14; similarly, here, Plaintiffs challenge the deprivation of the non-discretionary benefits they are entitled to receive due to Defendants' illegal termination of Somalia's TPS status.

### c) *Procedural Due Process Applies to Group-Based Determinations*

Courts have consistently held that procedural due process protections apply to government determinations that deprive large groups of individuals of liberty or property interests at once. *See, e.g.*, *AARP v. Trump*, 605 U.S. 91, 94–96 (2025) (holding government failed to provide adequate notice as required by Due Process Clause to class of detainees); *Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) (applying *Mathews v. Eldridge* procedural due process test to prisoner class's procedural due process challenge to prison supermax placement policy); *Goldberg v. Kelly*, 397 U.S. 254, 262–66 (1970) (concluding that New York public benefit termination procedures denied benefit recipients procedural due process); *Washington v. Trump*, 847 F.3d 1151, 1164–65 (9th Cir. 2017) (holding government failed to show likelihood of success on the merits of procedural due process claim challenging Executive Order restricting entry of nationals from seven countries). Moreover, the termination of Somalia's TPS designation more closely resembles an "adjudicative" action that requires due process protections than a "legislative" action. "[T]he line between legislative and adjudicative action for purposes of procedural due process analysis is not always easy to draw," and "not all government actions fall neatly into these polar categories." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 274 (1st Cir. 2011). When determining whether an action is adjudicative or legislative, courts consider the prospectivity and generality of the action. *See L C & S, Inc. v. Warren Cnty. Area Plan Comm'n*, 244 F.3d 601, 602–03 (7th Cir. 2001).

Here, Defendants terminated existing benefits previously granted to a specific class of current TPS holders and applicants based on specific facts related to conditions in Somalia. This retroactive action which deprives Plaintiffs of benefits they previously enjoyed distinguishes Plaintiffs' claims from the non-specific, prospective policies at issue in *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445–46 (1915) (holding that an opportunity to be

7

heard for all individuals on prospective tax policy was not constitutionally required), and *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245–46 (1973) (holding that the additional oral hearing on prospective railroad policy sought by plaintiffs was not required under the Interstate Commerce Act). In any event, Plaintiffs' claims regarding the Secretary's failure to adhere to statutory requirements clearly constitutes a "defect in the legislative process" exempting the Termination from the general bar on due process protections for legislative actions. *Hill v. U.S. Dep't of Interior*, 151 F.4th 420, 434 (D.C. Cir. 2025).

Additionally, "[b]y codifying the TPS statute, Congress . . . balanced predictability and stability with temporal limits – TPS holders can rely on the security of their status . . . ." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1022 n.9 (9th Cir. 2025). The predictability and stability interests of the statute reinforce the adjudicative nature of the termination, as Congress intentionally codified "numerous procedural safeguards that ensure individuals with TPS enjoy predictability and stability during periods of extraordinary and temporary conditions in their home country." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 768 (9th Cir. 2026). Therefore, Somali TPS holders are entitled, at a minimum, to a meaningful process before the government revokes *en masse* constitutionally protected interests that were previously granted under federal law.

### d)  *Plaintiffs Did Not Receive Due Process*

Plaintiffs did not receive constitutionally-sufficient process when deprived of their property and liberty interests. Contrary to Defendants' assertions, Opp. at 15, the TPS statute's procedural standards establish the process that is required for a deprivation of those interests under the Due Process Clause. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (holding that "[w]hatever the procedure authorized by Congress is, it is due process" for noncitizen); *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required

8

procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls."); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 638 (D. Mass. 2018) ("When regulations are promulgated to protect a fundamental right derived from the Constitution or a federal statute, . . . the Due Process Clause requires federal agencies to follow them[.]").

The case law Defendants cite fails to refute this argument. *Portillo-Rendon v. Holder*, 662 F.3d 815 (7th Cir. 2011), concerned a wholly discretionary immigration benefit (cancellation of removal), which provided the plaintiff no property or liberty interests on which to base a due process claim, and is thus inapposite. *Id.* at 817. Defendants' citation to *United States v. Caceres*, 440 U.S. 741, 751–52 (1979), Opp. at 15, conveniently omits that the Court stated that constitutional questions arise where, as in the case of terminations of TPS, "the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *Id.* at 752–53. Here, Plaintiffs have reasonably relied on the procedural protections in the TPS statute that temper the government's ability to heedlessly terminate Somalia's TPS designation and Plaintiffs will suffer substantially from the loss of the benefits guaranteed by the statute, all of which implicate their due process rights. Likewise, *Kopunek v. Dir. of Internal Revenue*, 528 F. Supp. 134 (S.D.N.Y. 1981), stands only for the unremarkable proposition that the Fifth Amendment's due process requirements were satisfied when the IRS followed "well settled" standards. *Id.* at 136. Plaintiffs' due process claim similarly alleges that the TPS statute's standards that have been "well settled" for more than three decades form the process that is due under the Due Process Clause. *See id.*

Defendants thus mischaracterize Plaintiffs' argument as objecting to the substance of the Secretary's determination and not the procedural deficiencies therein. Opp. at 16. Congress' prescriptions in the TPS statute—reliable information gathering, reasoned decision-making, and notice of the actual basis for the deprivation—closely track the functions due process serves to protect and therefore inform what process is constitutionally due, irrespective of the outcome. *See Mathews v. Eldridge*, 424 U.S. 319, 343–49 (1976) (emphasizing that the risk of erroneous deprivation was mitigated by extensive information gathering, agency review, and administrative reconsideration procedures).

Defendants' cursory assertion that the Secretary "did comply with the statute's procedural requirements," Opp. at 16, is belied by the record. The Secretary's one-line email failed to adequately "consult[] with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A); Pls. Br. in Supp. of Renewed Mot. for Postponement & Prelim. Inj. at 9, ECF No. 92 ("Pls. Br. Renewed Mot."); ECF No. 42-2 at AR-000733; *see also* Pls. Suppl. Mem. in Supp. of Pls.' Mot. to Postpone at 5–8, ECF No. 43 ("Pls. Suppl. Mem."). And because the Secretary had already decided to terminate Somalia's TPS designation prior to "review[ing] the conditions" in Somalia, 8 U.S.C. § 1254a(b)(3)(A), she did not give the true basis for the purported Termination in the Federal Register, which provides the constitutionally-required notice of the reasons for the government's decision, *See* Pls. Br. Renewed Mot. at 10 (discussing evidence in the record showing the Secretary's preemptive decision-making); *Am. Honda Fin. Corp. v. City of Revere*, 471 F. Supp. 3d 399, 407 (D. Mass. 2020) (Burroughs, J.) (explaining that notice is an important due process function). Defendants failed to follow even the minimum process that was due to Plaintiffs, violating Plaintiffs' due process rights.

## II.    Defendants Fail to Refute Plaintiffs' Arguments that Defendants Acted with Discriminatory Intent Against Somali People

Defendants rely only on cursory, broad assertions about the evidence in the *Mullin* record but fail to grapple with any of the Somalia-specific evidence in the record that demonstrates Defendants' discriminatory intent. Both their arguments are unavailing.

*First*, unlike the statements in *Mullin*, President Trump and Defendants' statements are racially overt and directly targeted at Somali people. *Contra* Opp. at 16. Defendants' extraordinarily perfunctory argument fails.[2] Unlike the general categories Defendants summarize from *Mullin*, Opp. at 16–17, Plaintiffs' record contains dozens of overtly racial statements that denigrated and villainized Somali people specifically, rather than immigrants and TPS holders generally, and that are explicitly tied to racialized stereotypes about Somalis' alleged criminality. These statements are directly related to the decision to terminate Somalia's TPS designation and the government's attempts to expel Somalis. *See* Pls. Br. Renewed Mot. at 10–24; *see generally* ECF No. 93-14. Defendants and President Trump explicitly and repeatedly invoked Somali people's race through overtly racist stereotypes and racially-charged code words that referred to Somali people as deadly criminals, gang members, animals who prey on people, and "pirates," all of which have racist origins. *See, e.g.*, ECF Nos. 5-19; 5-22; 5-31; 5-34; 5-46; Am. Compl. ¶¶ 95–129; *see* Pls. Br. Renewed Mot. at 10–24. Furthermore, these statements were specific to the context of blaming Somali people for fraud and other crimes in Minnesota and were echoed and reiterated by Defendants before, during, and after the announcement of the purported Termination. *See* Pls. Br. Renewed Mot. at 10–24. Unlike in *Mullin*, these overtly racialized statements and stereotypes cannot be explained away as generalized critiques of immigrants or their countries of

---

[2] Defendants' argument is so perfunctory it should be deemed waived. *J. Cajigas & Assocs., PSC v. Municipality of Aguada*, No. CIV. 13-1359 (JAF), 2014 WL 320653, at *2 (D.P.R. Jan. 29, 2014) ("[P]erfunctory and undeveloped arguments . . . are deemed waived.") (citing *Medina–Rivera v. MVM, Inc.*, 713 F.3d 132, 140–41 (1st Cir. 2013)).

11

origin and are instead indicative of racially discriminatory intent; they are specific to and targeted at Somali people and only Somali people.

When referencing Somali nationals, the President invoked racist stereotypes historically used to discriminate against Somalis and other Black people. He directly compared Somali people to animals who violently "prey" on others, which is explicitly racist and represents a marked contrast from statements that may suggest immigrants as generally "associate[d]" "with crime and other social ills." *See* Pls. Br. Renewed Mot. at 15; *Mullin*, 146 S. Ct. at 2138 (cleaned up). Defendants and President Trump also frequently called Somali people pirates and used pirate imagery to promote the racial stereotype that Somali people are criminals and otherwise morally deficient. *See* Pls. Br. Renewed Mot. at 15; *see also* Am. Compl. ¶ 102; ECF Nos. 5-36; 5-46; 5-47. Defendants' and President Trump's usage of racialized pirate imagery in this way is specific and unique to Somali people—it cannot be explained away as generalized antipathy toward immigrants or the TPS program as in *Mullin*. Lastly, he referenced the racial trope that Black people are members of, and operate within, street gangs to commit violent acts. *See* Pls. Br. Renewed Mot. at 14.

These are only a few examples out of dozens of *public* statements and social media posts made by Defendants and the President around the time of the purported termination. *See generally*, ECF No. 93-14. Defendants, for their part, fail to engage meaningfully with these or any of the direct evidence of racial animus that Plaintiffs presented in their Amended Complaint and Renewed Motion, nor any of the overwhelming circumstantial evidence Plaintiffs detail. *See* Opp. at 16–17. Given the "sensitive" and fact intensive inquiry demanded by *Arlington Heights*, Defendants' underdeveloped argument fails to explain how any of the statements above or in

12

Plaintiffs' Amended Complaint and prior briefing could be perceived as race neutral. *See Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 26 (1977).

*Second*, Plaintiffs are not simply challenging a categorization based on nationality; they are equally likely to succeed on their equal protection claim on the basis that the purported Termination discriminated against Somali people based on their national origin. There is no doubt that the Constitution protects noncitizens in the United States from national origin discrimination. *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, [a noncitizen] is surely a 'person' protected 'from invidious discrimination by the Federal Government.'") No relevant case law supports the proposition that every classification based on national origin is constitutionally permissible. While some courts have applied a deferential standard to executive action regarding noncitizens, *see* Opp. at 17 (citing *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008)), that same Circuit later held "there is no general rule" that discrimination against noncitizens receives deferential review, *United States v. Suquilanda*, 116 F.4th 129, 140 (2d Cir. 2024). Indeed, the Supreme Court recently applied *Arlington Heights'* heightened scrutiny framework to a challenge to the recission of a program that granted undocumented individuals work authorization, withholding from removal, and eligibility for various federal benefits. *Dep't of Homeland Sec. v. Regents of Univ. of Calif.*, 591 U.S. 1, 34 (2020) (plurality). And the Court made clear in *Trump v. Hawaii*, 585 U.S. 667 (2018), that discrimination based on race and national origin for people within the United States is impermissible. *Id*. at 710 (distinguishing "morally repugnant" classifications of people within the United States by race and nationality from "denying certain foreign nationals the privilege of admission").

Moreover, this Circuit has been clear that where, as with Somali people, "a victim is 'born in a nation whose primary stock is one's own ethnic group,'" "race and national origin discrimination may present identical factual issues." *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 475 (1st Cir. 1993). The overwhelming majority of people in Somalia are part of the Black Somali ethnic group.[3] Rather than being "tack[ed] on" to the racial discrimination claims, *contra* Opp. at 17, Plaintiffs' national origin discrimination argument elucidates Defendants' discriminatory intent as being rooted in Somali people's race *and* their national origin. For example, Defendants use of the racial smear "pirate" and pirate imagery against Somali people specifically, emphasizes the fusing of racial stereotypes about Black people with discriminatory conceptions of the Somali national identity. *See* Pls. Br. Renewed Mot. at 15–16. Statements criticizing Somali people for their Muslim faith also contribute to the intersectional discrimination inherent in Defendants' national origin discrimination. *Id.* at 16, n.7. President Trump's baseless allegations that Somali people are responsible for most crimes in Minnesota, Defendants' cherry-picking of crimes by Somali nationals—but not specific to Somali TPS holders—in Minnesota to validate the Termination, and Defendants' enforcement actions that singled out Somali people and only Somali people for detention, deportation, and expedited removal hearings to expel them at all costs reinforce that Defendants' discrimination is based on both race and national origin.

### III.    Defendants Have Not Cited Any Statutory Authority That Clearly Vests TPS Termination Power in the Secretary.

Statutory interpretation "begin[s]" and almost always ends "with the text." *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025). And Defendants carry the burden to "identify statutory authority" for the action they have purported to take. *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C.

---

[3] Cultural Atlas, *Somalia Population Statistics*, https://culturalatlas.sbs.com.au/somali-culture/somali-culture-population-statistics (last visited Aug. 5, 2026).

Cir. 2022). Here, Congress expressly authorized only one executive official to terminate TPS designations: the Attorney General. 8 U.S.C. § 1254a(b)(3)(B). The government's arguments fail at the threshold because they identify no statutory authority that clearly transferred the authority to terminate TPS from the Attorney General to the Secretary. First, Defendants rely on statutes that neither they nor any court had ever cited as the basis for DHS's authority to terminate a TPS designation. Lacking support in the statutes' text, Defendants stretch *Mullin*'s holding to manufacture a precedent that does not exist and cite judicial opinions that contain nothing more than background assumptions about the Secretary's authority. Defendants also assert that the *ultra vires* claim is self-defeating because it would render the underlying TPS designations and extensions invalid but ignore that the only agency action before the Court is the Termination.

### a) *Defendants' reliance on statutory provisions is fatal as they do not actually transfer TPS termination authority to the Secretary.*

None of the statutes Defendants cite as the basis of the Secretary's authority hold water.

**8 U.S.C. § 1103.** Section 1103(a) confirms that TPS termination authority remained with the Attorney General following DHS's creation. Through its "except" clause, Section 1103(a) reserves to the Attorney General all "powers, functions, and duties conferred upon the . . . Attorney General" to the extent they concern "chapter" 12 of title 8 of the U.S. Code or "all other laws relating to the immigration and naturalization of [noncitizens]." TPS termination authority clearly falls into the category of those "powers, functions, and duties" reserved to the Attorney General because it was expressly vested in the Attorney General specifically (and not, for example, a DOJ sub-agency like the U.S. Immigration and Naturalization Service), and because it is housed within "chapter" 12 of Title 8 of the U.S. Code (in addition to being immigration-related). *See* 8 U.S.C. § 1254a.

Defendants claim that such a reading would be "self-defeating" because "Section 1103(a) would transfer the Attorney General's functions in one breath while reserving them to the Attorney

15

General at the same time." Opp. at 20. Not so. Section 1103(a) simply provides a general statement that the DHS Secretary is charged with the administration and enforcement of immigration laws. It then expressly exempts from that general provision "the powers, functions, and duties conferred upon . . . the Attorney General . . . ." Defendants reading of the statute would completely nullify the exception. Moreover, Plaintiffs' reading of Section 1103(a) would not "swallow the rule that immigration functions were transferred to DHS." Opp. at 20. As Plaintiffs have previously explained, Section 1103(a) only reserves powers vested in the Attorney General specifically—not powers vested in or delegated to subagencies such as INS, which were expressly transferred to DHS, *see* 6 U.S.C. §§ 271, 542 note, or those transferred by the Reorganization Plan. Pls. Br. Renewed Mot. at 27.

Defendants next argue that Section 1103(a) is "properly understood to explain that the transfer" of immigration-related functions from the Attorney General to the DHS Secretary "covered functions except otherwise provided elsewhere." Opp. at 20. But it is unclear what exactly that means. Defendants point to section 1103(g) as an apparent "example" of a provision where Congress "provided elsewhere" that certain powers would remain with the Attorney General. *Id.* at 20–21. Seemingly, Defendants' view is that only provisions stating powers would *remain* with the Attorney General fall under Section 1103(a)'s "except" clause. But this cannot be squared with the fact that, just weeks ago, the Attorney General exercised his 8 U.S.C. § 1533(a)(1)—a provision in Chapter 12—authority to file a high-profile "application to remove" a "[noncitizen] terrorist" in order to commence removal proceedings in the alien terrorist removal court.[4] Nothing in the text of 8 U.S.C. § 1533(a)(1) refers to a retention of authority—it simply

---

[4] *See* DOJ, Office of Public Affairs, *Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting* (July 30, 2026), https://perma.cc/2CXR-BXFN

states what powers the Attorney General may exercise. Thus, the better reading of Section 1103(a) is that it transferred immigration-related functions not conferred specifically upon the Attorney General and not otherwise transferred or delegated[5]—including TPS termination authority.

**6 U.S.C. § 557.** The third statutory provision that Defendants cite as the basis for the Secretary's authority, § 557, does *not* independently transfer any authorities to the Secretary. The provision clarifies statutory language related to transfers of power effectuated by other statutes or means of delegating authority—it does not serve as a transfer of authority itself. In fact, Defendants acknowledge that it is just a "reference-updating" provision, which "operated to update all other federal laws with respect to functions that were transferred to the Secretary." Opp. at 21. Defendants further assert—without any citation or evidence—that Congress "did not rewrite each of the TPS statute's references to the 'Attorney General' because it relied on the transfer and reference-updating provisions in the Homeland Security Act." *Id.* But Congress has not explicitly addressed the issue of whether the Attorney General's authority to designate and terminate countries for TPS was transferred to the Secretary and the Supreme Court has long held that congressional acquiescence is an insufficient basis to infer intent. *Girouard v. U.S.*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law"); *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle"). For functions that were not transferred—like TPS termination authority as Plaintiffs argue above—§ 557 does not apply. In short, Defendants cannot identify any textual provision— nor any concrete congressional actions—that clearly transfers TPS termination authority to the

---

[5] *Accord United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917, 929 (E.D. Mo. 2016) (directing denaturalization certificate to Attorney General per 8 U.S.C. § 1451(f)); *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty.*, 538 F. Supp. 2d 995, 997 (S.D. Tex. 2008) (noting Attorney General's exercise of land acquisition authorities under 8 U.S.C. § 1103(b)).

17

Secretary. None exists.

### b)  Mullin *Did Not Foreclose Plaintiff's* Ultra Vires *Claim Nor Is It Binding Precedent*

Because the *ultra vires* claim challenges the Secretary's exercise of extra-statutory authority, the TPS review bar does not apply. Indeed, courts reviewing agency action must determine that "the particular official acting on behalf of the agency [was] delegated the authority to act; otherwise such agency action is invalid." *League of Women Voters of U.S. v. Newby*, 238 F. Supp. 3d 6, 11 (D.D.C. 2017) (quoting *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 12 (D.D.C. 2011)) Nor does *Mullin* foreclose review because the Supreme Court never considered this argument. No amount of effort by Defendants can give the *Mullin* decision a precedential effect it does not have.

First, by its plain text, the TPS statue's review bar applies to a "determination" by the "Attorney General." 8 U.S.C. § 1254a(b)(5)(A). Plaintiffs' *ultra vires* challenge falls outside the scope of that bar by asking whether the DHS Secretary had authority to terminate TPS for Somalia. *Mullin* was "silent on the argument now before [this Court] for the simple reason that the parties in [the case] were silent on it too." *Ret. Plans Commi. of IBM v. Jander*, 589 U.S. 49, 56 (2020) (Gorsuch, J. concurring). It cannot be read to bar Plaintiffs' *ultra vires* claim.

Second, Defendants' efforts to characterize *Mullin* as binding precedent are a last-ditch attempt to explain their failure to identify *any* statutory provision that clearly transfers authority from the Attorney General to the Secretary. Yet Defendants glaringly point to no evidence that the parties ever presented—or that the Court ever considered in *Mullin*—the question whether the authority to terminate a TPS designation is vested exclusively in the Attorney General. When interpreting the scope of the TPS statute's review bar, the Supreme Court focused on the word "determination," *see Mullin,* 146 S. at 2134–37, not the review bar's "Attorney General" language (which appears nowhere in the opinion). The Supreme Court's references to the "Secretary" are therefore not

"essential" to the Court's holding, Opp. at 19, and had nothing to do with the identity of the deciding official.[6] *See Mullin*, 146 S. Ct. at 2134–37.

Because Plaintiffs' claim was not presented to or considered by the Supreme Court, the *Mullin* decision is subject to the principle (applied consistently for more than a century) that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Defendants attempt to evade that doctrine and run afoul of the well-settled principle that decisions lack precedential value on issues that they "never squarely addressed." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also U.S. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (holding that where an issue was not "raised in briefs or argument nor discussed in the opinion of the Court," "the case is not a binding precedent on this point"). Moreover, Defendants make much of *Mullin*'s reference in the background section to 6 U.S.C. §§ 552(d) and 557, but again, those are just housekeeping provisions. The Supreme Court made no mention of 8 U.S.C. § 1103(a) or (g), the provisions on which Defendants now stake their argument.

Defendants' fallback argument—that even if the *Mullin* holding was dictum it would still warrant "great deference"—still does not cure the statutory gap. Opp. at 19. Dicta must actually be "considered" in order to be binding. Passing background remarks—incidental to the issues actually presented and unaccompanied by substantive analysis—are not "considered." *See, e.g.*, *United States v. Pimental*, 176 F.4th 151, 157–58 (1st Cir. 2026); *United States v. Patel*, 524 F. Supp. 2d 107, 111–12 (D. Mass. 2007); *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008). And

---

[6] Defendants' reliance on *Seminole Tribe* is misplaced—which held that a court is bound by "those portions of the opinion necessary to that result," 517 U.S. at 67. Defendants elide the difference between necessity and background assumptions: the question in *Mullin* was whether the review bar applies to the Secretary's TPS terminations, not whether the Secretary possesses TPS authority in the first place. Because that premise was never in dispute, the Court's acceptance of it was not necessary to resolving the question presented and thus *Seminole Tribe* does not extend binding effect to *Mullin*.

19

even persuasive dicta cannot override a statute's plain text.[7] Accordingly, *Mullin* does not relieve Defendants of their burden to point to statutory text that actually transfers TPS termination authority to the Secretary. *See supra* Sec. III(a).

Third, Defendants' citation to other judicial decisions that have remarked on the DHS Secretary's TPS authority in passing do not address the *ultra vires* issue and are equally non-precedential. Opp. at 21–22. Even worse for Defendants, none of the cases they cite relies on section 1103(g)—the linchpin in Defendants' theory. They are merely background *assumptions* that have persisted over time because no party until Plaintiffs here has ever questioned the DHS Secretary's TPS termination authority.

This Court may therefore independently assess on its own the question of whether TPS authority was properly transferred from the Attorney General and exercise "independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Indeed, courts have routinely rejected agencies' long-held—and mistaken—statutory interpretations. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (rejecting EPA's decades old interpretation); *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 355–57 (2025) (same for FCC interpretation); *Brown v. Gardner*, 513 U.S. 115, 122 (1994) (same for Department of Veteran Affairs interpretation).

c) *Defendants' argument that Plaintiffs' claim is self-defeating is circular and fares no better.*

Defendants further argue that Plaintiffs' *ultra vires* claim would have the sweeping consequence of invalidating prior redesignations and extensions of Somalia TPS. Opp. at 22. Not so. First, this APA lawsuit is narrowly directed at the Secretary's authority to terminate TPS as a

---

[7] *See, e.g.*, *Arthur C. Harvey Co. v. Malley*, 61 F.2d 365, 366 (1st Cir. 1932) (determining that the Supreme Court's "dictum[] should not control" because it is "contrary to the language of the statute"); *Bateman*, 515 F.3d at 282 (adopting the "plain terms of" the statute despite "considerable persuasive value" of Supreme Court dicta).

single final agency action, not at the underlying designation itself. Defendants misapprehend why a future lawsuit would be necessary to challenge Somalia's TPS redesignations, which are distinct from this challenge: the answer is Article III and the APA. If Plaintiffs prevail on their *ultra vires* claim, this Court is authorized under the APA to "set aside" only that particular agency action. 5 U.S.C. § 706(2). Article III similarly "restricts" this Court's jurisdiction to relief that redresses the particular "executive action" that has caused Plaintiffs' injuries. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Any challenge to Somalia's TPS redesignation would need to be the subject of a separate lawsuit of doubtful justiciability. Contrary to Defendants' view, these jurisdictional principles are central to our constitutional structure. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (describing Article III standing as being built on the "single basic idea" of "separation of powers" (citation omitted)).

Second, Defendants press at a crabbed reading of *Regents*, suggesting it was limited to scenarios where the government determines that a program is unlawful only in part. Opp. at 22. But *Regents* made clear that even "illegal" programs must be "wound down" in a way that considers "reliance interests" and is otherwise consistent with the APA.[8] 591 U.S. at 13, 25, 30. In any event, the Executive Branch very well could identify a separate basis for authority for a TPS designation—or conclude that at least part of the TPS program is independently authorized on other grounds—rather than rescinding it. *See Mullin*, 146 S. Ct. at 2128 (explaining that, prior to TPS statute's enactment, "the Executive Branch sometimes provided similar relief as a matter of discretion without any express statutory authorization"). The availability of those alternatives places any future TPS rescission squarely within the *Regents* framework.

---

[8] TPS holders have similar reliance interests to the DACA recipients in *Regents*—they have "embarked on careers, started businesses, purchased homes, and even married and had children" and the "consequences of the [termination]... would radiate outward" to their families, schools, and employers. *Regents*, 591 U.S. at 31 (citation modified).

21

Third, Plaintiffs have core liberty and property interests in TPS and thus procedural due process would apply to any rescission. *See supra* section I.

**IV.    Plaintiffs Have Shown Irreparable Harm and the Balance of Equities and Public Are in Their Favor.**

Plaintiffs have demonstrated that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip[] in [their] favor, and that an injunction [or postponement] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Defendants hang their hat on their view of likelihood of success and entirely overlook the extent of Plaintiffs' potential irreparable and imminent injuries, which include the loss of lawful immigration status; potential immigration confinement and removal; forced separation from families, loved ones, and communities; and lost access to related federal and state benefits, including work authorization, driver's licenses, and healthcare coverage. *See, e.g. Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (identifying "separation from family" as an irreparable harm). For example, Mohamed Doe and his wife just recently welcomed their first U.S. citizen child into their family and the Termination threatens his family with an impossible choice. Am. Compl. ¶ 33, ECF No. 90; *see also id.* ¶ 39 (Tyson Doe has a U.S. citizen brother); *id.* ¶ 43 (Nina Doe has a U.S. citizen host family who consider her to be like a daughter). Defendants also ignore other detailed evidence describing the harms Plaintiffs will face if the Termination takes effect. *See* Pls. Br. Renewed Mot. at 31–32; Pls.' Suppl. Mem. at 9–12 (describing evidence in the Certified Administrative Record that reflects irreparable harms related to returning to ongoing armed conflict and humanitarian crises in Somalia); Mem. & Order at 2, ECF No. 98 (describing "grave risks" faced by Plaintiffs and other Somali TPS beneficiaries). Defendants state that "Plaintiffs remain free to pursue any other immigration relief for which they be eligible," Opp. at

22

25, but fail to acknowledge their own hand in foreclosing those same pathways for Somali nationals. *See* Pls. Br. Renewed Mot. at 19–20 (accelerated immigration hearings designed to reject Somali asylum applications without access to counsel and adequate process); *id*. at 21–22 (USCIS policies that pause immigration benefits for Somali immigrants, including treating their nationality as a discretionary negative factor).

Defendants allege that they and the public face irreparable harm because they cannot exercise their authorities derived from the TPS statute. Opp. at 23–24. But "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *accord State v. U.S. Dep't of Hous. and Urban Dev.*, 171 F.4th 473, 492 (1st Cir. 2026) ("irreparable harm does not arise from a preliminary injunction that prohibits an agency from taking action that is likely unlawful."). Defendants' reliance on two unreasoned Supreme Court stays in other TPS litigation, Opp. at 24, is equally unconvincing. As courts analyzing the effects of unlawful TPS terminations have found, "[P]laintiffs' injuries far outweigh any harm to the government from a postponement." *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 276 (E.D.N.Y. 2025); *accord Saget v. Trump*, 375 F. Supp. 3d 280, 377–78.

Defendants contend that "the injuries Plaintiffs identify follow from the statutory scheme itself" because "TPS is, by design, 'temporary.'" Opp. at 24. The TPS statute, however, vests authority with the government to redesignate or terminate TPS designations. Thus, Defendants cannot dodge accountability for harms arising from their improper termination by pointing to the temporary nature of the protections. In fact, many TPS holders have lived in the U.S. for decades with established family and community ties and are seeking more permanent forms of immigration

status. Unlawfully terminating TPS protection forecloses their ability to access many of those avenues. *See* ECF Nos. 8-3–4, 9-1–4.

## CONCLUSION

Because Plaintiffs can show a likelihood of success and all factors weigh in their favor, the Court should grant Plaintiffs' renewed postponement motion.

Dated: August 6, 2026                      Respectfully submitted,

*Admitted *pro hac vice*


                                           */s/ Nargis Aslami*
                                           Nargis Aslami (MA Bar Number: 714848)
                                           Sadaf Hasan*
                                           Melissa Keaney*
                                           Collin Poirot*
                                           Abbey Rutherford*
                                           MUSLIM ADVOCATES
                                           1032 15th Street N.W. #362,
                                           Washington, D.C. 20005
                                           202.897.2622
                                           Nargis@muslimadvocates.org
                                           Sadaf@muslimadvocates.org
                                           Melissa@muslimadvocates.org
                                           Collin@muslimadvocates.org
                                           Abbey@muslimadvocates.org

                                           */s/ Erik Crew*
                                           Erik Crew*
                                           HAITIAN BRIDGE ALLIANCE
                                           4560 Alvarado Canyon Road, Suite 1H
                                           San Diego, CA 92120
                                           949.603.7411
                                           ecrew@haitianbridge.org

                                           */s/Kacey Mordecai*
                                           Kacey Mordecai*
                                           Mide Odunsi*
                                           LEGAL DEFENSE FUND
                                           700 14th Street N.W. Suite 600
                                           Washington, D.C. 20005
                                           202.682.1300
                                           Kmordecai@naacpldf.org
                                           Modunsi@naacpldf.org


                                           Ashley Burrell*
                                           Lauren Carbajal*
                                           LEGAL DEFENSE FUND
                                           40 Rector Street #5
                                           New York, NY 10006
                                           202.965.2200
                                           aburrell@naacpldf.org
                                           lcarbajal@naacpldf.org

25

*Counsel for Plaintiffs*

26

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, this brief will be sent electronically through this Court's CM/ECF system to all registered parties.

*/s/ Nargis Aslami*
Nargis Aslami