UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated, | * * * * * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 26-cv-11201-ADB |
| MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA, | * * * * * * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

In this action, two organizations and four individual plaintiffs challenge the decision of

the Secretary of Homeland Security to terminate Somalia's designation as a foreign state whose

nationals may apply for Temporary Protected Status ("TPS") in the United States. TPS provides

eligible people from certain countries with protection against detention or removal from the

United States and work authorization when it is unsafe for them to return to their own country.

Now before the Court are Plaintiffs' emergency motion seeking postponement of agency action

and a preliminary injunction, [ECF No. 91], and the government's motions to lift the administrative stay that this Court entered while briefing on Plaintiffs' emergency motion was pending, [ECF No. 97]; [ECF No. 108].  Because the Court is now prepared to rule on Plaintiffs' fully briefed emergency motion, the government's motions to lift the administrative stay are **GRANTED**.  For the following reasons, Plaintiffs' emergency motion for postponement and a preliminary injunction is **DENIED**.[1]

## I.    BACKGROUND

### A.    Statutory and Administrative History

#### 1.    Origins of the TPS Program

The TPS program was created by the Immigration Act of 1990, Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36 (codified as amended at 8 U.S.C. § 1254a), to provide a framework for humanitarian relief to nationals of certain countries residing in the United States. See generally 8 U.S.C. § 1254a; Mullin v. Doe, 146 S. Ct. 2121, 2129–30 (2026).

#### 2.    Creation of DHS

The Homeland Security Act of 2002 (the "HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended in scattered sections of the U.S. Code), "abolished the former [Immigration and Naturalization Service ('INS')] and established the Department of Homeland Security ('DHS')."  Flores v. Sessions, 862 F.3d 863, 870 (9th Cir. 2017) (citing 6 U.S.C. §§ 111, 251, 291); accord Khanal v. Blanche, 168 F.4th 1, 6 n.10 (1st Cir. 2026).  "[T]he functions of the [INS] were transferred from [the United States Department of Justice ('DOJ')] to DHS."  Sunday v. Att'y Gen. U.S., 832 F.3d 211, 216 n.5 (3d Cir. 2016).  The reorganization charged "[t]he

---

[1] Plaintiffs' first emergency motion, [ECF No. 3], is **DENIED AS MOOT** in light of Plaintiffs' filing of an amended complaint.

Secretary of Homeland Security . . . with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General." 8 U.S.C. § 1103(a)(1).

Pursuant to a provision of the HSA, 6 U.S.C. § 542, on November 25, 2002, the President submitted a reorganization plan to Congress that laid out, in general terms, the steps that the executive would take to "transfer . . . agencies, personnel, assets, and obligations to [DHS]" and then to "consolidat[e], reorganiz[e], or streamlin[e] . . . agencies transferred to [DHS]." 6 U.S.C. § 542(a)(1)–(2). Thereafter, DOJ issued a 2003 rule that divided regulations related to the former INS between itself and DHS. See Aliens and Nationality; Homeland Security; Reorganization of Regulations ("2003 Reorganization Rule"), 68 Fed. Reg. 9824, 9824 (Feb. 28, 2003). The rule noted the need for "further refinement to clarify the authority of [the] Secretary of Homeland Security to designate countries for [TPS]" and disclaimed "any indication that the Department of Justice is involved in those future decisions." Id. at 9827.

Since the creation of DHS, the Secretary of Homeland Security has issued TPS designations, see, e.g., Designation of Ukraine for Temporary Protected Status, 87 Fed. Reg. 23211 (Apr. 19, 2022); extensions, see, e.g., Extension of the Designation of Somalia Under Temporary Protected Status Program, 68 Fed. Reg. 43147 (July 21, 2003); redesignations, see, e.g., Extension and Redesignation of Somalia for Temporary Protected Status, 77 Fed. Reg. 25723 (May 1, 2012); and terminations, see [ECF No. 90 ¶ 67 (collecting examples)].

### 3.    Procedure

TPS proceeds in two steps. First, the Secretary must designate a foreign state as eligible, 8 U.S.C. § 1254a(b)(1), which he or she may do on the basis of an "ongoing armed conflict," id. § 1254a(b)(1)(A); a natural disaster causing substantial, temporary disruption of living

conditions such that the state cannot "handle adequately the return" of its nationals and for which the state "officially has requested designation," id. § 1254a(b)(1)(B); or the existence of "extraordinary and temporary conditions" that prevent nationals of the state from safely returning to it, except where permitting them to remain in the United States "is contrary to the national interest," id. § 1254a(b)(1)(C).

Second, after a state has been so designated, qualified nationals residing in the United States, see 8 U.S.C. § 1254a(c) (specifying eligibility requirements), may register for TPS "in a manner which the [Secretary] establishes," id. § 1254a(c)(1)(A)(iv). Once a person has established his or her eligibility and registered for TPS, he or she "shall not [be] remove[d] . . . from the United States during the period in which such status is in effect," id. § 1254a(a)(1)(A), and "shall [be] authorize[d] . . . to engage in employment in the United States," id. § 1254a(a)(1)(B).

The Secretary may initially designate a state for six to eighteen months at a time. 8 U.S.C. § 1254a(b)(2)(B). "At least 60 days before [the] end of the initial period of designation, and any extended period of designation," the Secretary must "consult[] with appropriate agencies," then "review the conditions in the foreign state" and "determine whether the conditions for such designation . . . continue to be met." Id. § 1254a(b)(3)(A). If, "after consultation with appropriate agencies," id. § 1254a(b)(3)(A), and "review [of] the conditions in the foreign state," id., the Secretary concludes that the state "no longer continues to meet the conditions for designation," id. § 1254a(b)(3)(B), he or she "shall terminate the designation" after a sixty-day period of notice by publication in the Federal Register, id. Otherwise, the designation is extended for at least six months. See id. § 1254a(b)(3)(C).

#### 4.     Somalia

Somalia was first designated for TPS in 1991 on the basis of extraordinary and temporary conditions.  Designation of Nationals of Somalia for Temporary Protected Status, 56 Fed. Reg. 46804 (Sep. 16, 1991).  Thereafter, its designation was extended and renewed—including, in 2002, the addition of ongoing armed conflict as a separate basis for the designation, see [ECF No. 90 ¶ 86 n.30 (collecting extensions and redesignations)]—until January 14, 2026, when then-Secretary Kristi Noem published notice of the termination of Somalia's TPS designation in the Federal Register, see Termination of the Designation of Somalia for Temporary Protected Status ("2026 Termination Notice"), 91 Fed. Reg. 1547 (Jan. 14, 2026).

### B.     Procedural History

The termination of Somalia's TPS status was set to take effect on March 17, 2026.  See 2026 Termination Notice, 91 Fed. Reg. at 1547.  On March 9, 2026, Plaintiffs, two organizations[2] and four individuals,[3] initiated this action by filing a complaint against the Secretary, DHS, United States Citizenship and Immigration Services ("USCIS"), and the United States of America.  [ECF No. 1].  The same day, before Defendants had been served, Plaintiffs filed an emergency motion seeking a stay pursuant to 5 U.S.C. § 705 and an interim administrative stay to enable Defendants to produce the administrative record and to allow time

---

[2] "Plaintiff African Communities Together ('ACT') is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States."  [ECF No. 90 ("Am. Compl.") ¶ 14].  "Plaintiff Partnership for the Advancement of New Americans ("PANA") is a non-profit, membership-based organization of refugees and displaced people with a focus on African, Middle Eastern, Muslim, and South Asian communities."  [Id. ¶ 21].

[3] The individual plaintiffs are Alexander, Mohamed, Tyson, and Nina Doe, all Somali nationals who have applied for or received TPS.  Their motion to proceed by pseudonym, [ECF No. 2], remains pending.  From their description in Plaintiffs' Amended Complaint, all individual plaintiffs appear to be leading exemplary lives in the United States.  See [Am. Compl. ¶¶ 26–48].

for the parties to brief the issues.  [ECF No. 3].  On March 13, 2026, the Court entered an

administrative stay,[4] ordered Plaintiffs to promptly serve Defendants, and ordered the parties to

file a joint schedule for briefing and production of the administrative record.  See generally [ECF

No. 33].  The parties agreed to have the case briefed and ready for hearing the week of May 4,

2026, see [ECF No. 35 at 2], then later agreed to stay the case pending the Supreme Court's

decision in Mullin, see [ECF No. 71]; [ECF No. 72].[5]

On June 25, 2026, the Supreme Court issued its decision in Mullin, which rejected two

similar challenges to TPS terminations.  See 146 S. Ct. at 2121.  On July 1, 2026, the

government moved to reopen this case and lift the administrative stay, contending that, in light of

Mullin, the Court had "more than sufficient direction to promptly rule on and deny Plaintiffs'

motion."  [ECF No. 77 at 1].  The Court partially granted and partially denied the government's

motion.  See [ECF No. 78].  The Court lifted the stay that was in place pending the decision in

Mullin, and, consistent with the order that imposed that stay, see [ECF No. 73], directed the

---

[4] Case law and statute empower district courts to order administrative stays when reviewing
agency action.  In 1942, the Supreme Court held that the same "traditional equipment for the
administration of justice" that empowers federal courts to "stay the enforcement of a judgment
pending the outcome of an appeal" provided courts reviewing agency actions with a "customary
power to stay orders under review."  Scripps-Howard Radio v. F.C.C., 316 U.S. 4, 9–11 (1942).
That understanding was later incorporated into 5 U.S.C. § 705, which was "primarily intended to
reflect existing law under the Scripps-Howard doctrine."  Sampson v. Murray, 415 U.S. 61, 68
n.15 (1974).  Therefore, "courts charged by statute with judicial review of agency decisions"
possess the same "authority . . . to issue appropriate writs in aid of that jurisdiction" as do
appellate courts.  See id. at 73; United States v. Texas, 599 U.S. 670, 700 (2023) (Gorsuch, J.,
concurring) (citing Sampson and affirming that, at a minimum, § 705 "confirm[s] courts'
authority to issue traditional equitable relief pending judicial review").  This includes the
authority to issue administrative stays.  See Rachel Bayefsky, Administrative Stays: Power and
Procedure, 97 Notre Dame L. Rev. 1941, 1951 (2022); United States v. Texas, 144 S. Ct. 797,
799 (2024) (Barrett, J., concurring).
[5] While briefing was underway, amicus briefs were filed by the Commonwealth of
Massachusetts, [ECF No. 49], and Oxfam America, Inc., [ECF No. 57].

parties to submit a joint status report stating their respective positions about which claims, if any, remained viable after Mullin.  See [ECF No. 78].  The administrative stay was left in place.  On July 9, 2026, the parties submitted their joint status report, [ECF No. 79], in which Plaintiffs indicated that (1) they believed their constitutional equal protection claim remained viable and (2) they would be amending their complaint to add additional claims that were not resolved by the Supreme Court, [id. at 3].  The parties proposed briefing schedules, [id. at 4], and the Court ultimately adopted Plaintiffs' proposed schedule, see [ECF No. 82].  While the parties briefed the issues remaining after Mullin and any new issues raised by that decision, the case remained administratively stayed.[6]  [ECF No. 78].

On July 20, 2026, the government appealed the Court's decision to leave the administrative stay in place.  [ECF No. 84].  While that appeal was pending, on July 30, 2026, Plaintiffs filed an amended complaint, [ECF No. 90], and a renewed emergency motion, [ECF No. 91], this time seeking both a stay pursuant to 5 U.S.C. § 705 and a preliminary injunction.  The Court issued an indicative ruling on July 31, 2026, which provided that if the case were remanded from the appeals court, it would dissolve its initial administrative stay and enter a new administrative stay only for as long as was necessary to resolve Plaintiffs' new emergency motion.  [ECF No. 94].  On August 3, 2026, in light of the Court's indicative ruling, the First

---

[6] Courts regularly leave administrative stays in place until a motion is fully briefed.  See Texas, 144 S. Ct. at 800 (Barrett, J., concurring); id. at 798 (citing June Med. Servs., L.L.C. v. Gee, 139 S. Ct. 661 (2019)); In re Abbott, 800 F. App'x 296, 298 (5th Cir. 2020).  While the briefing schedule the Court adopted may have been longer than is typical of expedited briefing in the appellate context, the Court submits that this schedule—two weeks for Plaintiffs' opening brief, two weeks for the government's responsive brief, and one week for Plaintiffs' reply—was warranted given the importance of the issue to both parties and the fact that they were not revisiting arguments previously developed before a lower court, but rather articulating their positions on meaningful constitutional issues for the first time shortly after Mullin.

7

Circuit dismissed the appeal, but noted that "the district court must rule promptly on the motion before it" and declined to "approve the briefing deadlines set by that court." [ECF No. 95 at 2]. Shortly after the First Circuit dismissed the appeal, the government filed a renewed motion to lift the administrative stay, [ECF No. 97]. The following day, on August 4, 2026, the Court modified its briefing schedule and ordered the parties to complete briefing on Plaintiffs' emergency motion by August 6, 2026. [ECF No. 98]. The parties complied with the amended schedule, see [ECF No. 101], [ECF No. 102], [ECF No. 103], and the motions were fully briefed by the evening of August 6, 2026. On August 13, 2026, the government filed another motion to lift the administrative stay, [ECF No. 108].[7]

## II.     LEGAL STANDARD

A motion for a stay pending final resolution of a challenge to agency action under § 705 is resolved according to "[t]he same standard [that] governs" a motion for preliminary injunction.

---

[7] Given the government's impatience, see [ECF No. 108], the Court notes that this order is issuing just over seven weeks after Mullin was decided, just over a week after the pending motions were fully briefed, and within a week of comparable rulings in other TPS cases. See Doe v. Noem, No. 25-cv-15483, Dkt. No. 115 (N.D. Ill. Aug. 7, 2026); Afr. Cmtys. Together v. Noem, No. 25-cv-13939, Dkt. No. 122 (D. Mass. Aug. 7, 2026); Nat'l TPS All. v. Noem, No. 25-cv-05687, Dkt. No. 233 (N.D. Cal. Aug. 6, 2026) (electronic order). During this time, the Court has not ignored Mullin, acted in contravention of its holding, or afforded Plaintiffs any relief. It has merely taken enough time to allow the parties to meaningfully respond to Mullin and then to engage in the thoughtful and deliberative process that is at the heart of the job of a judge.

There has been significant vitriol directed at this Court during the pendency of this case, including many letters and personal attacks. These attacks misapprehend the nature of the judicial function under our Constitution. It is the job of the courts in this country to resolve complex disputes fairly, carefully, and in accordance with the law regardless of whether we agree with that law or not. The parties must have time to present their cases and then the judge must be afforded a reasonable amount of time to come to a considered decision, understanding that many of these decisions have grave consequences for the parties involved. Here, the Court took the time that it felt was necessary to review the briefing, do research, come to a reasoned decision, and prepare an order, given the significant issues not resolved by Mullin and the life-altering consequences of this decision for the affected Somali TPS beneficiaries.

Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 164 (D. Mass. 2025) (first citing

Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 496 F. Supp. 3d 600, 609 (D. Mass.

2020); and then citing Colorado v. Env't Prot. Agency, 989 F.3d 874, 883 (10th Cir. 2021)).  The

granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never

awarded as of right.'"  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d

26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).  In deciding

whether to grant a motion for a preliminary injunction, courts must consider four factors: "(i) the

movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the

movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as

between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may

have on the public interest."[8]  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  These

four factors "are not entitled to equal weight in the decisional calculus," id.; rather, the movant's

likelihood of success on the merits "is the main bearing wall of the four-factor framework," id. at

10 (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)).

"[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015)

(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

Unless the movants can "demonstrate that [they are] likely to succeed in [their] quest, the

remaining factors become matters of idle curiosity."  Id. (quoting New Comm Wireless Servs.,

287 F.3d at 9).  As the moving party, Plaintiffs here bear the burden of establishing each of the

four elements.  See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

---

[8] The balance of hardships and public interest factors "merge when the Government is the
opposing party."  Nken v. Holder, 556 U.S. 418, 435 (2009).

### III.    DISCUSSION

Plaintiffs' amended complaint asserts five causes of action: constitutional challenges pursuant to the Fifth Amendment's Due Process Clause, [ECF No. 90 ("Am. Compl.") ¶¶ 262–267], and equal-protection guarantee, [id. ¶¶ 286–294], two APA challenges pursuant to 5 U.S.C. § 706(2)(B), [id. ¶¶ 268–285, 295–301], and one APA challenge pursuant to 5 U.S.C. § 706(2)(C), [id. ¶¶ 302–311].

#### A.    Constitutional Claims

##### 1.    Reviewability

The TPS statute bars "judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Mullin established that this judicial-review bar prevents this Court from considering nonconstitutional claims, see 146 S. Ct. at 2133, but left open whether the Court may consider any remaining constitutional challenges, see id. at 2137 (plurality opinion) (deciding "substance of . . . respondents' equal protection claim" without concluding that district courts have jurisdiction over such claims). The Court concludes that it may exercise jurisdiction over Plaintiffs' constitutional claims.

"[E]very right, when withheld, must have a remedy, and every injury its proper redress . . . ." Aguilar v. U.S. Immigr. & Customs Enf't, 510 F.3d 1, 17 (1st Cir. 2007) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 147 (1803)), so while "the Supreme Court has not found constitutional difficulties in congressional abrogation of certain remedies as long as others are left intact," id. at 17 (first citing Lauf v. E.G. Shinner & Co., 303 U.S. 323, 330 (1938); then citing Cary v. Curtis, 44 U.S. (3 How.) 236, 250 (1845); and then citing Swain v. Pressley, 430 U.S. 372, 381 (1977)), "Congress probably cannot nullify rights guaranteed in the Constitution by prohibiting all remedies for the violation of those rights," id. at 18 (citing Webster v. Doe,

10

486 U.S. 592, 603 (1988)).  At a minimum, if "Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear."  Mullin, 146 S. Ct. at 2137 (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)).

The Court is unaware of any case, outside of the habeas corpus context,[9] in which a statute was held to clearly preclude all judicial review of constitutional challenges, and no case in which such a withdrawal of jurisdiction was sustained as constitutional.  See generally Richard H. Fallon, Jr., Jurisdiction-Stripping Reconsidered, 96 Va. L. Rev. 1043 (2010).  Yet the judicial-review bar in the TPS statute, if found to reach constitutional claims, would prohibit all "judicial review," 8 U.S.C. § 1254a(b)(5)(A), without reserving or specifying any alternative remedial pathways.  The Court does not read the statute to go so far.

Congress legislates against the backdrop of the Constitution, see Bond v. United States, 572 U.S. 844, 857–58 (2014), which presumes that there will be a forum for resolution of constitutional disputes, see Aguilar, 510 F.3d at 18.  Viewing the phrase "judicial review" against that background, the Court cannot discern a clear statement evidencing an intent to preclude the adjudication of constitutional claims in the context of the TPS statute.  Cf. Johnson v. Robison, 415 U.S. 361, 367, 373–74 (1974).  As other courts have noted, where Congress intended to limit judicial review of constitutional claims in the INA, "it said so explicitly." Ramos v. Nielsen, 321 F. Supp. 3d 1083, 1105 (N.D. Cal. 2018) (citing 8 U.S.C. § 1252(b)(9)). In the absence of compelling evidence to the contrary, the Court will not conclude that Congress departed from over two hundred years of history by denying all remedies for constitutional

---

[9] Boumediene v. Bush, 553 U.S. 723 (2008), reached the closely related conclusion that the Military Commissions Act of 2006 "denie[d] the federal courts jurisdiction to hear [certain] habeas corpus actions," id. at 736, then invalidated that denial of jurisdiction on the basis that it "effect[ed] an unconstitutional suspension of the writ [of habeas corpus]," id. at 792.

11

claims when it passed 8 U.S.C. § 1254a.  Accordingly, although § 1254a(b)(5)(A) may bar

review of statutory claims, the Court does not find that to be true of constitutional claims.

### 2.    Due Process

Plaintiffs' first constitutional argument is that the Secretary's termination of Somalia's

TPS designation violated the Fifth Amendment's Due Process Clause,[10] see [ECF No. 92 at 15],

which protects all people from being deprived of "life, liberty, or property, without due process

of law," U.S. Const. amend. V, and applies equally to noncitizens who have entered the United

States, see Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

Plaintiffs challenge the termination under the procedural branch of due process doctrine.

See [ECF No. 92 at 16].  As the First Circuit has explained:

> Due process has both procedural and substantive components.  The right to
> procedural due process "guarantee[s] . . . that, before a significant deprivation of
> liberty or property takes place at the state's hands, the affected individual must be
> forewarned and afforded an opportunity to be heard at a meaningful time and in a
> meaningful manner."  González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir.
> 2011) (internal quotation marks omitted) (quoting Amsden v. Moran, 904 F.2d 748,
> 753 (1st Cir. 1990)).  The right to substantive due process "safeguards individuals
> against certain offensive government actions, notwithstanding that facially fair
> procedures are used to implement them."  DePoutot v. Raffaelly, 424 F.3d 112, 118
> (1st Cir. 2005) (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88
> L. Ed. 2d 662 (1986)).

Maldonado-González v. P.R. Aqueduct & Sewer Auth., 158 F.4th 27, 34 (1st Cir. 2025)

(alterations in original).  To make out a procedural due process claim, "the plaintiffs must

identify a protected property or liberty interest," Redondo-Borges v. U.S. Dep't of Hous. & Urb.

---

[10] The government directs the Court to Mullin's admonition that "challengers cannot avoid a
judicial-review bar by creative pleading or clever lawyering."  146 S. Ct. at 2136; see [ECF
No. 102 at 9].  The quoted portion of Mullin, however, concerns attempts to apply the APA to
subsidiary or antecedent agency decisions to circumvent a bar on APA review of a final agency
decision.  Here, rather than applying the same law to prior decisions, Plaintiffs identify a distinct
source of law that they contend furnishes an independent basis for setting aside the challenged
final action.

Dev., 421 F.3d 1, 7 (1st Cir. 2005) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005)), to which they "must 'have a legitimate claim of entitlement'" that is "more than a unilateral expectation," id. at 8 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).

i.     Property Interests

"Property interests . . . are created and their dimensions are defined by . . . independent source[s]," such as statutory law, and courts look to the specific contours of the source of an asserted property right to ascertain whether one has been created.  Roth, 408 U.S. at 577–78. "Discretionary forms of relief do 'not rise to the level of such a protected interest,'" Kandamar v. Gonzales, 464 F.3d 65, 69 (1st Cir. 2006) (quoting DaCosta v. Gonzales, 449 F.3d 45, 50 (1st Cir. 2006)); accord Doyle v. City of Medford, 606 F.3d 667, 672 (9th Cir. 2010) ("A regulation granting broad discretion to a decision-maker does not create a property interest."), but where a "statute [sufficiently] narrows the government's discretion," a person may have a legitimate claim of entitlement, Laborde-Garcia v. P.R. Tel. Co., 993 F.2d 265, 267 (1st Cir. 1993).  The government does not, however, "create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee."  Town of Castle Rock v. Gonzales, 545 U.S. 748, 771 (2005) (Souter, J., concurring).  Further, a property interest must be "distinguishable from the procedural obligations imposed on state officials to protect it."  Id. at 772.

Thus, to prevail on this issue, Plaintiffs must establish that the TPS statute creates a property interest in Somalia's ongoing TPS designation such that they are entitled to constitutionally sufficient process before the designation is terminated.  To do so, they rely on a number of benefits that the government is required to provide to TPS beneficiaries once the program is in effect.  Specifically, they cite to "employment authorization, protection from

13

detention, and protection from removal," [ECF No. 92 at 16 (citing 8 U.S.C. § 1254a(a)(1)(A)–(B), (a)(4)(B), (d)(4))], as entitlements that rise to the level of protected property interests.

Though the Court recognizes how important these benefits are to recipients of TPS, they do not establish property interests in Somalia's TPS designation, due to the two-step structure of the TPS program. As explained above, TPS beneficiaries receive the benefits of TPS only for the period that their country of origin has been designated (hence the name "temporary protected status"), and when a country's TPS designation is set to expire, the Secretary must make the discretionary decision whether to terminate the designation or extend it for six to eighteen months. See generally 8 U.S.C § 1254a. Because TPS beneficiaries will receive future benefits if—but only if—the Secretary decides to extend the designation of their country of origin (or to redesignate it), they have nothing "more than a unilateral expectation," Roth, 408 U.S. at 577, in their future TPS eligibility.[11] Thus, while benefits are "mandate[d]," [ECF No. 92 at 17], during the term for which a country has been designated, the periodic decision to extend that designation is discretionary and does not give rise to a cognizable property interest. Cf. Nat'l TPS All. v. Noem, 150 F.4th 1000, 1022 n.9 (9th Cir. 2025) ("TPS holders can rely on the security of their status but only for a limited period of time.").

The cases cited by Plaintiffs, see [ECF No. 92 at 16–17], do not alter this determination. Mansor v. United States Citizenship and Immigration Services, 685 F. Supp. 3d 1000 (W.D. Wash. 2023), concerned nationals of a country that had already been designated, who alleged that they had applied and met the eligibility criteria for TPS, but had not received the temporary

---

[11] These facts are analogous to Roth, in which the Supreme Court concluded that an assistant professor appointed to a one-year term had no due process interest in his reappointment, 408 U.S. at 578.

employment authorization to which they were entitled.  See id. at 1006.  Framing the inquiry in terms of "whether the statutory and regulatory provisions at issue here are sufficiently mandatory to confer an entitlement," id. at 1013, that court concluded that because employment authorization is mandatory once TPS applicants have established that they qualify for the program (including establishing that their nation of origin has been designated by the Secretary), it amounts to a constitutionally protected property interest.  See id. at 1014–15.  That holding, however, concerned individuals' entitlements to mandatory benefits after the Secretary designated their country of origin, not their prospective entitlements to discretionary extension or the redesignation of their country of origin for future terms.

Plaintiffs also direct the Court to Ramos, 321 F. Supp. 3d 1083.  In that case, TPS beneficiaries from several countries challenged decisions to terminate their countries' designations, see id. at 1083, on procedural due process grounds, among others, see id. at 1121. In denying the defendants' motion to dismiss, that court concluded that because TPS beneficiaries are "entitled to continue receiving benefits until the Secretary makes the determination to terminate [their country's designation] pursuant to the process and criteria set forth in the statute," id., they had "at least a plausible claim," id. at 1122, to a property interest in the "statutorily-mandated 'review' and 'determination'" procedures, id.  Notably, the court did not pursue that formulation as the case progressed beyond the motion-to-dismiss stage.[12]

---

[12] It appears that procedural due process was not discussed in subsequent developments in that litigation.  See Saget v. Trump, 375 F. Supp. 3d 280, 366 n.24 (E.D.N.Y. 2019) (noting that "the Ramos Court similarly declined to address the plaintiffs' procedural due process claim in granting injunctive relief, even though the court raised concerns at the motion-to-dismiss stage"). See generally Ramos v. Nielsen, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), vacated and remanded sub nom. Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, 59 F.4th 1010 (2023), appeal dismissed sub nom. Ramos v. Mayorkas, No. 18-16981, 2023 WL 4363667 (9th Cir. June 29, 2023).

Further, it appears that such an interest would not amount to "property" as defined by the Fifth Amendment, because it would be "[in]distinguishable from the procedural obligations imposed on state officials to protect it," Castle Rock, 545 U.S. at 772 (Souter, J., concurring).  See Caesars Mass. Mgmt. Co. v. Crosby, 778 F.3d 327, 332 n.2 (1st Cir. 2015) (noting that "there is no freestanding right to due process that is itself a form of property"); Johnson v. Ryan, 55 F.4th 1167, 1193–94 (9th Cir. 2022) (collecting cases); Olim v. Wakinekona, 461 U.S. 238, 250 (1983) ("Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); cf. Teigen v. Renfrow, 511 F.3d 1072, 1082 (10th Cir. 2007) ("Because the right to be considered for promotion and other employment benefits is not a substantive right but a procedural one, a statutory entitlement to such consideration cannot form the basis for a federal due process claim.").

In conclusion, as Plaintiffs concede, "[t]he government has discretion whether to designate a foreign state for TPS," [ECF No. 92 at 17], as well as whether to terminate a "country's continued designat[ion] for TPS," [id. at 18].  Accordingly, Plaintiffs' only cognizable interest is in the Secretary following the review and termination procedures prescribed by statute while making a decision that is ultimately discretionary.  See Clukey v. Town of Camden, 717 F.3d 52, 56 (1st Cir. 2013) ("In considering whether state [or federal] law creates an entitlement, we look primarily to the discretion [the at-issue] law accords [government] actors to withhold the entitlement from individuals.").  Interests in procedure are not "property" within the meaning of the Due Process Clause, so Plaintiffs have not shown a likelihood of success on the merits of this claim.

ii.    Liberty Interests

Plaintiffs assert liberty interests in the rights "to remain in the United States[,] to work[,] and [to] live with their family members."  [ECF No. 92 at 17 (first citing Saget v. Trump, 375 F.

16

Supp. 3d 280, 333 (E.D.N.Y. 2019); then citing Destino v. FCI Berlin, Warden, No. 25-cv-00374, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025); and then citing Ching v. Mayorkas, 725 F.3d 1149, 1157 (9th Cir. 2013))].  The Court agrees that immigration detention and removal from the country implicate core due process liberty interests, e.g., Zadvydas v. Davis, 533 U.S. 678, 693–94 (2001), and as such, when the government seeks to deprive a person of those rights—that is, to detain or remove them—it must do so in a manner that comports with the Constitution, e.g., id.; A.A.R.P. v. Trump, 605 U.S. 91, 94 (2025) (per curiam) (citing Trump v. J.G.G., 604 U.S. 670, 673 (2025) (per curiam)).  Here, however, terminating Somalia's TPS designation does not deprive anyone of these interests; it merely makes them susceptible to future deprivations.  If the government wishes to remove or detain Somali people who previously held TPS, those enforcement actions will be subject to the protections of the Due Process Clause. The Court is aware of no precedent that would allow it to find a protected liberty interest in being free from the prospect of immigration enforcement.

### 3.    Equal Protection

Plaintiffs next raise two claims under the Fifth Amendment's guarantee that the federal government will not deny any person the equal protection of the laws, see Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 217–18 (1995)—namely, that the termination of Somalia's TPS designation unconstitutionally discriminated based on both race and national origin.  See [ECF No. 92 at 20–34]; [ECF No. 103 at 14–15 (highlighting that national-origin claim is distinct)].

"Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S 252 . . . (1977), supplies the standard for assessing th[ese] claim[s]." Mullin, 146 S. Ct. at 2148 (Kagan, J., dissenting); cf. id. at 2137–38 (majority opinion) (assuming without deciding that Arlington Heights supplies the proper framework).  Under that standard, "[p]roof of . . . discriminatory intent or purpose is required to show a violation of [the Fifth Amendment's equal protection

17

guarantee]," but the impermissible intent need not be "'dominant' or 'primary.'" Arlington Heights, 429 U.S. at 265. Rather, Plaintiffs only need to show that "a discriminatory purpose has been a motivating factor in the decision." Id. at 265–66. Because "direct evidence of discriminatory purpose is rarely available," "impermissible discriminatory animus can be inferred from the totality of the circumstances, including both direct and circumstantial evidence." Calvary Chapel Belfast v. Univ. of Me. System, 180 F.4th 13, 26 (1st Cir. 2026) (citing, inter alia, Arlington Heights, 429 U.S. at 266–68).

To begin, the Court must determine what statements should be considered in evaluating these equal protection claims. Plaintiffs present a timeline of statements that they contend reflect the requisite discriminatory intent, the vast majority of which were made by President Trump, see generally [ECF No. 93-14]; [ECF No. 90 ¶¶ 95–114], though Plaintiffs also identify two posts from DHS's X account, one from the White House's X account, and one statement each by Stephen Miller and Scott Bessent, Secretary of the United States Department of the Treasury, [ECF No. 93-14 at 5–6]. Plaintiffs contend that the Court should consider the President's statements "because the President had authority and influence over Defendants' decision." [ECF No. 92 at 22 (first citing Centro Presente v. U.S. Dep't of Homeland Sec., 332 F. Supp. 3d 393, 414–15 (D. Mass. 2018); and then citing Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 471 (1982))]. The Court agrees that the statements by the President are relevant and defers consideration of the remaining statements because they repeat themes already present in the President's comments and thus would not alter Plaintiffs' likelihood of success on the merits.

Executive officers, such as the Secretary of Homeland Security, "remain accountable to the President, whose authority they wield," Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 213 (2020), and not only are they "subject to his superintendence," Trump v.

18

Slaughter, 146 S. Ct. 2283, 2293 (2026) (quoting The Federalist No. 72, at 436 (Alexander Hamilton)), but he also may "remove those who fail to live up to" expectations, id. at 2295. Given his control over the executive branch, the Court finds that evidence of the President's motivation in declaring that he was terminating TPS is probative of whether impermissible bias entered the deliberative process.  See Centro Presente, 332 F. Supp. 3d at 414–15; Dep't of Homeland Sec. v. Regents of the Univ. of Calif., 591 U.S. 1, 38 (2020) (Sotomayor, J., dissenting) ("Taken together, 'the words of the president' help to 'create the strong perception' that the rescission decision was 'contaminated by impermissible discriminatory animus.'" (quoting Trump v. Hawaii, 585 U.S. 667, 739–40 (2018) (Sotomayor, J., dissenting))).[13]  The Mullin majority, too, appeared to assume, though it did not explicitly state, that the President's statements could factor into the equal-protection analysis.  See Mullin, 146 S. Ct. at 2138–39.

i.      Discrimination on the Basis of Race

Plaintiffs argue that they are likely to succeed on their race-discrimination claims because President Trump and others in his administration made countless statements that were "racially overt[,] . . . directly targeted at Somali people," [ECF No. 103 at 12], and "explicitly tie[d] racialized notions about Somalis' alleged criminality to demands for their expulsion," [ECF No. 92 at 21–22].  Though Plaintiffs lay out a strong case for why the at-issue statements were racist, see [ECF No. 92 at 23–27], after Mullin, which included a constitutional race-discrimination claim, the Court cannot discern a path to concluding that Plaintiffs will succeed on the merits of this claim.

---

[13] Given the timeline of President Trump's statements in this case relative to the termination decision, see generally [ECF No. 93-14], the Court concludes that Regents, in which the Supreme Court declined to consider statements by the President with greater temporal distance from the challenged agency action, see 591 U.S. at 35, is inapposite.

In <u>Mullin</u>, the plaintiffs "offered . . . statements by the President so repellent and racially inflected that the majority decline[d] to put them in print."  <u>Mullin</u>, 146 S. Ct. at 2149 (Kagan, J., dissenting).  Among them were that Haitians were eating the dogs, cats, and other pets of the people of Springfield, Ohio; that Haitians in the United States "probably have AIDS"; that Haiti is a "filthy, dirty, [and] disgusting" "shithole"; that Haitian immigration is "like a death wish for our country"; and that Haitians, among other groups, "are 'poisoning the blood' of our country." <u>Id.</u> (alteration in original).  Despite the undisguised racial animus reflected in these statements, the majority of the Supreme Court somehow concluded that the words showed nothing more than "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies," <u>id.</u> at 2139 (majority opinion), and held that the plaintiffs were "unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation," <u>id.</u> at 2140.

Bound as it is to view things through the <u>Mullin</u> prism, the Court cannot identify any statement or combination of statements offered by Plaintiffs here that is more illustrative of racial antipathy than were those in <u>Mullin</u>, and as such, it cannot find evidence of racial animus that would distinguish this case from that one.

Plaintiffs also argue that there is additional circumstantial evidence present here that was not present in <u>Mullin</u>.  That includes "the Administration's singular focus" on Somalia, its "abrupt[] depart[ure] from decades of past practice," its immigration enforcement operations in Minnesota, the alleged fast-tracking of and interference with asylum hearings, the "considerable evidence in the record suggest[ing] that conditions in Somalia are unsafe," and President Trump's ongoing targeting of Somalia through other immigration policies.  [ECF No. 92 at 28–32].  Plaintiffs also point to President Trump's concern for and comments about white South

20

Africans, and to his administration's favoring of white Ukrainian immigrants, as evidence of white nationalism.  [Id. at 32–34].  This circumstantial evidence clearly shows that Somalia and its people are being targeted, but after Mullin, that is not sufficient to sustain a race-based equal protection claim.

ii.     Discrimination on the Basis of National Origin

Plaintiffs also allege national-origin discrimination, which is a legal theory not addressed by Mullin.  Although "the concept of national origin stands in uneasy relation to other prohibited grounds in ways that render its independent force uncertain," Aziz Z. Huq, The Double Movement of National Origin Discrimination, 87 U. Chi. L. Rev. 2397, 2401 (2020), "[j]ustices of both the right and the left on the Supreme Court have repeatedly enumerated national origin among the criteria triggering strict scrutiny pursuant to the Equal Protection Clause without a hint of protest or controversy," id. at 2400; see, e.g., Peña-Rodriguez v. Colorado, 580 U.S. 206, 252 (2017) (Alito, J., dissenting).  Decisions of lower courts have fleshed out the concept somewhat, but the body of law is not comprehensive or particularly cohesive.  See United States v. Gomez, 797 F.2d 417, 419 (7th Cir. 1986) (noting that it "obviously would be unconstitutional" to sentence a defendant more harshly on the basis of his nationality); cf. United States v. Kaba, 480 F.3d 152, 156 (2d Cir. 2007) (stating that "[a] defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." (quoting United States v. Leung, 40 F.3d 577, 586 (2d Cir. 1994)) and vacating a sentence that focused on defendant's Guinean nationality and sought to send a message "across the Atlantic"); United States v. Figueroa, 622 F.3d 739, 743–44 (7th Cir. 2010) (declining to decide whether "references to national origin, standing alone, would require reversal" because sentence could be vacated on other grounds); Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, 474 (1st Cir. 1993)

21

(upholding jury verdict on statutory race-discrimination claim because of close relationship between race and national origin).

That said, it seems evident that national origin remains subject to strict scrutiny based on the Supreme Court's recent, forceful repudiation of Korematsu v. United States, 323 U.S. 214 (1944), which it called "morally repugnant" because it approved the "forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race." Trump v. Hawaii, 585 U.S. 667, 710 (2018). Although it refers in some instances to race, however, the actual logic of Korematsu's now-repudiated holding turned on national origin. See Huq, supra, at 2409 (noting the "obvious centrality of national origin to a government policy of interning Japanese Americans (but not other Asian Americans)" and observing that Korematsu expressly justified the internment policy on the basis that it only targeted "those of Japanese origin," 323 U.S. at 218–19); Korematsu, 323 U.S. at 223 ("Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because . . . the military urgency of the situation demanded that all citizens of Japanese ancestry be segregated . . . ." (emphasis added)). Indeed, Korematsu recognized that "cast[ing] this case into outlines of racial prejudice . . . [would] confuse[] the issue" because the classification concerned national origin, not race. Id. at 223. Accordingly, the Supreme Court's repudiation of Korematsu reaffirms that national origin is a characteristic that merits the greatest degree of protection under our constitutional equal protection jurisprudence.

Nonetheless, at least at this stage of the litigation, in the absence of more settled law on national-origin discrimination and without any examples of successful challenges to federal

22

agency action based on national origin, the Court cannot conclude that Plaintiffs have sufficiently demonstrated the likelihood of success required for injunctive relief.[14]

### B.    APA Claims

Plaintiffs bring three APA claims.  Two allege that the termination violated constitutional due process and equal protection guarantees, along the lines of the arguments discussed above, and thus should be vacated pursuant to 5 U.S.C. § 706(2)(B).  See [Am. Compl. ¶¶ 268–285, 295–301].  The Court concludes that because those claims rely on a statutory cause of action, albeit one that incorporates the Constitution as a source of law, the Court's jurisdiction over them is foreclosed by the Supreme Court's decision in Mullin.  Plaintiffs are thus unlikely to succeed on those claims (and would also be unlikely to succeed if the Court did have jurisdiction, for the reasons discussed above).

Plaintiffs' third APA claim is that the Secretary lacked authority to terminate Somalia's TPS status because the Secretary was never assigned the Attorney General's power to terminate TPS, either by the HSA, the creation of DHS, or the reorganization of DOJ.  [Am. Compl. ¶¶ 302–311].  The Court has jurisdiction over this final claim because the judicial-review bar only applies to decisions by the statutorily authorized decision-maker.  See 8 U.S.C. § 1254a(b)(5)(A)

---

[14] The government correctly observes that "[d]istinctions drawn among nationalities by the Executive are a permissible feature of immigration law," [ECF No. 102 at 17], but the fact that some classifications survive constitutional scrutiny does not imply that all will.  The government directs the Court to the observation of one court, which commented that "[s]o long as such distinctions are not wholly irrational they must be sustained," Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979); see also Rajah v. Mukasey, 544 F.3d 427, 438 (2d Cir. 2008) (citing Narenji); [ECF No. 102 at 17 (citing Rajah)], but it appears that the court that originally stated that proposition relied on cases concerning more general distinctions, rather than the targeting of particular national groups, see Narenji, 617 F.2d at 747.  Furthermore, the government must provide an explanation for the distinctions it draws, and regardless of what standard of review applies, government action cannot rest on "a bare . . . desire to harm a politically unpopular group."  Romer v. Evans, 517 U.S. 620, 634–35 (1996) (quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)).

(barring "judicial review of any determination of the Attorney General").  Here, the issue is not the decision itself, but rather whether, after the reorganization of DHS, the authorized decision-maker is the Attorney General or the Secretary.  Compare [ECF No. 92 at 35–39], with [ECF No. 102 at 20–22].  If Defendants are correct that the decision-maker can be the Secretary, the judicial-review bar applies, but if Plaintiffs are correct that the decision-maker must be the Attorney General, it does not.  Under such circumstances, where the question of jurisdiction "entirely overlap[s]" with the merits, the Court may decide the jurisdictional issue, even if its conclusion could "in effect deprive [it] of jurisdiction."  Brownback v. King, 592 U.S. 209, 218 (2021); see also Doe v. Noem, No. 25-cv-15483, Dkt. No. 115, at 13–14 (N.D. Ill. Aug. 7, 2026).

Briefly put, for the reasons recently articulated by another session of this Court, see Afr. Cmtys. Together v. Noem, No. 25-cv-13939, Dkt. No. 122, at 5–11 (D. Mass. Aug. 7, 2026);[15] see also Doe v. Noem, No. 25-cv-15483, Dkt. No. 115, at 14–19 (N.D. Ill. Aug. 7, 2026), the Court concludes that the Secretary was assigned the Attorney General's power to terminate TPS by the HSA and subsequent reorganization.  Accordingly, the challenged decision to terminate Somalia's TPS designation was within the Secretary's authority, and Plaintiffs are unlikely to succeed on this claim.

## C.    Remaining Factors

In the interest of a complete record of its decision, the Court reaches the remaining factors despite its conclusion that Plaintiffs have not demonstrated a likelihood of success on the merits, thus precluding injunctive relief.  Plaintiffs have made a convincing showing that they will suffer irreparable harm if the injunction is withheld, see [ECF No. 92 at 41–43], and the

---

[15] Because Plaintiff African Communities Together is a party to that case, the Court assumes familiarity with that order.

balance of hardships and the public interest also favor Plaintiffs, given that the government has made no showing that maintaining TPS status for the duration of this litigation would impose an undue burden apart from any injury inherent in delayed enforcement of the executive's priorities, see [ECF No. 102 at 23–24 (first citing Trump v. CASA, Inc., 606 U.S. 831, 861 (2025); and then citing Nken v. Holder, 556 U.S. 418, 435–36 (2009))].

IV.     **CONCLUSION**

For the foregoing reasons, the government's motions to lift the administrative stay, [ECF No. 97]; [ECF No. 108], are **GRANTED**, and Plaintiffs' emergency motion, [ECF No. 91], is **DENIED**.[16]

**SO ORDERED.**

August 14, 2026                                      */s/ Allison D. Burroughs*
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE

---

[16] As noted previously, Plaintiffs' first emergency motion, [ECF No. 3], is **DENIED AS MOOT**.