UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*, et al.,

Defendants.

Case No. 26-cv-11201-ADB

**LEAVE TO FILE GRANTED ON SEPTEMBER 14, 2026**

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

## I. INTRODUCTION

Defendants respectfully move to dismiss Plaintiffs' amended complaint, which asserts five claims asking the Court to review and set aside the Secretary of Homeland Security's termination of Somalia's Temporary Protected Status (TPS) designation. *See* Doc. No. 90. The amended complaint should be dismissed because (1) 8 U.S.C. § 1254a(b)(5)(A) prohibits judicial review of Plaintiffs' claims regarding a TPS termination; (2) 8 U.S.C. § 1252(f)(1) independently precludes courts from enjoining or restraining the operation of the TPS statute; and (3) Plaintiffs' allegations fail to state a plausible claim under either the Administrative Procedure Act (APA) or the Constitution.

## II. BACKGROUND

### A. Somalia's TPS Designation.

The Secretary of Homeland Security is authorized to designate a foreign country for TPS if the Secretary finds that, as relevant here, "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state

. . . would pose a serious threat to their personal safety," 8 U.S.C. § 1254a(b)(1)(A), or if the Secretary finds that there are "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States," 8 U.S.C. § 1254a(b)(1)(C).

Initial TPS designations are discretionary and must be periodically reviewed to determine whether the conditions underlying a country's TPS designation continue to be met. 8 U.S.C. § 1254a(b)(2), (b)(3)(A). The Secretary must "consult[] with appropriate agencies," and, if he determines that a country's TPS designation is no longer justified, must "terminate the designation by publishing notice in the Federal Register of th[at] determination." 8 U.S.C. § 1254a(b)(3)(A), (B). The notice must explain the "basis for the determination." *Id.*

Somalia was initially designated for TPS on September 16, 1991, based on a determination that there were "extraordinary and temporary conditions" in Somalia that prevented Somali nationals from returning in safety. *Designation of Nationals of Somalia for [TPS]*, 56 Fed. Reg. 46804 (Sept. 16, 1991). Following the initial designation, Somalia's TPS designation was extended nine times between September 17, 1992, and September 17, 2001. *See* Termination, 91 Fed. Reg. at 1547-48 & nn.1-10. In September 2001, Somalia's TPS designation was extended and newly redesignated. *Id.* at 1548 & n.11. The designation was then extended eight times, between September 17, 2002, and September 17, 2012. *Id.* & nn.12-19. A redesignation in July 2002 designated Somalia for TPS on the dual bases of ongoing armed conflict and extraordinary and temporary conditions, and subsequent designations included these dual bases as justification for continued designation. *Id.* & n.20. In May 2012, the designation was extended, and Somalia again was newly redesignated. *Id.* & n.21. The designation was extended five more times, from

March 18, 2014, to September 17, 2021. *Id.* & nn.22-26. After that, Somalia's TPS designation was extended and newly redesignated three times, from September 18, 2021, to March 17, 2026. *Id.* & nn.27-29.

On January 14, 2026, the Secretary of Homeland Security announced the Termination, which provides that, "[a]fter reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Somalia no longer continues to meet the conditions for designation for [TPS]." 91 Fed. Reg. at 1547.

**B. This Litigation.**

Plaintiffs sued on March 9, 2026, asserting claims under the APA and the equal-protection guarantee of the Fifth Amendment. Dkt. No. 1. That same day, they filed an emergency motion seeking an administrative stay and a postponement under 5 U.S.C. § 705 to postpone the effective date of the Secretary's termination of Somalia's TPS designation. Dkt. Nos. 2-5, 11. On March 13, 2026, this Court granted the motion in part, implementing an administrative stay and deferring ruling on the postponement until the administrative record had been produced and the parties had fully briefed the issues. Dkt. No. 33. On April 29, 2026, after the administrative record had been filed and the parties had submitted their briefs, the Court entered an electronic order asking whether the parties opposed a stay of the litigation pending the decision of the Supreme Court in *Mullin v. Doe* and *Trump v. Miot*. Dkt. No. 70. Upon being advised that neither party opposed such a stay, this Court implemented it on May 1, 2026. Dkt. No. 73.

On June 25, 2026, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," while also finding that an equal-protection claim—analogous to the one asserted by Plaintiffs here—was flawed and not likely to succeed on the merits. *Mullin v. Doe*, 146 S. Ct. 2121, 2137–40 (2026).

On July 1, 2026, Defendants filed a motion to lift the abeyance and the administrative stay. Dkt. No. 77. The Court lifted the abeyance but not the administrative stay. Dkt. No. 78. On July 9, 2026, the parties submitted a joint status report that included their positions on a briefing schedule, and on July 13, 2026, the Court issued a scheduling order. Dkt. Nos. 79, 82.

On July 20, 2026, Defendants filed a notice of appeal in the First Circuit Court of Appeals, and the following day filed in the First Circuit a motion for summary reversal and vacatur of this Court's administrative stay, or in the alternative, a writ of mandamus directing the Court to dissolve the administrative stay. On July 24, 2026, Plaintiffs filed a response to Defendants' appeal, and on July 27, 2026, Defendants filed their reply.

On July 30, 2026, Plaintiffs filed a renewed motion for postponement and for a preliminary injunction. Dkt. No. 91. Plaintiffs also filed an Amended Complaint. Doc. No. 90. The Court entered an electronic order on July 31, 2026, in which the Court, *inter alia,* dissolved the Court's previous administrative stay and entered a new administrative stay to be in effect until further order of the Court. Dkt. No. 94. In light of this order, the First Circuit declined to retain jurisdiction and remanded for further proceedings. Dkt. No. 95 (Judgment). On August 3, 2026, Defendants filed a motion to lift the new administrative stay. Dkt. No. 97. On August 4, 2026, the Court issued an order that, *inter alia,* amended the briefing schedule. Dkt. No. 98. Pursuant to that order, Defendants filed their opposition to Plaintiffs' renewed motion for postponement and for a preliminary injunction on August 5, 2026, Doc. No. 102, and Plaintiffs filed their reply on August 6, 2026, Doc. No. 103.

This Court issued its Memorandum and Order on Plaintiffs' emergency motion seeking postponement of agency action and a preliminary injunction, and Defendants' motions to lift the administrative stay, granting Defendants' motions to lift the stay and denying Plaintiffs'

emergency motion for postponement and a preliminary injunction. *See African Communities Together [ACT] v. Mullin*, --- F. Supp. 3d ---, 2026 WL 2364398 (D. Mass. Aug. 14, 2026), *appeal pending*, No. 26-1930 (1st Cir. filed Aug. 17, 2026).

## III. STANDARD

A court should dismiss claims under Rule 12(b)(1) when it lacks jurisdiction to decide them. That includes where, as here, § 1254a(b)(5)(A) applies. *See Ramos v. Wolf*, 975 F.3d 872, 888 (9th Cir. 2020) (treating § 1254a(b)(5)(A) as a "jurisdictional statute"), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

In addition, a court should dismiss claims under Rule 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)). In making this determination, the court should disregard legal conclusions but must treat "[n]on-conclusory factual allegations" as true. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Ordinarily, the dispositive question in an APA case concerns "not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). "This does not mean, however, that Rule 12(b)(6) can never be in play in an APA [case]." *Id.* at 76 n.4. As the First Circuit has explained, "[s]uch a motion may be appropriate in certain circumstances," including where, as here, "the agency claims that the underlying premise of the complaint is legally flawed (rather than factually unsupported)." *Id.*

## IV. ARGUMENT

### A. Section 1254a(b)(5)(A) prohibits judicial review of Plaintiffs' claims.[1]

The TPS statute unambiguously provides that "[t]here is no judicial review of *any* determination of the [Secretary] with respect to the designation, *or termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute clearly commits TPS termination determinations to the Secretary's unreviewable authority and precludes courts from hearing lawsuits challenging the legality of those determinations. Plaintiffs' lawsuit seeks to challenge—indeed, set aside or vacate—the Secretary's determination to

[1] Defendants recognize that in ruling on Plaintiffs' motion for postponement the Court determined that "although § 1254a(b)(5)(A) may bar review of statutory claims, the Court does not find that to be true of constitutional claims." *ACT v. Mullin*, 2026 WL 2364398, at *5. Respectfully, Defendants disagree, but recognize that the Court determined on other grounds that Plaintiffs failed to establish that their constitutional claim was likely to succeed on the merits.

terminate Somalia's TPS designation. The Court should therefore dismiss this case based on a straightforward application of § 1254a(b)(5)(A).[2]

The plain meaning of the statute's terms confirms its broad sweep—as recognized by the Supreme Court. The modifier "any"—in the phrase "any determination"—sweeps broadly and encompasses determinations "of 'whatever kind.'" *Patel v. Garland*, 596 U.S. 328, 338 (2022). The term "with respect to" likewise "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Doe*, 146 S. Ct. at 2133 (citing *Patel*, 596 U.S. at 339). Indeed, the Supreme Court has held similar jurisdiction-stripping language in the INA was expansive enough to preclude judicial review of factual findings. *Patel*, 596 U.S. at 337-40 (statute barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter). Accordingly, all of Plaintiffs claims are barred by 8 U.S.C. § 1254a(b)(5)(A), which by its terms applies just as squarely to constitutional claims as it does to statutory claims.

At minimum, and as recently held by the Supreme Court, 8 U.S.C. § 1254a(b)(5)(A) "applies to all non-constitutional claims." *Doe,* 146 S. Ct. at 2137. The Supreme Court reasoned that this bar on judicial review applies not only to the substantive TPS determination, but also to

[2] In all events, to sue a federal agency and its officials, a plaintiff must identify an express waiver of sovereign immunity and show that its claim falls within the waiver's scope. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012). Although the APA contains a limited waiver of sovereign immunity for claims seeking non-monetary relief, it does not affect "other limitations on judicial review," and does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702. Moreover, the APA does not permit challenges to "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, the TPS statute contains a direct limitation on judicial review, expressly (or, at minimum, impliedly) forbids the relief Plaintiffs seek, and commits TPS termination determinations to the Secretary's discretion. 8 U.S.C. § 1254a(b)(5)(A). Plaintiffs therefore cannot rely on the APA's waiver of sovereign immunity to bring their claims.

claims based on purported procedural errors and any subsidiary determinations as well. *Id.* at 2134, 2136.

Realizing that non-constitutional claims are unreviewable under *Doe*, Plaintiffs frame Counts One and Two of their amended complaint in terms of due process violations. However, as discussed below, "challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering," *id.* at 2136, such as labeling as "procedural" claims that are substantive in nature. *Id.*

Plaintiffs allege that they have protected liberty and property interests "in the attendant benefits that the TPS statute confers." Doc. No. 90, ¶ 272. To safeguard their liberty and property interests, Plaintiffs allege that a TPS designation may be terminated only after the Secretary "meaningfully consult[s] with appropriate federal agencies" and conducts a "review" of the "conditions in the foreign state." Doc. No. 90, ¶¶ 281-282 (citing 8 U.S.C. § 1254a(b)(3)(A)). Plaintiffs further allege the Secretary disregarded these processes and instead reached a conclusion that was "preordained" and "pretextual." Doc. No. 90, ¶¶ 282-283. Plaintiffs assert that such alleged errors rise to the level of a due process violation, but their due process claims fail for four reasons.

*First*, and most fundamentally, § 1254a(b)(5)(A) bars review of these claims. That provision bars "judicial review" of decisions to terminate TPS, without distinguishing between statutory and constitutional claims any more than it distinguishes between procedural and substantive claims. The Supreme Court reserved the question whether the judicial review bar applies to constitutional claims. But even if some constitutional claims could theoretically proceed despite the blanket prohibition on "judicial review" of TPS termination decisions, it is particularly clear that Plaintiffs' "due process" claim is barred because it is a straightforward retread of the same claims the Supreme Court already held were covered by the judicial-review bar.

The plaintiffs in *Doe*—like Plaintiffs here—sought to challenge a TPS termination "based on alleged procedural errors," including that the Secretary did not adequately consult with appropriate federal agencies and that the Secretary's decision was pretextual and preordained. *Doe*, 146 S. Ct. at 2133; *see also* Doc. No. 90, ¶¶ 282-283. The Supreme Court, however, held that the judicial-review bar applied precisely to those claims. *Id.* And, in so doing, it took care to emphasize the "importan[ce]" of "ensur[ing] that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering" such as labeling as "procedural" claims that are substantive in nature. *Id.* at 2136. Here, the Court should look beyond the mere "constitutional" label and recognize these claims for what they clearly are: challenges based on the Secretary's purported failure to adhere to *statutory* requirements. *See Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) (Breyer, J.) ("In examining a complaint we are bound to look beyond the literal meaning of the language used to ascertain the real cause of the complaint."). "A petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an argument in constitutional garb." *Mehilli v. Gonzales*, 433 F.3d 86, 93 (1st Cir. 2005) (quotation marks and alterations omitted). "Any other result would elevate form over substance and allow parties to evade" the TPS judicial-review bar "by relabeling their" statutory claims as constitutional ones. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

*Second*, the procedural due process constraints that Plaintiffs seek to invoke do not apply to the Secretary's determinations to designate a country for TPS or to extend or terminate a TPS designation. *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245-46 (1973) (distinguishing, for due process purposes, between agency decisions that

"adjudicate disputed facts in particular cases" and those that involve "the formulation of a basically legislative-type judgment, for prospective application only"). These constraints instead come into play when the government "adjudicate[es]" an individual's "rights or liabilities." *Harper v. Werfel*, 118 F.4th 100, 115 (1st Cir. 2024); *see Trager v. Peabody Redevelopment Auth.*, 367 F. Supp. 1000, 1002 (D. Mass. 1973) ("The procedural due process requirements of notice and hearing attach themselves wherever there is need for an adjudicative hearing."). They do not, by contrast, apply where—as here—the government "weigh[s] general information and ideas affecting relatively large numbers of people . . . whose rights are affected as part of" the government's execution of "an overall [legislative] scheme." *Id.* at 1002. Plaintiffs' procedural due process claims are predicated on the "three-part balancing test articulated" in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Doc. No. 71, ¶ 252. But *Mathews* is entirely the wrong framework, as it applies to "individual adjudications," not the sort contemplated in determining TPS designations. *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir. 2011). Although they attempt to do so, *see* Doc. No. 90, ¶ 280, Plaintiffs cannot successfully state a claim for relief based on *Mathews*.

*Third*, Plaintiffs' allegations turn exclusively on statutory procedural requirements and thus fail to state a due process claim on their own terms. Plaintiffs claim that Somalia's TPS designation was terminated without due process of law based solely on their allegations that the Secretary failed to follow certain "procedural safeguards in *the TPS statute*." *See* Doc. 90, ¶ 279 (emphasis added). But, as "[t]he First Circuit has . . . confirmed," "not every statutory violation has a 'constitutional dimension' or is '[ ]tethered to the abridgment of constitutional rights.'" *United States v. Sabean*, 2016 WL 5721135, at *7 (D. Me. Oct. 3, 2016) (citing *United States v. Adams*, 740 F.3d 40, 43 (1st Cir. 2014)); *see Arguello v. Noem*, No. 2:25-cv-00786-RJS, 2025 WL

2896849, at *6 (D. Utah Oct. 9, 2025) ("a statutory violation does not necessarily amount to a constitutional procedural due process violation").

The two cases that Plaintiffs reference in their amended complaint on this issue illustrate the point. *See* Doc. No. 90, ¶ 279. In *Portillo-Rendon v. Holder*, 662 F.3d 815 (7th Cir. 2011), the Seventh Circuit took pains to distinguish between alleged due process violations and alleged statutory or regulatory violations: "it is appropriate to consider the Constitution only if the statute and regulations are deficient." *Id.* at 817. The court explained that if an agency failed to provide the "process required by the statute," the court could "provide relief on statutory grounds." *Id.* And it cautioned that "intoning 'due process'" would not "cover" the same ground as the procedural protections afforded by statutes and regulations. *Id.* Subsequently, in *Adame v. Holder*, 762 F.3d 667 (7th Cir. 2014), the Seventh Circuit cited *Portillo-Rendon* and included a parenthetical explanation stating that "a petitioner may have a legal claim when she can show statutory procedural shortfalls." *Id.* at 672. The point being that an agency's failure to abide by statutory procedures may give rise to a *statutory* claim—not a constitutional one.

In short, a failure to abide by statutory *procedural* requirements would only amount to a due process violation if those requirements encompassed or were coextensive with the demands of the Due Process Clause itself. And Plaintiffs' due process claims do not allege or even suggest that the Due Process Clause itself—independent of the TPS statute—would require the Secretary to consult with appropriate agencies or publish the basis for her determination in the Federal Register before terminating a country's TPS designation. Accordingly, Plaintiffs' due process claims are nothing more than statutory claims dressed up as purported constitutional violations. For this reason, they are barred by § 1254a(b)(5)(A) and, in any event, fail on their merits.

*Last*, to assert a procedural due process claim, Plaintiffs must "first" show that "there exists a liberty or property interest" to which they have "a legitimate claim of entitlement." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Where a statute creates a benefit, the plaintiff must "have more than a unilateral expectation of it." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Accordingly, a statute may give rise to a legitimate claim of entitlement only where it places "substantive limitations" on the government's exercise of discretion, *Wakinekona*, 461 U.S. at 249, and "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met," *Thompson*, 490 U.S. at 462.

Plaintiffs have no legitimate claim of entitlement to Somalia's TPS designation being extended. The TPS statute provides in relevant part that—in deciding whether to extend or terminate a designation—the Secretary "shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). It does not, however, impose any "substantive limitations" on the Secretary in determining whether these conditions continue to be met. *Wakinekona*, 461 U.S. at 249. Extending a country's TPS designation similarly rests upon the Secretary's discretionary judgment as to whether the statutory criteria continue to be met. 8 U.S.C. § 1254a(b)(3)(C).

And insofar as Plaintiffs claim an entitlement to have the Secretary follow the TPS statute's procedural provisions before terminating a TPS designation, that "would be an entitlement to

nothing but procedure," which the Supreme Court has deemed "inadequate" to form the basis of a protected interest under the Due Process Clause. *Town of Castle Rock*, 545 U.S. at 764.

In discussing Plaintiffs' due process claims, this Court observed that, in order to prevail with respect to property interests, Plaintiffs would have to "establish that the TPS statute creates a property interest in Somalia's ongoing TPS designation such that they are entitled to constitutionally sufficient process before the designation is terminated." *ACT v. Mullin,* 2026 WL 2364398, at *7. The Court noted that in attempting to do so Plaintiffs relied on a number of benefits the government must provide to TPS beneficiaries once the program is in effect, specifically, employment authorization, protection from detention, and protection from removal. *Id.,* citing Doc. No. 92 at 16. In determining that these benefits do not establish property interests in Somalia's TPS designation, the Court explained:

> TPS beneficiaries receive the benefits of TPS only for the period that their country of origin has been designated (hence the name "temporary protected status"), and when a country's TPS designation is set to expire, the Secretary must make the discretionary decision whether to terminate the designation or extend it for six to eighteen months. [Citing 8 U.S.C. § 1254a]. Because TPS beneficiaries will receive future benefits if – but only if – the Secretary decides to extend the designation of their country of origin (or to redesignate it), they have nothing "more than a unilateral expectation, [citing *Roth,* 408 U.S. at 577), in their future TPS eligibility. [Footnote omitted]. Thus, while benefits are "mandated," [citing Doc. No. 92 at 17], during the term for which a country has been designated, the periodic decision to extend that designation is discretionary and does not give rise to a cognizable property interest. [Cite omitted].

*Id.* As for liberty interests, this Court agreed with Plaintiffs that immigration detention and removal from the country implicate "core due process liberty interests" but determined that "terminating Somalia's TPS designation does not deprive anyone of these interests; it merely makes them susceptible to future deprivations." *Id.* at *8.

Further, the decision whether to grant TPS to any particular individual is also discretionary. *See* 8 U.S.C. § 1254a(a)(1)(A) (providing that the Secretary "may grant" TPS to a qualifying

national of a designated country); 8 C.F.R. § 244.2 (stating "an alien may in the discretion of the director be granted [TPS] if the alien establishes that he or she" meets the eligibility criteria); *Tobar v. Garland*, 65 F.4th 195, 196 (5th Cir. 2023) (indicating TPS is a "discretionary form of relief"); *Bah v. Cangemi*, 548 F.3d 680, 685 (8th Cir. 2008) (same); *cf. CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 328 (D. Md. 2018) (stating "the explicitly temporary nature of the [TPS] program suggests" that holders cannot establish "reliance interests"). As the First Circuit has long recognized, "discretionary forms of relief do not rise to the level of . . . a protected [due process] interest." *Rivera v. Sessions*, 903 F.3d 147, 151 (1st Cir. 2018) (quoting *DaCosta v. Gonzales*, 449 F.3d 45, 50 (1st Cir. 2006)).

Two other sessions of this court have rejected due process claims substantially the same as those in the Amended Complaint. In *African Communities Together v. Mullin*, No. 25-cv-13939 (D. Mass. Aug. 7, 2026) Doc. No. 122, the court denied the plaintiffs' motion to amend their complaint to add two new claims, one of which was a proposed due process claim asserting that the plaintiffs have constitutionally protected liberty and property interests in South Sudan's TPS designation because it affords them protection against removal and authorization to work. The court determined that the plaintiffs' proposed due process claim was closer to a challenge to a "generally-applicable" agency action and that the plaintiffs thus had no invocable individual liberty or property interests in the TPS designation. The plaintiffs also contended that the former Secretary violated their due process rights by failing to consult with appropriate agencies and to publish the true basis for the termination in the Federal Register, but the court rejected this claim as a repackaging of their previously asserted claims under the APA, which are not reviewable in light of *Mullin,* 146 S. Ct. at 3133-37.

Similarly, in *African Communities Together v. Mullin, et al.*, No. 26-cv-10278, 2026 WL 2408737 (D. Mass. Aug. 18, 2026), the court dismissed the plaintiffs' similar due process claim with respect to the termination of the TPS designation for Ethiopia for failure to state a claim on which relief could be granted because it was closer to a challenge to a 'generally applicable' agency action and thus minimal process was due. 2026 WL 2408737 at *6 (cites omitted).

**B. Section 1254a(b)(5)(A) prohibits judicial review of Counts Two and Four.**

In deciding Plaintiffs' motion for postponement, this Court determined that it lacked jurisdiction over counts two and four pursuant to Section 1254a(b)(5)(A). 2026 WL 2364398, at *11. The Court stated:

> Plaintiffs brings three APA claims. Two allege that the termination violated constitutional and equal protection, along the lines of the arguments discussed above, and thus should be vacated pursuant to 5 U.S.C. § 706(2)(B). [Citing to Doc. No. 90, ¶¶ 268-285 (count two), and ¶¶ 295-301 (count four)]. The Court concludes that because those claims rely on a statutory cause of action, albeit one that incorporates the Constitution as a source of law, the Court's jurisdiction over them is foreclosed by the Supreme Court's decision in *Mullin.* Plaintiffs are thus unlikely to succeed on the merits (and would also be unlikely to succeed if the Court did have jurisdiction, for the reasons discussed above).

*Id.* Accordingly, the Court should dismiss counts two and four for lack of jurisdiction.

**C. Section 1252(f)(1) precludes Plaintiffs' requested relief.**

In addition, granting Plaintiffs' requested relief would impermissibly restrain the Secretary's operation of the TPS statute in violation of 8 U.S.C. § 1252(f)(1), which strips "court[s] (other than the Supreme Court)" of "jurisdiction" to "enjoin or restrain the operations of part IV of this subchapter," in any "action or claim" by any "party" (with one exception not relevant here). This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Section 1254a is one of the statutory provisions that § 1252(f)(1) covers. In the U.S. Code, § 1254a appears in part V of the relevant subchapter. The public law enacted by Congress, however, strips lower courts of the authority to enjoin or restrain "the provisions of chapter 4 of title II," which contains the TPS statute (section 244 of the INA as amended). Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306 (enacting § 1252(f)), 308 (specifying section 244 as part of chapter 4), 110 Stat. 3009. When the enacted text and the U.S. Code conflict, the enacted text prevails. *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), [but] it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112. . . .").

Plaintiffs may argue that they do not seek to enjoin or restrain the operation of the TPS statute. Critically, though, § 1252(f)(1) is not limited to injunctions; it applies to any orders that "enjoin *or restrain*" a covered statute's operation, "[r]egardless of the nature of the action or claim[.]" § 1252(f)(1) (emphasis added). Thus, whether Plaintiffs' requested relief—"[s]et[ting] aside or otherwise vacat[ing] the termination of TPS for Somalia" under the APA—constitutes an *injunction* misses the point. Indeed, the word "restrain" must have independent meaning from "enjoin." Congress provided in the neighboring provision that no court shall "enjoin the removal of any alien" in certain circumstances. *Id.* § 1252(f)(2). The variation in the side-by-side provisions indicates that "restrain" was an intentional addition that carries separate meaning and broadens the sweep of § 1252(f)(1) beyond injunctions. *See City & County of San Francisco v. Environmental Prot. Agency*, 604 U.S. 334, 344 (2025).

The dispositive inquiry is thus not whether Plaintiffs seek an injunction but instead whether they seek an order that "enjoins or restrains the operation of" the TPS statute. The answer is clearly

yes. Granting Plaintiffs' requested relief would assuredly "restrain" the Secretary from exercising his authority under the TPS statute, compel the expenditure of finite governmental resources implementing a TPS designation that is contrary to the national interest, and preclude Executive officials from enforcing immigration laws in the way the Executive Branch deems appropriate. *See Aleman Gonzalez*, 596 U.S. at 549 ("restrain" means to "check, hold back, or prevent (a person or thing) from some course of action"); *see also Black's Law Dictionary* 1314 (defining "[r]estrain" as meaning to "limit" or "put compulsion upon") (emphasis omitted). Section 1252(f)(1) therefore applies and precludes the Court from granting Plaintiffs' requested relief.

**D. Plaintiffs' allegations fail to state a claim on the merits.**

Even if Plaintiffs' claims were reviewable, they fail on their merits.

**1. The Court should dismiss Counts Three and Four.**

In Counts Three and Four, Plaintiffs allege that Defendants' termination was impermissibly motivated by racial and/or national origin animus against Somali people and therefore violated the equal-protection component of the Due Process Clause of the Fifth Amendment. Doc. No. 90, ¶¶ 286-301. The Supreme Court already rejected these allegations as unlikely to support an equal protection claim in materially similar circumstances, as discussed further below. *Doe*, 146 S. Ct. at 2139-40.

As an initial matter, in citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), Plaintiffs suggest that the Court should apply "exacting scrutiny" to their equal-protection claims. Doc. No. 90, ¶ 287 n.207. In addition, this Court employed the *Arlington Heights* standard in concluding that Plaintiffs did not show a likelihood of success on the merits of their equal protection claims. 2026 WL 2364398, at *8. Respectfully, however, Defendants maintain that the Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018), prescribes

that rational-basis review governs constitutional challenges to Executive Branch immigration policies like the challenged termination and that such policies pass muster so long as they are "plausibly related" to the government's policy objective. *Id*. at 704. That deferential review reflects that "decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,'" which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Id*. at 702 (citation omitted).[3]

Like the policy at issue in *Hawaii*, TPS termination determinations involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *id.*, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. The TPS statute requires the Secretary to determine whether a foreign state is able "to handle adequately the return" of its nationals and whether conditions in the country prevent the country's nationals "from returning to the state in safety." 8 U.S.C. § 1254a(b)(1). Such determinations are fraught with potential implications for our relations with the relevant country.

Somalia's TPS designation was terminated because "Somalia no longer continues to meet the conditions for [TPS]" under the TPS statute, 91 Fed. Reg. at 1547, and the Secretary's determination easily passes rational-basis review. That determination reflected the Secretary's judgment that permitting Somali nationals to remain temporarily in the U.S. is contrary to our "national interest," considering the foreign policy, public safety, and national security

[3] In addition, nationality-based classifications drawn by Congress or the Executive under the immigration laws are reviewed for rational basis. *See Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). Moreover, as in *Kandamar*, "[t]here is nothing in this record to demonstrate outrageous discrimination." 464 F.3d at 74 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999)).

considerations that were identified. *Id.* at 1550. It was thus "plausibly related" to the government's foreign relations interests, border security priorities, and the objectives of the TPS program. *Hawaii,* 585 U.S. at 704-05. The Secretary's determination was fully consistent with Congress's goal of providing temporary relief to aliens until the conditions necessitating that relief come to an end.

But even under heightened scrutiny, Plaintiffs' allegations fail to state a claim. Under *Arlington Heights*, to establish an equal protection claim, Plaintiffs would need to prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265-66. Plaintiffs summarily assert that the "Somali people's race and national origin were at least one motivating factor in" the Secretary's termination determination. Doc. No. 90, ¶ 292. But the Court need not and should not credit that conclusory assertion, *Iqbal*, 556 U.S. at 678, particularly because it ignores the strong, race-neutral explanation the Secretary provided as to why Somalia no longer meets the criteria for TPS. 91 Fed. Reg. 1547-1553. It also ignores the foreign policy, public safety, and national security considerations cited by the Secretary in support of her determination. 91 Fed. Reg. 1550-1552. And none of Plaintiffs' remaining allegations establish a discriminatory purpose.

Plaintiffs allege that President Trump and others made discriminatory statements regarding the race and national origin of Somalis. *See, e.g.*, Doc. No. 90, ¶¶ 94-103. But the cited statements raise no plausible inference of discriminatory intent. Furthermore, some were "made in unrelated contexts," and thus "do not qualify as 'contemporary statements' probative of the decision at issue." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *see Ramos*, 975 F.3d at 898 (noting that President Trump's statements "occurred primarily in contexts removed from and unrelated to TPS policy or

decisions"). The Supreme Court considered statements virtually identical in kind in *Doe* and observed that none were "overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." 146 S. Ct. at 2138.

> For example, one may oppose TPS and favor tighter restrictions on immigration for economic or other reasons that have nothing to do with race. And a person without racial bias can provide a harshly unfavorable description of living conditions in some of the countries with TPS designations.

*Id.*

The court went on to find that the statements were "insufficient" to show that the TPS termination was based on race. *Id.* at 2139. The same is true here.

Plaintiffs' claim of national origin discrimination is even weaker. First, it fails for the same reasons as the equal-protection claim: The race-neutral explanation the Supreme Court credited in *Doe* defeats an equal-protection claim regardless of whether it is labeled race or national-origin discrimination. The Supreme Court credited the administration's "object[ion] to lengthy TPS designations" generally, reflected in its termination of every designation that had come up for review, "13 in all." 146 S. Ct. at 2139. "Ironically," the Supreme Court said, "both [respondents] identif[ied] a strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* Moreover, distinctions drawn among nationalities by the Executive are a permissible feature of immigration law and "must be upheld so long as they are not wholly irrational." *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations and quotation marks omitted)); *accord Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *see Doe*, 146 S. Ct. at 2144 (Thomas, J., concurring) ("[O]ur immigration laws have distinguished among aliens based on their national origin from the beginning," and "applicants for immigration are treated differently based on their nationality as a matter of course."); *Kandamar*, 464 F.3d at 72 ("Congress may permissibly set immigration criteria based on an alien's nationality or place of

origin"). Indeed, TPS designations expressly distinguish based on national origin, and if such distinctions were unconstitutional, TPS itself would be impermissible.

This Court determined that Plaintiffs failed to establish a likelihood of success on the merits of their equal protection claims. 2026 WL 2364398, at *10-11. In so doing, the Court observed that it could not find evidence of racial animus that would distinguish the statements in this case from those in *Mullin*. The Court also stated that it could not conclude that Plaintiffs had sufficiently demonstrated the likelihood of success on the merits of their claim of national-origin discrimination. *Id.* at *11. In sum, Plaintiffs' allegations fail to support a claim that the Secretary's TPS determination was motivated by racial animus or national origin, even when the *Arlington Heights* test is applied. Based on materially indistinguishable evidence, the Supreme Court found that the plaintiffs in *Doe* were unlikely to prove their equal protection claim. Accordingly, Plaintiffs have failed to state an equal-protection claim.

**2. The Court should dismiss Counts One and Two**

Plaintiffs' procedural due process claims fail for the reasons discussed in Section IV(A) above. *See also Olim v. Wakinekona*, 461 U.S. at 250 ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Accordingly, counts one and two should be dismissed.

**3. The Court should dismiss Count Five.**

Finally, as noted above, Plaintiffs' excess-of-statutory-authority and/or *ultra vires* claim is unreviewable from the start because it is a non-constitutional claim, and the Supreme Court has unequivocally held that "the TPS statute's judicial-review bar applies to *all* non-constitutional claims." *Doe*, 146 S. Ct. at 2137 (emphasis added).

Even if Plaintiffs' *ultra vires* claim were reviewable, it fails on the merits. In 2002 Congress created the Department of Homeland Security and reorganized responsibility for numerous Executive Branch immigration functions. A straight-forward reading of the statutes, the Supreme Court's decision in June, every lower-court decision for the past 24 years, this Court's opinion rejecting the plaintiffs' postponement order on this ground, and the practical self-defeating implications of plaintiffs' claim, confirm that the Secretary of Homeland Security holds the statutory authority to designate countries for TPS and to extend or terminate those designations.

**Statutes.** The Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135 (codified primarily at 6 U.S.C. § 101 *et seq.*) (the "Act"), established DHS and reorganized responsibility for numerous Executive Branch immigration functions. Relevant here, the "administration and enforcement" of all laws "relating to the immigration and naturalization of aliens" was transferred to the Secretary of Homeland Security. 8 U.S.C. § 1103(a)(1). Section 1103(a) carves out functions conferred upon the Attorney General, but this same section specifies that these conferred—and thus reserved—functions pertain to those previously exercised by the Executive Office for Immigration Review (EOIR): "The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to [EOIR] . . ." 8 U.S.C. § 1103(g). EOIR did not previously administer the sections of TPS statute regarding TPS country designations, extensions, and terminations. Therefore, the Attorney General did not retain such functions, which have been transferred to the Secretary. If, as Plaintiffs contend, § 1103(a) reserved to the Attorney General *all* functions that the Attorney General previously exercised, then § 1103(g) would prove redundant: There would be no need to specify that the Attorney General continues to have the functions that the Attorney General previously

exercised with respect to EOIR, because § 1103 would have already reserved those functions to the Attorney General. And it is a cardinal rule of statutory construction that courts should "avoid" interpreting a statute in a way that would render "some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).

Congress did not change the TPS statute's text to refer to the Secretary of Homeland Security because it did not need to. Instead, it relied on a series of transfer and reference-updating provisions built into the Homeland Security Act to accomplish the shift in authority. While 8 U.S.C. § 1103 charged the Secretary with the "administration and enforcement" of the immigration laws, 6 U.S.C. § 557 operated to update all other federal laws with respect to functions that were transferred to the Secretary under the Act:

> With respect to any function transferred by or under this chapter…reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

*Id.* Because TPS administration was a function of the Attorney General that was transferred to DHS, Section 557 operates to update every reference to the Attorney General in 8 U.S.C. § 1254a to mean the Secretary of Homeland Security, or in certain instances, *see* § 1254a(c), to both officials. *Id.* Since enactment of the Homeland Security Act in 2002, the courts and the agencies have recognized the Secretary of Homeland Security's authority over the designation, extension, and termination of TPS for dozens of countries.

**Judicial Constructions (including this Court's).** Reflecting the statute's clarity, every court to discuss the issue for the last 24 years has recognized the transfer of TPS authority to the Secretary of Homeland Security. It is controlling that the Supreme Court has clearly stated that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." *Doe*, 146 S.

Ct. at 2129. This was no offhand or unreasoned statement. As support, the Supreme Court cited 6 U.S.C. §§ 552(d) and 557—making clear that it specifically considered and accepted the transfer of TPS authority from the Attorney General to the Secretary. *Id.* And throughout its decision, the Supreme Court unequivocally interpreted the TPS statute as pertaining to the Secretary. That analysis controls this case.

Lower courts have universally adopted this construction, too. The Eleventh Circuit in *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137 (11th Cir. 2009), recognized that although the TPS statute references the Attorney General, decision-making authorities were transferred to the Secretary of DHS by statute (citing 8 U.S.C. § 1103(a)). The district court in *Saget v. Trump*, 375 F. Supp. 3d 280, 297 (2019), likewise recognized 8 U.S.C. § 1103 and 6 U.S.C. § 557 as the basis for the transfer of TPS designation authority to the Secretary. More recently, in *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (2025), the District of Maryland explicitly described 6 U.S.C. § 557 as "conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security." The district courts in *National TPS Alliance v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025), *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (N.D. Cal. 2025), and the Ninth Circuit in its 2025 and 2026 decisions in that same litigation, *National TPS Alliance v. Noem*, 150 F.4th 1000 (2025), *National TPS Alliance v. Noem*, 166 F.4th 739 (2026), all proceeded on the premise that the Secretary of Homeland Security exercises the authority granted by 8 U.S.C. § 1254a. Plaintiffs have not cited a single decision in which a court has concluded the Secretary of Homeland Security lacked the authority to designate a country for TPS or terminate a country's TPS designation.

In fact, another session of this court recently denied as futile the plaintiffs' effort to file an amended complaint including a count based on this *ultra vires* claim, having determined that the

Secretary has decision-making authority over TPS designations. *ACT v. Mullin*, 2026 WL 2274504, at **2-4 (D. Mass. Aug. 7, 2026), *appeal pending*, No. 26-1898 (1st Cir. filed Aug. 10, 2026). And a third session of this court dismissed a count premised on an *ultra vires* claim based on its agreement with "[t]he only courts to have squarely addressed this issue" – including this Court – that the Secretary was assigned the Attorney General's power to terminate a TPS designation. *ACT v. Mullin*, 2026 WL 2408737, at **3-5 (D. Mass. Aug. 18, 2026).

In ruling on Plaintiffs' postponement motion, this Court considered whether the authorized decisionmaker for purposes of terminating Somalia's TPS designation is the Attorney General or the Secretary, and "conclude[d] that the Secretary was assigned the Attorney General's power to terminate TPS by the H[omeland] S[ecurity] A[ct] and subsequent reorganization. Accordingly, the challenged decision to terminate Somalia's TPS designation was within the Secretary's authority, and Plaintiffs are unlikely to succeed on this claim." 2026 WL 2364398, at *12.

**Self-defeating:** Finally, as a practical matter, if this Court were to adopt Plaintiffs' theory, it would mean that the Secretary lacked authority to *redesignate,* and *extend* Somalia's TPS since the Secretary took office in 2003. Both provisions of the TPS statute refer to the "Attorney General." 8 U.S.C. § 1254a(b)(1), (b)(3)(B). If the Court were to find that the Secretary lacks authority over TPS determinations—such that the termination of Somalia's TPS designation lacks effect—it would likewise mean that many subsequent redesignations and extensions of Somalia's TPS designation lacked legal effect as well. Plaintiffs' success on the law would strip them of the protections they seek to maintain, making this claim self-defeating.

Accordingly, count five should be dismissed.

## V. CONCLUSION

For the reasons described above, the Court should dismiss the amended complaint.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: September 14, 2026

By: */s/ Robert E. Richardson*
ROBERT E. RICHARDSON
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3247
Robert.Richardson@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Robert E. Richardson*
ROBERT E. RICHARDSON
Assistant U.S. Attorney